UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
    Plaintiff,

v.     Case No. 07-14124

HOSANNA-TABOR EVANGELICAL     Honorable Patrick J. Duggan
LUTHERAN CHURCH AND SCHOOL,
    Defendant,

and

CHERYL PERICH,
    Plaintiff/Intervenor,

v.

HOSANNA-TABOR EVANGELICAL
LUTHERAN CHURCH AND SCHOOL,
    Defendant.
                               /

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 23, 2008.

PRESENT:       THE HONORABLE PATRICK J. DUGGAN
                     U.S. DISTRICT COURT JUDGE

This action arises from Plaintiff/Intervenor Cheryl Perich's ("Perich") employment relationship with Defendant Hosanna-Tabor Evangelical Lutheran Church and School ("Hosanna-Tabor"). Hosanna-Tabor officially terminated Perich from her teaching position on April 11, 2005. On May 17, 2005, Perich filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that Hosanna-Tabor had

discriminated and retaliated against her in violation of the Americans with Disabilities Act ("ADA").  The EEOC brought suit against Hosanna-Tabor for retaliation against Perich on September 28, 2007.  Perich later intervened as a plaintiff raising the same federal retaliation claim as the EEOC and adding a second retaliation claim under Michigan state law.  Presently before the Court are Hosanna-Tabor's motions for summary judgment on all claims as well as Perich's motion for summary judgment which has been joined by the EEOC.  The motions have been fully briefed and a hearing was held on September 25, 2008.  For the reasons set forth below, the Court grants Hosanna-Tabor's motions for summary judgment.

**I. Factual and Procedural Background**

Hosanna-Tabor is a religious school that teaches kindergarten through eighth grades.  Hosanna-Tabor's faculty consists of two types of teachers: "lay" or "contract" teachers and "called" teachers.  A contract teacher is hired by the Board of Education for a one year term and must renew the contract each year to continue in Hosanna-Tabor's employment.  In contrast, a called teacher is hired by the voting members of the Hosanna-Tabor Lutheran Church congregation on the recommendation of the Board of Education, Board of Elders, and Board of Directors.  To be eligible for a "call," a teacher must complete "colloquy" classes as required by the Lutheran Church-Missouri Synod that focus on various aspects of the Christian faith.  After completing the colloquy, the teacher receives a certificate of admission into the teaching ministry and the Michigan District of the Lutheran Church-Missouri Synod will assist the teacher in finding employment by placing the teacher's name on a list of teachers that is distributed to schools in need.

2

Once selected by a church congregation, a called teacher obtains the title of "commissioned minister." Called teachers are hired on an open ended basis and cannot be summarily dismissed without cause. Finally, called teachers have the opportunity to claim a special housing allowance on their income taxes provided they are conducting activities "in the exercise of ministry." (Def.'s Mot. for Partial Sum. J., Ex. Q.)

In July 1999, Hosanna-Tabor hired Perich as a contract teacher to teach kindergarten for the upcoming school year. Perich had previously been employed at other Lutheran schools and had already begun pursuing her "call" by attending colloquy classes at Concordia College. Perich completed her colloquy in February 2000 and received her call from the Hosanna-Tabor Lutheran Church on March 29, 2000.[1] From then until her termination, Perich was listed as a commissioned minister in the Lutheran Church-Missouri Synod. At least once during this time, Perich claimed the housing allowance on her taxes.

After receiving her call, Perich's employment continued unchanged in form from her time as a contract teacher. During her years with Hosanna-Tabor, Perich taught math, language arts, social studies, science, gym, art, and music. In addition, Perich taught a religion class for thirty minutes a day four days a week and attended a chapel service with her class for about thirty minutes once a week. About twice a year, Perich led the chapel service in rotation with other teachers. Hosanna-Tabor does not require that teachers

---

[1]The parties have not indicated what classes Perich took to complete her colloquy but agree that she took courses at Concordia College that satisfied the requirements for called teachers set forth by the Lutheran Church-Missouri Synod.

leading chapel or teaching religion be "called" or even Lutheran. Perich also led her classes in prayer three times a day for a total of five or six minutes and, at least during her final year as a teacher at Hosanna-Tabor, Perich's class engaged in a devotional for five to ten minutes each morning. In all, however, activities devoted to religion consumed only about forty-five minutes of the seven-hour school day.

Nonetheless, Hosanna-Tabor's website indicates that it provides a "Christ-centered education" that helps parents by "reinforcing biblical principals [sic] and standards." Hosanna-Tabor also characterizes its staff members as "fine Christian role models who integrate their faith into all subjects." Perich notes, however, that secular school subjects were taught with textbooks commonly used in public education and that she can only recall twice in her career when she introduced the topic of religion during otherwise secular discussion.

Perich's employment with Hosanna-Tabor went without incident for several years. In the summer of 2004, however, Perich became suddenly ill at a Hosanna-Tabor golf outing. As her doctor struggled to find the right diagnosis, Perich agreed with Hosanna-Tabor administrators that it would be best that she go on disability leave for the 2004-2005 school year. Perich officially went on disability leave in August. During the period she was on disability, Perich provided regular updates to Hosanna-Tabor's principal, Stacy Hoeft.

On December 16, 2004, Perich informed Hoeft via email that her doctor had finally confirmed a diagnosis of narcolepsy and that she would be able to return to work in two to four months once she was stabilized on medication. On January 10, 2005, Hoeft

informed Perich of Hosanna-Tabor's decision to hire a substitute teacher to work in Perich's absence. Until that time, another teacher had been teaching three grade levels at once to cover for Perich but the arrangement was no longer feasible. In anticipation of the 2005-2006 school year, Hoeft requested on January 19 that Perich begin considering and discussing with her doctor what she would be able to do upon return. Perich responded the same day that she would be fully functional with the assistance of medication. Perich reiterated this sentiment with additional explanation on January 21.

Also on January 21, Hoeft informed Perich of the school board's intent to amend the employee handbook to request that employees on disability for more than six months resign their calls to allow Hosanna-Tabor to responsibly fill their positions. Such resignations would not prevent employees from later pursuing reinstatement of their calls upon return to health. Perich had been on disability for over five months at the time she received this email.

On January 27 Perich informed Hoeft that she would be able to return to work between February 14 and February 28. Hoeft responded with surprise to Perich's email because, only days before, Perich had disclosed that she was unable to fill out her disability forms because of her condition. Hoeft feared that Perich's condition would jeopardize the safety of the students in her care. Hoeft also expressed concern about forcing students to adjust to a third teacher in one academic year. Three days later at a voter's meeting for the Hosanna-Tabor Church, school administrators opined that Perich would not be able to return to teaching that school year or the next. Based on this and other considerations, the congregation voted to request that Perich accept a peaceful

release agreement wherein Perich would resign her call in exchange for the congregation paying for a portion of her health insurance premiums for the remainder of the calendar year. On February 7, the school board selected Scott Salo, chairman of the board, to discuss this proposal with Perich.

On February 8 Perich's doctor gave her a written release to return to work without restrictions on February 22. The next day, Salo contacted Perich to arrange a meeting to discuss her employment. Perich instead requested to meet with the entire school board and the meeting was scheduled for February 13. At that meeting, the board presented the peaceful release proposal and Perich responded by presenting her work release note. Despite the doctor's note, the board remained concerned about Perich's ability to supervise students for an entire school day. Perich explained that she needed to return to work because, as of her doctor's release on February 22, she would no longer be eligible for disability coverage. The board, however, continued to request that Perich resign and asked her to email her decision by February 21.

Shortly after nine at night on February 21, Perich emailed Hoeft to inform her that she would not resign from her position and would be at school to resume her job in the morning. The next day there was no job for Perich to return to upon her arrival at Hosanna-Tabor. Perich, however, refused to leave school grounds until she received a letter acknowledging that she appeared for work because the Hosanna-Tabor employee handbook states that failure to return to work on the first day following the expiration of an approved medical leave is viewed as a voluntary termination. Perich subsequently received a letter from Hoeft and Salo indicating that she had provided improper

6

notification of her return to work and requesting that she continue her leave.  Perich then left the premises.

Hoeft and Perich spoke again that day over the phone; Hoeft indicated that Perich would likely be fired and Perich indicated that she would assert her legal rights against discrimination and asked Hoeft to pass that information along to the boards.  Perich also emailed Hoeft and stated that her doctor had reaffirmed that she was healthy and ready to work.  In a letter dated February 22, however, the Board of Education described Perich's conduct as "regrettable" and indicated that they would be reviewing the process of rescinding her call on account of her disruptive behavior.

On March 19, the Board of Education sent Perich a second letter stating that they would request that her call be rescinded at the voter's meeting of the Hosanna-Tabor Church on April 10.  The cited reasons for this action included Perich's "insubordination and disruptive behavior" on February 22.  The board also felt that Perich had "damaged beyond repair" her working relationship with Hosanna-Tabor by "threatening to take legal action."  The Hosanna-Tabor Constitution and By-Laws allow the congregation to depose a "Pastor or duly Called Professional Minister" for, among other reasons, "[w]illful neglect of official duties without cause" or "[e]vident and protracted incapacity to perform the functions of the sacred office."  Three-fourths approval of the voting members present at a meeting is required for such action.  After informing Perich of this procedure, the March 19 letter went on to reinstate the peaceful release offer originally proposed on February 13.  Perich was given until April 8 to accept the offer.

On March 21 Perich's legal counsel sent a letter to Hosanna-Tabor's legal counsel

suggesting that Hosanna-Tabor's actions amounted to unlawful disability discrimination. Perich's counsel implored Hosanna-Tabor to seek a peaceful resolution to the matter before Perich was forced to file a complaint with the EEOC or institute a law suit. Nonetheless, on April 10, 2005, the voting members of the Hosanna-Tabor Lutheran Church congregation voted to rescind Perich's call. Perich was informed by letter the next day. Perich responded by filing a charge of discrimination and retaliation with the EEOC on May 17.

On September 28, 2007, the EEOC filed a complaint against Hosanna-Tabor alleging one count of retaliation in violation of the ADA. Perich moved to intervene on March 11, 2008. Perich's motion was granted on April 10, 2008, and Perich filed a complaint against Hosanna-Tabor on the same day. Perich's complaint includes one count of retaliation under the ADA and one count of retaliation under Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"). Presently before the Court are motions for summary judgment from all parties on all counts. The issues presented include the applicability of the "ministerial exception," the timeliness of Perich's PDCRA claim, and the existence of direct and circumstantial evidence of retaliation by Hosanna-Tabor because Perich threatened legal action.

## II. Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56©). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56©) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

### III. The "Ministerial Exception"

Along with its prohibition of discrimination on the basis of race, color, religion, sex, and national origin, Title VII of the Civil Rights Act of 1964 contains a "ministerial exception" allowing religious employers to prefer members of their own faith for certain positions. 42 U.S.C. §§ 2000e-1(a) to 2000e-1(a). Although this exception specifically allows discrimination only on the basis of religion, courts have interpreted the First

9

Amendment to require that religious employers be permitted even more liberty in their employment decisions and have therefore extended the exception to discrimination against other protected classes. *See, McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972); *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007). The same reasoning makes the ministerial exception applicable to claims made under the ADA. *Hollins*, 474 F.3d at 225. Furthermore, the Michigan Court of Appeals recently acknowledged that the ministerial exception, as understood in federal law, applies to discrimination claims made against religious employers in Michigan. *Weishuhn v. Catholic Diocese of Lansing*, — N.W.2d —, 279 Mich. App. 150, 2008 Mich. App. LEXIS 1073, at *1 (Mich. Ct. Appl. May 22, 2008).

Where the ministerial exception applies, it deprives federal courts of subject matter jurisdiction and bars the plaintiff's claims. *Hollins*, 474 F.3d at 224-25. The exception does not apply, however, to all claims made against religious employers. "In order for the ministerial exception to bar an employment discrimination claim, the employer must be a religious institution and the employee must have been a ministerial employee." *Id.* at 225. For purposes of the ministerial exception, "religious institutions" includes religiously affiliated schools, *see id.*, and the parties do not dispute that Hosanna-Tabor meets this requirement. Therefore, the primary issue is whether Perich served as a ministerial employee.

**A. Ministerial Employees**

An employee's status under the ministerial exception is a legal conclusion that rests with the court. *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999). Although the

exception most clearly applies to clergy and ordained ministers, it is not limited to such employees. *Hollins*, 474 F.3d at 226; *Rosati v. Toledo, Ohio Catholic Diocese*, 233 F. Supp. 2d 917, 921 (N.D. Ohio 2001). To determine if other employees fall within the exception, courts consider whether "the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Hollins*, 474 F.3d at 226 (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985)). Accordingly, an employee may be considered ministerial, although not ordained, depending on the function and actual role of his or her position in the religious institution. *Id.*; *Starkman*, 198 F.3d at 176-77 (5th Cir. 1999). "This approach necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church . . . ." *Rayburn*, 772 F.2d at 1169.[2]

---

[2]At the September 25, 2008, hearing on these motions, defense counsel asserted that this Court need not apply the "primary duties" test to the present case because Perich's position as a "Commissioned *Minister*" automatically makes her a *ministerial* employee. Plaintiff's counsel countered that there is a distinction between "ordained" and "commissioned" ministers and that the exception applies automatically only to the former.

Ordained or not, interference with a religious institution's employment decisions regarding what they have labeled "commissioned" *ministers* threatens the religious freedom guaranteed by the First Amendment. In *Rayburn*, the Fourth Circuit explained, "The right to choose *ministers* without government restriction underlies the well-being of religious community," and further held, "Where the values of state and church clash or where there is a differing emphasis among priorities or as to means in an employment decision of a theological nature, the church is entitled to pursue its own path without concession to the views of a federal agency or commission." 772 F.2d at 1167, 1171 (emphasis added). It is this Court's opinion, then, that Hosanna-Tabor is entitled deference in its decision to treat Perich as a minister even though the EEOC argues otherwise.

Nonetheless, this Court acknowledges that it was the *Rayburn* Court that first used

11

Despite widespread consensus about how to identify ministerial employees, the courts remain sharply divided about what positions fit the criteria. *See* Note, *The Ministerial Exception to Title VII: The Case for a Deferential Primary Duties Test*, 121 Harv. L. Rev. 1776, 1787-88 (2008) ("[J]udicial evaluations of the role of employees–from parochial school teachers to church organists–has not created any discernibly consistent pattern." (footnotes omitted)); Janet S. Belcove-Shalin, *Ministerial Exception and Title VII Claims: Case Law Grid Analysis*, 2 Nev. L.J. 86, 115 ("Applying these guidelines to specific cases has not yielded consistent results."). In fact, there are courts on both sides of the issue when it comes to elementary school teachers in religious schools.

Several courts considering the employment status of teachers in religious schools have concluded that, when those teachers primarily teach secular subjects, the ministerial exception does not apply. *Redhead v. Conference of Seventh Day Adventists*, 440 F. Supp. 2d 211, 221-22 (E.D.N.Y. 2006); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849, 854 (S.D. Ind. 1998). *Redhead* and *Guinan* involved fifth grade elementary school teachers whose daily schedules included teaching religion but who primarily taught secular subjects. *Redhead*, 440 F. Supp. 2d at 214; *Guinan*, 42 F. Supp. 2d at 850, 852. Beyond teaching religion for one hour a day, Redhead attended a

---

the primary duties test and that the only other known case to deal with a "commissioned" minister did the same. *Rayburn*, 772 F.2d at 1169; *Clapper v. Chesapeake Conference of Seventh Day Adventists*, No. 97-2648, 166 F.3d 1208 (table), 1998 WL 904528 (4th Cir. Dec. 29, 1998). Therefore, this Court proceeds with an analysis of the primary duties test but considers Perich's title relevant to identifying the precise contours of her "primary duties."

worship service with her students only once a year. 440 F. Supp. 2d at 214. Guinan, meanwhile, organized Mass for the students once a month and was only permitted to teach religion by virtue of the fact that she qualified as a "catechist"–meaning she was a "teacher of Christianity."[3] 42 F. Supp. 2d at 850. Despite their religious responsibilities, the *Redhead* and *Guinan* courts refused to find that the women were "ministerial" employees. The *Guinan* court explained its decision by noting that "[t]he vast majority of Guinan's duties involved her teaching secular courses," that "the Archdiocese did not require teachers at [the school] to be Catholic," and that "the application of the ministerial exception to non-ministers has been reserved generally for those positions that are, at the very least, close to being exclusively religious based . . . ." *Id.* at 852-53. The *Redhead* court similarly focused on the fact that Redhead's religious activities "were limited to only one hour of Bible instruction per day and attending religious ceremonies with students only once per year." 440 F. Supp. 2d at 221.

The *Guinan* opinion also relied on the Second Circuit's analysis in *DeMarco v. Holy Cross High School*. 4 F.3d 166 (2d Cir. 1993). Although it discusses the issue in the context of the First Amendment rather than specifically defining the "ministerial exception," *DeMarco* presents one of the few circuit court opinions to address the application of employment discrimination laws to teachers at religious schools. Ultimately the court concluded that analyzing a Catholic high school math teacher's age

---

[3]Guinan, in particular, qualified as a Catechist because she attended a Catholic college and took eighteen hours of theology. 42 F. Supp. 2d at 850 n.2. The threshold requirements for a Catechist, however, were not explored by the court.

discrimination claim would not violate the First Amendment even though that teacher was responsible for leading students in prayer and taking them to Mass. *Id.* at 172. Important to the decision, however, was the fact that the defense asserted by the school–that DeMarco failed to begin class with prayer and attend Mass with his students–only required resolution of a factual dispute:

> Given that the religious duties that DeMarco allegedly failed to carry out are easily isolated and defined, we are confident that the able district judge will be able to focus the trial upon whether DeMarco was fired because of his age or because of failure to perform religious duties, and that this can be done without putting into issue the validity or truthfulness of Catholic religious teaching.

*Id.* Adjudication of this type of factual dispute, according to the Second Circuit, does not result in excessive entanglement of government and religion. *Id.*[4]

In sharp contrast to the aforementioned cases, however, is the Fourth Circuit's unpublished opinion in *Clapper v. Chesapeake Conference of Seventh Day Adventists*, No. 97-2648, 166 F.3d 1208 (table), 1998 WL 904528 (4th Cir. Dec. 29, 1998). There, the Fourth Circuit focused on the school's mission of obtaining "the salvation of each student's soul through his or her indoctrination in Seventh-day Adventist theological

---

[4]The Third Circuit came to a similar conclusion in *Geary v. Visitation of the Blessed Virgin Mary Parish School*. 7 F.3d 324, 330 (3d Cir. 1993) ("A conclusion that the religious reason did not in fact motivate dismissal would not implicate entanglement since that conclusion implies nothing about the validity of the religious doctrine or practice and, further, implies very little even about the good faith with which the doctrine was advanced to explain the dismissal."). The Third Circuit went on to warn, however, that "the First Amendment dictates that a plaintiff may not challenge the validity, existence or 'plausibility' of a proffered religious doctrine, and we caution that the ADEA would not apply in such a case." *Id.*

14

beliefs." *Id.* at *1. In accord with this mission, the school's education code required "that the beliefs and practices of every teacher employed by the Chesapeake Conference be in complete harmony with the beliefs and practices of the Seventh-day Adventist Church." *Id.* at *2. Teachers were required to be tithe paying members of the church, were expected to participate in church activities, and were paid up to thirty percent of their salaries by church tithes.[5] Additionally, the education code required teachers to "[l]ook upon Christian teaching as a holy vocation" and awarded "a 'Commissioned Ministry of Teaching Credential' to its full-time elementary school teachers who, although they may not have undergone formal ministerial training, have demonstrated great experience and spiritual commitment to the Church." *Id.* at *3.

Like the case before this Court, the plaintiff in *Clapper* had obtained his Commissioned Ministry of Teaching Credential and engaged in various religious activities with his students throughout the school day. *Id.* Clapper's daily routine included leading his students in prayer three times a day and any time upon request, conducting worship for about ten minutes a day, teaching Bible as part of the school curriculum, and engaging the students in the practice of witnessing, "which encourages them to apply their faith in a practical way." *Id.* When appropriate, Clapper also integrated church theology into the secular portions of the academic curriculum. *Id.*

---

[5]At the September 25, 2008, hearing, defense counsel indicated that up to 50% of Hosanna-Tabor's funding–which is then used to pay teacher salaries–comes directly from the tithes and offerings of church members. Although there is no particular reason to doubt this statement, the Court cannot find support for it in the record and therefore does not place heavy reliance upon it.

Based on these facts, the Fourth Circuit concluded that Clapper was a ministerial employee and, therefore, that his employment discrimination claim was barred by the ministerial exception. *Id.* at *8. The court was not persuaded by Clapper's "attempts to downplay the ministerial nature of his former teaching positions at [the school] by asserting that the time he spent instructing his students in Bible and leading them in worship constituted only 10.6 percent of his work week." *Id.* at *4. The court refused to reduce the primary duties test to "a purely quantitative test" but rather opined that:

> While the relative quantity of time an employee of a religious entity spends directly teaching and spreading the faith, providing church governance, supervising a religious order, or supervising or participating in religious ritual and worship is important in determining whether those activities are the primary duties of such employee, the degree of the church entity's reliance upon such employee to indoctrinate persons in its theology is equally important.

*Id.* at *7. Ultimately the court held that "[w]hat is of constitutional significance is whether, in the total mix of circumstances, enforcement of Clapper's action would substantially infringe upon the Chesapeake Conference's right to choose its spiritual leaders." *Id.* With this focus in mind, the court concluded that Clapper's claims could not proceed. *Id.*

Still other cases, though not specifically concerning elementary teachers in religious schools, provide guidance in the analysis of Perich's employment status. Based on the use of the primary duties test to identify ministerial employees, courts have made it clear that "application of the [ministerial exception] depends on the function of the position and not on categorical notions of who is or is not a minister." *Rosati*, 233 F. Supp. 2d at 921.

16

Nonetheless, this understanding of the rule has generally been used to extend application of the exception to employees who lack official ministerial titles or ordination, not to support holdings that "ministers" are not ministerial employees. *See, e.g.*, *Rayburn*, 899 F.2d at 1168-69. The Seventh Circuit, however, recognized in dicta a possible need for the latter use of the rule where a church uses the title as mere subterfuge; in those cases, the designation will not provide protection from employment discrimination laws. *See Tomic v. Catholic Diocese of Peoria*, 412 F.3d 1036, 1039 (7th Cir. 2006) ("[I]f to avoid having to pay minimum wage to its janitor a church designated all its employees 'ministers,' the court would treat the designation as a subterfuge.").

Finally, the defense asserted by Hosanna-Tabor was analyzed in dicta in another Seventh Circuit case. Although *Schleicher v. Salvation Army* involved ordained ministers alleging violations of the Fair Labor Standards Act ("FLSA"), the court resorted to a hypothetical retaliation claim to explain why it could not apply the FLSA to the ministers:

> If they charged retaliation, and the Salvation Army replied that they had been fired because their filing a suit seeking to enforce wage and overtime claims was inconsistent with their religious obligations as ministers and was thus an independent and adequate ground for firing them, the court would have to explore the doctrines of the Salvation Army that define the role of its ministers. Blocking such inquiries–such entanglements of the secular courts in religious affairs–is one of the grounds on which the ministers exception was devised as a rule of interpretation of employment laws that do not make explicit reference to religious organizations.

518 F.3d 472, 474 (7th Cir. 2008). By asserting that Perich's threats to pursue legal action were inconsistent with the Lutheran Church-Missouri Synod's belief that Christians should not sue Christians in secular courts, Hosanna-Tabor brought the

17

*Schleicher* hypothetical to life.

**B. Perich's Employment Status**

Considering the circumstances of Perich's employment in light of the foregoing case law, she must be considered a ministerial employee. Factually, Perich's employment situation most closely resembles that of the commissioned minister in *Clapper* and, unlike *DeMarco*, the validity of Hosanna-Tabor's reason for terminating Perich cannot be disposed of by mere factual inquiry. To the contrary and as *Schleicher* warned, analysis of Hosanna-Tabor's particular defense requires some exploration of religious doctrine in violation of the First Amendment. *See Rayburn*, 772 F.2d at 1169 ("To subject church employment decisions of the nature we consider today to Title VII scrutiny would also give rise to 'excessive government entanglement' with religious institutions prohibited by the establishment clause of the First Amendment."). Furthermore, there is no indication that Hosanna-Tabor uses the title "commissioned minister" as subterfuge to avoid employment litigation. Hosanna-Tabor does not give the title to just any teacher and the fact that teachers at Hosanna-Tabor need not be Lutheran, even when it comes to teaching religion, does not strip the commissioned minister title of meaning. That Hosanna-Tabor distinguishes between "lay" and "called" teachers by awarding the commissioned minister title suggests that the school values the latter employees as ministerial even if some courts would not.

On the whole, the commissioned minister certificate in this case represents a give-and-take relationship overseen by the Lutheran Church-Missouri Synod. In exchange for completing additional classes in Lutheran theology and obtaining the approval of a voting

18

congregation, teachers are awarded the various employment benefits of being "called." Included in these benefits is an employment relationship that appears to be governed by the same rules as the church applies to its ordained ministers. (*See* Def.'s Mot., Ex. C (quoting Hosanna-Tabor's Constitution and By-Laws as applicable to "Pastors" and "duly Called Professional Ministers").) A called teacher is also listed in a directory of qualified teachers put forth by the Lutheran Church-Missouri Synod to assist schools in need. Furthermore, the Lutheran Church-Missouri Synod publishes an annual roster of commissioned ministers that includes called teachers. Put simply, this is not a case where the defendant seeks to prove ministerial status after the fact merely to avoid liability. Hosanna-Tabor treated Perich like a minister and held her out to the world as such long before this litigation began.

The separation of church and state in the United States has made federal courts inept when it comes to religious issues;[6] the inquiry into the value of an employee in furthering a religious institution's sectarian mission is no different.[7] The lack of clarity in federal court cases regarding elementary school teachers should not hinder churches from valuing teachers as important spiritual leaders and deciding who will fill those positions as ministerial employees, subject, of course, to inappropriate uses of the title "minister" as subterfuge. For these reasons, it seems prudent in this case to trust Hosanna-Tabor's

---

[6]*Rweyemamu v. Cote*, 520 F.3d 198, 204-05 (2d Cir. 2008) (explaining the history of the ministerial exception); *Rayburn*, 772 F.2d at 1167-68.

[7]Note, *supra*, at 1787 ("[C]ourts face difficulty in distinguishing religious from nonreligious activities.").

19

characterization of its own employee in the months and years *preceding* the events that led to litigation. Because Hosanna-Tabor considered Perich a "commissioned minister" and the facts surrounding Perich's employment in a religious school with a sectarian mission support this characterization, the Court concludes that Perich was a ministerial employee. If, on these circumstances, the Court were to conclude otherwise, it would risk "infring[ing] upon [Hosanna-Tabor's] right to choose its spiritual leaders." *Clapper*, 1998 WL 904528 at *7.

Because Perich was a ministerial employee of Hosanna-Tabor, this Court can inquire no further into her claims of retaliation. Under the circumstances, "the free exercise clause of the First Amendment protects the act of a decision rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." *Rayburn*, 772 F.2d at 1169. Because no further analysis may be made, the remainder of the issues raised by the parties in their respective briefs for summary judgment are moot.

Accordingly,

**IT IS ORDERED** that Defendant's motions for summary judgment are **GRANTED**. A judgment consistent with this opinion will issue.

s/PATRICK J. DUGGAN<br>UNITED STATES DISTRICT JUDGE

Copies to:
Omar Weaver, Esq.
James E. Roach, Esq.

Deano C. Ware, Esq.

20