```
                         pranschke.james_060408.txt
00001
  1                    UNITED STATES DISTRICT COURT
  2                    EASTERN DISTRICT OF MICHIGAN
  3                         SOUTHERN DIVISION
  4
  5   EQUAL EMPLOYMENT OPPORTUNITY
  6   COMMISSION,
  7             Plaintiff,                2:07-CV-14124
  8        vs.                            Hon. Patrick J. Duggan
  9   HOSANNA TABOR EVANGELICAL
 10   LUTHERAN CHURCH AND SCHOOL,
 11             Defendant.
 12   and
 13   CHERYL PERICH,
 14             Plaintiff/Intervenor,
 15        vs.
 16   HOSANNA TABOR EVANGELICAL
 17   LUTHERAN CHURCH AND SCHOOL,
 18             Defendant.
 19   _____
 20
 21
 22
 23
 24
 25
00002
  1
  2        The Deposition of JAMES EDWARD PRANSCHKE,
  3        Taken at 477 Michigan Avenue,
  4        Detroit, Michigan,
  5        Commencing at 2:21 p.m.,
  6        Wednesday, June 4, 2008,
  7        Before Jodi L. Jones, CSR-6591.
  8
  9
 10
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
00003
  1   APPEARANCES:
  2
  3   OMAR WEAVER
  4   Equal Employment Opportunity Commission
  5   477 Michigan Avenue
  6   865 McNamara Building
  7   Detroit, Michigan 48226
  8   (313) 226-4600
                                  Page 1
```

```
                         pranschke.james_060408.txt
  9        Appearing on behalf of Plaintiff.
 10
 11   JAMES E. ROACH
 12   Vercruysse, Murray & Calzone, P.C.
 13   31780 Telegraph Road
 14   Suite 200
 15   Bingham Farms, Michigan 48025
 16   (248) 540-8019
 17        Appearing on behalf of Plaintiff/Intervenor.
 18
 19   DEANO C. WARE
 20   26677 W. Twelve Mile Road
 21   Southfield, Michigan 48034
 22   (248) 386-9985
 23        Appearing on behalf of Defendants.
 24
 25   ALSO PRESENT:  Cheryl Perich.

00004
  1   Detroit, Michigan
  2   Wednesday, June 4, 2008
  3   2:21 p.m.
  4
  5             JAMES EDWARD PRANSCHKE
  6   was thereupon called as a witness herein, and after
  7   having first been duly sworn to testify to the truth,
  8   the whole truth and nothing but the truth, was
  9   examined and testified as follows:
 10                       EXAMINATION
 11   BY MR. WEAVER:
 12   Q.   Good afternoon.  Mr. Pranschke, my name is Omar
 13        Weaver.  I represent the Equal Employment Opportunity
 14        Commission in this case.  Let me start by asking you
 15        if you've ever had your deposition taken before.
 16   A.   Yes, I've a given deposition before.
 17   Q.   Okay.  Most recently when was the last time you've had
 18        that happen?
 19   A.   Fall of last year.  September, October.
 20   Q.   Okay.  Let me just remind you of a few essential rules
 21        for both of us as we go through this process.  First
 22        and foremost, the court reporter is taking down
 23        everything that we are saying so it's important to
 24        speak clearly and answer verbally, yes or no, as
 25        opposed to other gestures that may not be as clear.
00005
  1   A.   Okay.
  2   Q.   Secondly, we shouldn't talk over each other.  You
  3        should wait until I finish a question before you give
  4        your answer and I'll wait until you are done answering
  5        before I ask the next question.
  6   A.   Okay.
  7   Q.   And finally, if you don't understand a question, just
  8        let me know.  I'll be happy to repeat it, okay?
  9   A.   Okay.
 10             MR. WARE:  And the only thing I'd add is this
 11        isn't a guessing exercise, so if you don't know the
 12        answer to a question, say I don't know.
 13             THE WITNESS:  Okay.
 14             MR. WARE:  If you are speculating or trying
 15        to remember, then just preface your answer with, you
 16        know, I'm trying to remember or I can speculate.
 17             THE WITNESS:  Okay.
                                  Page 2
```

```
                         pranschke.james_060408.txt
 18   BY MR. WEAVER:
 19   Q.   What is your current address, sir?
 20   A.   36025 Grennada, G-r-e-n-n-a-d-a.  That's in Livonia.
 21   Q.   And where are you from originally?
 22   A.   I grew up in Redford.
 23   Q.   Redford, okay.  And are you currently married?
 24   A.   I am married, yes.
 25   Q.   For how many years?
00006
  1   A.   It will be 20 -- 28 this November.
  2   Q.   Do you have any children?
  3   A.   I have one child, yes.
  4   Q.   Are you employed now?
  5   A.   I am.
  6   Q.   Where are you working?
  7   A.   I work at Blue Cross Blue Shield of Michigan.
  8   Q.   Mr. Pranschke, have you done anything today to -- have
  9        you done anything to prepare for your deposition
 10        today?
 11   A.   I talked with Deano for a few minutes before -- before
 12        we came in and I read some documents that my legal
 13        staff gave me when I was doing my other deposition.
 14   Q.   Your other deposition?
 15   A.   The deposition I gave back in September.
 16   Q.   Okay.
 17   A.   That was a suit involving Blue Cross Blue Shield.
 18   Q.   And what documents in particular did you review?
 19   A.   Just how to -- how to answer questions, tell the
 20        truth, be direct, that type of thing.
 21   Q.   Are you currently a member of Hosanna Tabor Lutheran
 22        Church?
 23   A.   Yes, I am.
 24   Q.   How long have you belonged to the church?
 25   A.   My entire life.  53 years.
00007
  1   Q.   Does your wife also belong to the church?
  2   A.   Yes, she does.
  3   Q.   And my understanding is that there is also a school?
  4        Hosanna Tabor is not only a church but it's also a
  5        Lutheran school?
  6   A.   It's one of our missions is a lutheran school, yes.
  7   Q.   And is that through grades K through 8 or --
  8   A.   We start with preschool, three and four.  Preschool
  9        through grade eight.
 10   Q.   Okay.  Have you -- can you just tell me all of the
 11        positions of service you've had for either the church
 12        or the school?  Well, let me qualify because you've
 13        been there for quite some time.  I would say probably
 14        within the last five years.
 15   A.   The only position I've had in the last five years,
 16        I've been president of the congregation.  Well, I
 17        usher and I do some Sunday school and help with -- I
 18        mean, I'm involved in a lot of different things, but
 19        official position is president.
 20   Q.   Okay.  And you are going to have to just briefly
 21        educate me a little bit.
 22   A.   Okay.
 23   Q.   What do you do as president of the congregation?
 24   A.   Just about everything -- no.  Official duties are to
 25        preside over the -- the congregational meetings and
                                  Page 3
```

```
                         pranschke.james_060408.txt
00008
  1        the board of directors meetings to provide leadership.
  2   Q.   Okay.
  3   A.   But I -- I have my hands in a lot of different things.
  4   Q.   You mentioned the board of directors.  Is that a
  5        separate body from the board of education?
  6   A.   Yes.
  7   Q.   Okay.  As congregation president are you yet and still
  8        a member of the school board even though you are
  9        president of the congregation?
 10   A.   I'm ex-officio member of every board, but I don't
 11        typically attend most board meetings; although, I have
 12        been recently because our pastor has left.  We don't
 13        currently have a pastor and I've been kind of trying
 14        to fill his role in the board meetings.  So that's
 15        been since November my pastor left.
 16   Q.   Okay.  My understanding is that the members of the
 17        board of education are essentially volunteers; is
 18        that --
 19   A.   Yes.  We are all volunteers.
 20   Q.   Okay.
 21   A.   No one is paid.
 22   Q.   Okay.
 23   A.   The principal is -- I think he or she is an ex-officio
 24        member of the school board, so they do not -- they
 25        don't get a vote but they come to the -- to the
00009
  1        meetings.
  2   Q.   Okay.
  3             MR. WEAVER:  Can we mark that please?
  4             MARKED BY THE REPORTER
  5             DEPOSITION EXHIBIT NUMBER 1
  6             2:32 p.m.
  7   BY MR. WEAVER:
  8   Q.   I'm showing you what's been marked as Exhibit 1, which
  9        for the record is Hosanna Tabor's answers to the first
 10        set of interrogatories.  I just want to direct your
 11        attention to interrogatory number one, which requests
 12        a list of the individuals who served on the board
 13        between August 2004 and June 2005.  Do you see where I
 14        am?
 15   A.   Yes, I do.
 16   Q.   Okay.
 17   A.   It lists my name, but that is incorrect.
 18   Q.   What is incorrect about it?
 19   A.   I'm not a full member.  I'm an ex-officio member.
 20   Q.   Okay.  And you mentioned the principal was also an
 21        ex-officio member?
 22   A.   Correct.
 23   Q.   And at the time that was Stacey Hoeft?
 24   A.   That's correct.
 25   Q.   Okay.  And with respect to the other people listed
00010
  1        there, to your knowledge were they all members at that
  2        time?
  3   A.   I -- I do not remember that far back.  I know they
  4        have all been involved with the school board, whether
  5        they were members -- the school board is -- kind of
  6        fluctuates, so there are members that come and go
  7        pretty fluidly.
  8   Q.   Okay.  Can you think of anyone who may have been a
                                  Page 4
```

```
                       pranschke.james_060408.txt
 9           member who is not listed in number -- in item one of
10           this interrogatory at the time, 2004-2005?
11    A.     No, I don't know of anyone else.
12    Q.     I may have asked you this already, but are you
13           currently still president of the congregation?
14    A.     Yes, I am.
15    Q.     Okay.  Who are the current members of the board?  The
16           school board, I'm sorry.
17    A.     Oh, school board.  Okay.  The chairman is Janeen
18           Rotta, the secretary is Judy Johnston, and I don't
19           know if the other ones on the board if they have a
20           specific function that they do.  Lisa Reardon, Tracy
21           Mosure, Sandy Bryer, those are the members.
22    Q.     Okay.
23    A.     And then David Cush, our principal, is ex-officio.  Is
24           that five?  Janeen -- one, two, three, four, five,
25           yeah.
00011
 1    Q.     How often does the school board meet?
 2    A.     Typically once a month depending if they have --
 3           they've been meeting more regular, they are reviewing
 4           some handbook or something, I don't know, but
 5           typically once a month.  And maybe -- maybe not in the
 6           summer.
 7    Q.     Okay.
 8    A.     Again, I don't attend the meetings so I don't know for
 9           sure.
10    Q.     Okay.  Can you tell me your -- even though you don't
11           attend meetings, to the best of your knowledge what is
12           the purpose or function of the board of education?
13           You mentioned a minute ago the review of handbook.
14    A.     To review handbooks, to set policy, that type of
15           thing.  It'd be more policy related to the children
16           and the operation of the school.  They also offer
17           contracts when we -- when we do a contract to the --
18           to the teachers.
19                We have -- we have two types of teachers,
20           call teachers and contract teachers.  The call
21           teachers, the school board is not -- cannot call
22           somebody.  The congregation as a whole calls our
23           teachers.
24    Q.     Okay.
25    A.     So they would go through the process and review and
00012
 1           recommend to the board of directors who would then
 2           take it to the congregation.
 3    Q.     I'm confused.  You said the congregation reviews the
 4           calls and, what, they make the recommendations to the
 5           board of directors?
 6    A.     No, no.  The school board or -- or a call committee.
 7    Q.     Okay.
 8    A.     Most often made up a lot of members of the school
 9           board, they may have like other members.  If we're in
10           need of a teacher and we want to call somebody, they
11           would review a list that they would get from our
12           district.
13    Q.     Right.
14    A.     Do interviews and that kind of thing, and then make a
15           recommendation.  There might be -- typically there is
16           more than one when it gets to the congregation, so
17           there is a choice to be made.  And then the
                                 Page 5
```

```
                       pranschke.james_060408.txt
18           congregation in a meeting would -- would listen to the
19           recommendation from the school board and -- or no
20           recommendation, might -- and vote to call it, call a
21           certain teacher.
22    Q.     Okay.  And just so that I'm clear, does the board of
23           directors have a role in that or no?
24    A.     Kind of as a sounding board for the school board.  The
25           school board would bring it to the board of directors.
00013
 1    Q.     Okay.
 2    A.     And then my role as president, I would call a
 3           special -- special meeting, or if it happened to
 4           fall -- we have three regular meetings a year.  If it
 5           happened to fall at the right time, we would just have
 6           it at our regular meeting.
 7    Q.     Okay.
 8    A.     The call process.
 9    Q.     And so going back to the contract teachers, the board
10           can independently offer contract to a contract
11           teacher?
12    A.     Within budget constraints.
13    Q.     Right.  Got it.
14    A.     So if we have budgeted for a teacher and there is an
15           opening, typically the process, they typically like to
16           hire synodically trained teachers who would then be
17           called, okay?
18    Q.     Right.
19    A.     If they are not available then they would -- or if the
20           time was short, they would, you know, look for
21           another -- another teacher and they would offer a
22           contract, again, within budget constraints.  Anything
23           that increases our budget needs to go to the
24           congregation.
25    Q.     Okay.  Okay.  To the best of your knowledge are call
00014
 1           teachers employed by both Hosanna Tabor and the
 2           Michigan District of the --
 3    A.     No.  Just Hosanna Tabor.
 4    Q.     Okay.  They just -- they just become eligible --
 5    A.     They become eligible for a call through being
 6           synodically trained and being on -- what's called
 7           being on the roster of the Lutheran Church of Missouri
 8           Senate.
 9    Q.     Okay.
10    A.     So the Lutheran Church of Missouri Senate has -- has,
11           you know, stated that these people are eligible for
12           call.
13    Q.     Okay.
14    A.     You understand the three bodies here, the senate
15           versus the district versus the church?
16    Q.     Yes.
17    A.     Okay.
18    Q.     So far.
19    A.     Okay.
20    Q.     Okay.  I just want to make sure I understand something
21           about the congregation.  The -- with respect to the
22           body that votes on, for example, bringing in a call
23           teacher or some other matter, is that -- I'm assuming
24           that consists of just certain members empowered to
25           vote versus the entire congregation or is that --
                                 Page 6
```

```
                       pranschke.james_060408.txt
00015
 1    A.     Every member 18 and older is eligible to be a voting
 2           member.
 3    Q.     Okay.
 4    A.     In order to be a voting member you have to attend a
 5           regular congregational meeting.  So we accept -- we
 6           accept new members to the -- to the voting assembly at
 7           regular meetings.  If it is a special meeting, that's
 8           not -- that's not allowed.  We cannot accept new
 9           members at a special meeting.  A special meeting has
10           to be just what it is called for.
11    Q.     And special meetings just occur as situations might
12           arise?
13    A.     As situations arise, yes.
14    Q.     Okay.  Can you tell me what, if any, process occurs
15           with respect to interaction between the school board
16           and the congregation when you want to remove a called
17           teacher or essentially terminate that person's
18           employment?
19    A.     The school board or any -- actually anybody, the
20           school board or board of directors or even district
21           could bring information to the congregation that would
22           show cause for rescinding a call.  That's the
23           terminology.  You know, so whatever, you know,
24           situation would arise that would require that
25           recommendation to be made.  And then the congregation,
00016
 1           because they have issued the call, they are the only
 2           ones that can rescind a call.
 3    Q.     Okay.  Okay.  I'm assuming you know Cheryl Perich?
 4    A.     Yes.
 5    Q.     Okay.  And she used to teach for Hosanna Tabor,
 6           correct?
 7    A.     Correct.
 8    Q.     I'm representing to you that the last school year she
 9           worked was 2003 through 2004, is that -- would you
10           dispute that?
11    A.     I -- I don't remember what year it would be.
12    Q.     Okay.  Is it your understanding that in the fall of
13           2005 she was on a disability?
14    A.     I knew she was on a disability.  I wouldn't -- I
15           couldn't remember the exact time of that, but it was
16           the fall before all this transpired.
17    Q.     Okay.  And do you have any knowledge or any idea
18           whatsoever how long she was on a disability leave?
19    A.     I think it was at least -- at least six months.
20    Q.     You mean six months before making an attempt to return
21           to work?  I just want to clarify that.
22    A.     She was out of the classroom six months when the
23           school board was taking action to -- to put in
24           another -- in another teacher.
25    Q.     Okay.
00017
 1    A.     Prior to that they were combining classrooms and that
 2           was not working out very well.
 3    Q.     Did you become aware at any time during the school
 4           year 2004-2005 that Ms. Perich had been diagnosed with
 5           narcolepsy?
 6    A.     Somewhere in that period, yeah, I attended a school
 7           board meeting and became aware of that.  Although, I
 8           think there was -- was diagnosis and new diagnosis and
                                 Page 7
```

```
                       pranschke.james_060408.txt
 9           it seemed like we were unclear exactly what -- what
10           condition she was being treated for.  Or at least I am
11           unclear.
12    Q.     Okay.
13    A.     It seemed like it started with one thing and then went
14           to another thing and they were -- trying to rule out
15           things.  And again, I didn't follow it real closely so
16           I don't -- I don't know.
17    Q.     Okay.  But when it was all said and done, the last
18           condition that she had been diagnosed with, that was
19           narcolepsy, nothing else came up after that?
20                MR. WARE:  Well, if you know.
21    A.     I don't know.
22    BY MR. WEAVER:
23    Q.     You know how to say you don't know if you don't know,
24           right?
25    A.     Correct.
00018
 1    Q.     All right, thanks.
 2                MR. WARE:  And I know how to ask him if he
 3           knows.
 4                MR. WEAVER:  You can't do that.  He -- you
 5           said at the very beginning of the deposition that he
 6           shouldn't answer a question if he doesn't know.
 7                MR. WARE:  Then I'll just say objection and
 8           I'll ask it anyway, which I can do.
 9                MR. ROACH:  Well, that's not an evidentiary
10           objection --
11                MR. WARE:  Well, we won't determine that, the
12           judge will determine that.
13                MR. ROACH:  -- evidentiary objection.
14                MR. WARE:  That's what I'm doing.  Now, it's
15           not for you to tell me whether it is or not.  If I
16           consider it an evidentiary objection, I'm going to
17           make it and preserve it.
18                MR. WEAVER:  You didn't make an objection.
19           You coached him before he answered.
20                MR. WARE:  I'm telling you I'll call an
21           objection.
22                MR. WEAVER:  Then object.
23                MR. WARE:  That's what I'll do then.  I mean,
24           it depends on -- people do it differently.  If you
25           want to be formal, I'll just say objection.
00019
 1                MR. WEAVER:  Can you read back the last
 2           question and full answer, please?
 3                (The requested portion of the record was read
 4           by the reporter.)
 5    BY MR. WEAVER:
 6    Q.     Okay.  And you mentioned that it came -- there was a
 7           discussion at a board meeting.  Are you referring to a
 8           board meeting that took place before the board met
 9           with Ms. Perich in February of 2004?  In other words,
10           was she at that meeting or was this at some meeting
11           before?
12    A.     I don't remember the details of that.  I know there
13           were a couple of meetings that I attended and Ms.
14           Perich was at -- was at one of them.
15    Q.     Okay.  Do you -- can you tell me who shared with the
16           board her diagnosis of narcolepsy?
17    A.     I would -- I don't know for sure.  I would speculate
                                 Page 8
```



pranschke.james_060408.txt

```
                                                                           00022
   18        it was Mrs. Hoeft.                                                1        headed options concerning medical benefits for Pastor
   19   Q.   Okay.  To the best of your understanding as a lay                 2        Eggers and Ms. Perich on the following page.
   20        person do you know what kind of condition that                    3   A.   Yes.
   21        narcolepsy involves or what kind of disorder it might             4   Q.   Do you see where I am?
   22        be?                                                               5   A.   Uh-huh.
   23             MR. WARE:  Objection.  Calls for speculation.                6   Q.   Okay.  These last two pages, is it your understanding
   24   BY MR. WEAVER:                                                         7        that these last two pages are the attachments to the
   25   Q.   Go ahead, you can answer it just based on your                    8        meeting minutes?
                                                                               9   A.   Yes.
00020                                                                         10   Q.   Okay.  Okay.  And with respect to Ms. Perich and item
    1        understanding generally as a lay person.                         11        C, on page two it states option two is approved by a
    2   A.   My understand is that the person falls asleep at --              12        majority vote 35 to 8.  The timeline will be
    3        whenever and not -- not anything to do with lack of              13        established by the school board at their next meeting
    4        sleep or whatever.                                               14        in February.  And I'm just going to go to the
    5   Q.   Okay.                                                            15        attachment that refers to option two and I think
    6             MARKED BY THE REPORTER                                      16        that's the last page.
    7             DEPOSITION EXHIBIT NUMBER 2                                 17   A.   Okay.
    8             2:56 p.m.                                                   18   Q.   Option two references a proposal presented by
    9   BY MR. WEAVER:                                                        19        yourself and Mr. Salo, chair of the school board and
   10   Q.   Okay.  Mr. Pranschke, I'll just show you what's been             20        Bob -- is it Cochran?
   11        marked as Exhibit 2.                                             21   A.   Cochran, yes.
   12             MR. WARE:  As an objection can you show me                  22   Q.   Chair of the board of elders?
   13        what you are showing him before you give it to him?              23   A.   Yes.
   14             MR. WEAVER:  Yeah.  Sorry about that.  Here.                24   Q.   At that time did you have a proposal in writing at
   15             MR. WARE:  Thank you.                                       25        this meeting?
   16   BY MR. WEAVER:
   17   Q.   First, have you seen this recently?  For example,             00023
   18        before your deposition?                                           1   A.   This is it.
   19   A.   No, I did not.                                                    2   Q.   Okay.  This is it, the attachment?
   20   Q.   Okay.                                                             3   A.   Correct.
   21   A.   Well, I have seen this before.  Not recently.                     4   Q.   Okay.  And tell me what was it that you were proposing
   22   Q.   Okay.  Do you think you may have seen it during the               5        at this meeting with respect to Ms. Perich?
   23        EEOC's investigation process or anything like that?               6   A.   The proposal was to in -- in -- in return for premium
   24   A.   No.                                                               7        payments of her medical premium.  It seems like that's
   25   Q.   Okay.  And for the record, you are looking at meeting             8        all.  That in return for that, she would give peaceful
                                                                               9        release from her call.
00021                                                                         10             There are two ways typically that a call is
    1        minutes from the shareholder meeting that occurred on            11        terminated.  It's either a person who has been called
    2        January 30th, 2005?                                              12        asks to be -- have peaceful release or this other
    3   A.   Yes.                                                             13        process that we talked about earlier where the
    4   Q.   And just for clarification purposes, is the                      14        congregation would rescind a call.
    5        shareholder meeting a congregation meeting?                      15   Q.   Okay.
    6   A.   Yes.                                                             16   A.   But even with a peaceful release, the congregation has
    7   Q.   Okay.  That's just another terminology for it?                   17        to act and grant peaceful release.
    8   A.   It's our -- it's our once a year meeting that is                 18   Q.   Okay.  So in exchange for coverage of medical benefits
    9        supposed to resemble a shareholder meeting.                      19        through the end of the calendar year, the proposal was
   10   Q.   Okay.                                                            20        that Ms. Perich give a peaceful release of her call?
   11   A.   It is the one we typically talk about goals.                     21   A.   Correct.
   12   Q.   And you can -- at this shareholder meeting do you also           22   Q.   Is that essentially a resignation?
   13        maybe review any matters or issues regarding the                 23   A.   Pretty much, yes.
   14        personnel of the church or the school?                           24   Q.   And when a call teacher gives a peaceful release of
   15   A.   We could -- we could issue calls at that time.                   25        her call, it wouldn't be expected for her to -- him or
   16   Q.   Okay.
   17   A.   There might be reports from, you know, various bodies         00024
   18        talking about hiring situations and that kind of                  1        her to return the following school year to that same
   19        thing.                                                            2        school?
   20   Q.   Okay.  I want to just direct your attention to the                3             MR. WARE:  Objection, leading.
   21        second page of Exhibit 2, item number 12, which starts            4   BY MR. WEAVER:
   22        proposals concerning our disabled employees and then              5   Q.   Go ahead.
   23        in parentheses it says refer to attachment.  And then             6   A.   I'm sorry, am I supposed to answer or not?
   24        the following page there is a proposed policy list of             7   Q.   Yes, go ahead.
   25        signatures of attendees and then it looks like what is            8   A.   No, not always.  Is that -- is that the situation --
                        Page 9                                                                         Page 10
```

```
                        pranschke.james_060408.txt
    9        we have had teachers ask for a release if their call           18   Q.   Okay.
   10        with the idea that they would become a contract                19   A.   And -- but typically when they are looking for -- for
   11        teacher.  There are -- there are -- there are benefits         20        a replacement teacher they would attempt to do a call.
   12        to being a call teacher.  One of them is that you get          21   Q.   But you guess -- okay.  Given what's stated here
   13        to have a portion of your -- of your salary designated         22        though, it was not the intent -- the intent was not
   14        as a housing allowance and that housing allowance is           23        for Ms. Perich to return the following school year?
   15        not taxed.                                                     24   A.   That is correct.
   16             So if, you know, the teacher was making                   25   Q.   And what was the reason for this proposal being
   17        $30,000 and could -- could justify a housing allowance
   18        of $20,000, they would only be taxed on 10.  But on         00027
   19        the flip side of that, then they are considered                 1        presented at the shareholder meeting?
   20        self -- a self-employed individual as far as the IRS            2   A.   Well, as stated in the last one we wanted to do a --
   21        is concerned and therefore they have to pay their own           3        a -- have a replacement teacher.
   22        Social Security tax and Medicare tax.                           4   Q.   I understand that.
   23   Q.   Okay.  And but -- in this particular -- with respect            5   A.   So we could continue --
   24        to Ms. Perich, the -- the school was not seeking to             6   Q.   Okay.
   25        convert her from a call teacher to a contract teacher,          7   A.   -- with the operation of the school.
                                                                             8   Q.   Okay.  Okay.  Specifically why it was the -- to the
00025                                                                        9        position of the board that she was physically
    1        was it?                                                        10        incapable to return?
    2   A.   No, it was not.                                                11   A.   Just the reports from doctors and -- and her own
    3   Q.   And I'm going to go five bullet points down under the          12        personal e-mails and communication.
    4        alternative proposal that we're looking at in Exhibit          13   Q.   So this determination was based in part on some of the
    5        2 which states school administrator and school board           14        e-mail that may have been exchanged between Ms. Perich
    6        feels it is very unlikely Ms. Perich would be                  15        and Ms. Hoeft?
    7        physically capable to return to the classroom this             16   A.   I believe so, yes.
    8        year or next year.  And just for clarification                 17   Q.   And would those e-mail also -- well, let me back up a
    9        purposes, the school administrator would be Ms. Hoeft?         18        minute.  You also said that it was based on reports
   10   A.   That's correct.                                                19        from doctors.  What physicians in particular are
   11   Q.   And was -- were there meetings before the shareholder          20        you --
   12        meeting in which this consensus was discussed about            21   A.   No, I'm not -- I'm not -- let me -- let me rephrase
   13        Ms. Perich's suitability to return?                            22        that.  It might have been just reports
   14   A.   I -- I assume so.  I don't -- I -- I mean, I was at            23        from the doctors contained in the e-mails.  I don't --
   15        meetings but I can't remember exactly the position of          24        I don't remember for sure if we actually saw a
   16        when -- it seems that we would not have put this               25        doctor's report or how the -- how the -- if Stacey was
   17        proposal together without having, you know, been to
   18        the school board meetings where this was discussed.         00028
   19   Q.   Okay.  And given your -- that you are part of the               1        just reporting what she knew.
   20        group of people who are presenting this proposal, were          2   Q.   And was -- when you say Stacey you mean Ms. Hoeft?
   21        you involved in sharing this opinion that she wasn't            3   A.   Mrs. Hoeft, I'm sorry.
   22        fit to come back in the school year -- in the current           4   Q.   Okay.  Was she also reporting what she knew about Ms.
   23        school year or the following school year?                       5        Perich having the condition of narcolepsy or passing
   24   A.   I was there.  I don't know that I rendered an opinion.          6        out or anything like that, was she sharing that
   25   Q.   Okay.                                                           7        with --
                                                                             8   A.   She was sharing that, yes.
00026                                                                        9   Q.   Okay.  But just so we're clear, you are not saying
    1   A.   I did not have any interaction with Ms. Perich.                10        this determination was made because you actually saw
    2   Q.   Okay.  But is it fair to say that given what's stated          11        any of Ms. Perich's medical records, it was just from
    3        here in Exhibit 2 that that was the position of the            12        what was shared by Ms. Hoeft and those communications
    4        board at that time?                                            13        with Ms. Perich?
    5   A.   Yes.                                                           14   A.   I can't honestly remember what I -- what I saw.
    6   Q.   And then the next point down it states it's important          15   Q.   Okay.  I guess I just -- you mentioned a minute ago
    7        to the school's operation that Ms. Perich ask for a            16        that you wanted to retract from saying that you saw
    8        peaceful release from her call to facilitate a search          17        doctor's reports.
    9        for replacement.  Were you looking for a contract              18   A.   Yeah, I'm not positive that I saw doctor's reports.
   10        employee to replace her or another called teacher?             19   Q.   Okay.
   11   A.   I believe in the middle of the year it would most              20   A.   So it may have been Mrs. Hoeft's report.  Yeah, I
   12        likely be a contract teacher.                                  21        can't remember --
   13   Q.   Okay.  And what about the following year?                      22   Q.   Okay.
   14   A.   I -- I have no idea what -- what the plan was.  If             23   A.   -- if I saw an actual doctor's report.
   15        they were -- typically when they hire a contract               24   Q.   Okay.  You don't have a medical background, correct?
   16        teacher, if that teacher is working out well, they             25   A.   I do not.
   17        would continue that relationship.
                        Page 11                                                                        Page 12
```





```
                       pranschke.james_060408.txt
 9          not Ms. Hoeft shared with you that Ms. Perich's
10          rationale for coming to work that day was to make sure
11          she wouldn't be viewed as a voluntary termination, did
12          that come up at all?
13              MR. WARE:  I'm going to object to hearsay,
14          which I think you testified and that is evidentiary,
15          but since this is a deposition, go ahead.
16       A. I don't remember that being shared.
17  BY MR. WEAVER:
18       Q. Okay.  I know you testified earlier that you don't
19          recall whether or not Ms. Perich showed the board a
20          note from her doctor clearing her return to work or
21          verbally indicated that she was cleared to return to
22          work, but nevertheless, I have to ask you this.  If it
23          turned out that Ms. Perich had been cleared to return
24          to work, isn't there a provision in the handbook that
25          states that if an employee does not return to work if
00039
 1          they are cleared that it could be viewed as a
 2          voluntary termination?
 3              MR. WARE:  Okay.  I'm going to object as to
 4          if it turns out, which calls for a hypothetical.
 5              MR. WEAVER:  Hypothetical is perfectly
 6          legitimate as long as they lead to the discovery of
 7          relevant evidence.
 8              MR. WARE:  Okay.  I'm going to object that
 9          the question calls for speculation as to if something
10          is to happen if something else happened.
11              MR. WEAVER:  Well, that's my same response.
12  BY MR. WEAVER:
13       Q. You can -- you can answer.
14              MR. WARE:  Well, it calls for speculation,
15          so --
16  BY MR. WEAVER:
17       Q. You can answer.
18              MR. WARE:  If you can, you can answer.
19       A. Okay.  Would you restate the question?
20  BY MR. WEAVER:
21       Q. Sure.  If it turns out that at the time Ms. Perich
22          showed up to the school and made herself available for
23          work, that she was actually medically cleared to
24          return to work, given what's -- how do I say -- let me
25          back up.  If it turns out that she was actually
00040
 1          cleared to return to work and she made herself
 2          available to return to work, would that be expected to
 3          avoid being deemed as someone who effectuated a
 4          voluntary termination under the handbook?
 5       A. Said a different way, if she was cleared to work and
 6          did not report to work, that would be deemed a
 7          voluntary termination.
 8       Q. Okay.
 9       A. Is that the gist of it?
10       Q. Yes.
11       A. I don't know.  I don't know what the handbook states
12          specifically.
13       Q. Okay.
14       A. It seems reasonable that would be the case, but I -- I
15          don't know what the handbook says.
16       Q. All right.
17              MR. WEAVER:  Can you mark this please?
                             Page 17
```

```
                       pranschke.james_060408.txt
18                  MARKED BY THE REPORTER
19                  DEPOSITION EXHIBIT NUMBER 4
20                  3:51 p.m.
21  BY MR. WEAVER:
22       Q. You've been handed what's been marked as Exhibit 4 and
23          I just want to direct your attention to the third page
24          of this particular section of the employee handbook
25          pertaining to benefits.  The third page covers medical
00041
 1          leave and in particular item number two at the top of
 2          the third page which states failure to return to work
 3          on the first day following the expiration of an
 4          approved leave of absence may be considered a
 5          voluntary termination.  Usually --
 6       A. I don't know that exactly addresses what your question
 7          was.  I don't -- I mean, if a leave of absence was
 8          approved and there was a return date in that leave of
 9          absence, that's -- that might be what this is speaking
10          to.
11       Q. All right.  And isn't it often the case that a leave
12          of absence would expire and a return date would be
13          attained through medical clearance of that employee?
14       A. That would -- that would be reasonable, but if -- if
15          medical clearance was given it seemed that there would
16          be -- there would be notification prior to just
17          showing up and that it would be -- it would be worked
18          out between the administration and the teacher that
19          they are coming back to work.
20       Q. Okay.
21       A. And my understanding is that that did not happen.  The
22          school day had already started, we had a teacher in
23          place and -- and basically Ms. Perich showed up and
24          said I'm here to work.
25       Q. And when you speak of notification, are you referring
00042
 1          to giving notification to the school that the employee
 2          has been medically cleared to come back?
 3       A. That -- yeah, that would be the notification.
 4       Q. But again, going back to your testimony, you couldn't
 5          offer or had no recollection as to whether or not she
 6          attempted to notify the board of her clearance to
 7          return to work when she met with the board, is that --
 8       A. No, I don't.  I don't know that.
 9       Q. And do you know whether or not Ms. Perich sent an
10          e-mail to Stacey Hoeft the day before informing Ms.
11          Hoeft that she decided not to give a voluntary release
12          of her call and that she'd come to work the next day?
13       A. I'm not aware of that, no.
14       Q. Okay.
15       A. Although, let me think here.  I seem to remember
16          something about a late night e-mail that -- that was
17          sent to the school along that regards.
18       Q. Okay.
19       A. I don't -- I mean, that's as much as I remember about
20          it, but it was -- it was expressed to me that it
21          was -- it was unexpected that -- when Cheryl arrived.
22       Q. All right.  I want to jump back to the first exhibit I
23          gave you really quick.  If you'll look at
24          Interrogatory No. 3, it was asking for the approximate
25          number of employees that were, you know, employed in
                             Page 18
```

```
                       pranschke.james_060408.txt
00043
 1          the years 2005 through 2007 and I got an answer for
 2          2005, generally speaking.  Can you shed some light on
 3          how many employees were working for Hosanna in 2006,
 4          both contract and call?
 5       A. Why it may be unclear is that somewhere in this time
 6          frame we -- we started a day care and employees of the
 7          day care came for brief periods, they were there for,
 8          you know, a month or so.
 9       Q. All right.  Okay.
10       A. So how many -- how many were exactly on the payroll,
11          we'd need to look at payroll records to see how many.
12       Q. Okay.
13       A. And then -- well, obviously subs don't count, but
14          anyways that -- and I'm not sure exactly when the day
15          care started.  It seems that fall of 2006 would be
16          about right is when that -- is when our day care
17          started.  So, I mean, this information should be
18          available.  We have payroll records, so I don't -- I
19          don't know why it wasn't provided.
20       Q. Okay.
21       A. And then we also had -- I mean, due to financial
22          conditions where we're continually reducing --
23          reducing our teaching staff, combining classrooms.
24          For the most part during this time we have had a
25          pastor.  It wasn't until late last year that -- that
00044
 1          we are without a pastor at all.  And then teachers
 2          right now we have -- we have six -- six teachers --
 3          actually we have -- we have seven teachers, one is
 4          not -- is not functioning full time as a teacher --
 5       Q. Okay.
 6       A. -- because we did not actually have a spot, so --
 7       Q. And right now teachers and staff included, how many
 8          people would you say you have employed?
 9       A. How many currently are employed?
10       Q. Yeah.
11       A. We have two custodial staff, part time custodial
12          staff, three to six in the day care, again part time,
13          two part time administrative staff, and then the seven
14          teachers that I -- oh, and then our principal is -- is
15          part time.  We actually are sharing a principal with
16          another Lutheran school.  They have -- they have
17          called him and we have -- we have made an arrangement
18          with -- with that church to utilize his services on a
19          part time basis.
20       Q. Okay.  So --
21       A. So he's not -- he's not an employee and he's not --
22          he's not technically a contract employee either, he's
23          more of a I don't know.
24       Q. Okay.  So what I'm hearing -- so you can speak pretty
25          much about what the current staff is made up of?
00045
 1       A. Yes.
 2       Q. In 2006 and in 2007 there was some fluctuation in --
 3          in terms of how long they stayed, the duration of
 4          their employment?
 5       A. Nineteen actually seems large to me for 2005 because
 6          we -- we maybe had nine teachers and a pastor, three
 7          in the administrative office.  See, and again, people
 8          come and go so it might have been 19 that we paid over
                             Page 19
```

```
                       pranschke.james_060408.txt
 9          the course of the year.
10       Q. Right.
11       A. But not at any one time did we have -- I don't believe
12          we had that many.
13       Q. Okay.  Okay.  But bottom line, the payroll records
14          will clear that up?
15       A. Correct.
16       Q. Okay.  Can you tell me whether or not Hosanna has
17          implemented any personnel policies that prohibit or
18          address discrimination in the workplace?  Anything
19          like that in the handbook or elsewhere?
20       A. The handbook is currently being reviewed, not too
21          quickly, but it seems like we did make a change in the
22          disability policy.  Whether it -- it -- whether it
23          dealt with discrimination, I'm not -- I'm not sure.
24       Q. Okay.  All right.  Have you trained the staff about
25          any laws prohibiting disability discrimination in the
00046
 1          workplace or brought in a consultant --
 2       A. I --
 3       Q. -- or trainer or anything?
 4       A. I am -- I am not in the school.  I don't -- I don't
 5          see what -- but I know that it was -- it was part of
 6          the agreement that we were, we're going to provide
 7          that training.  I assume it -- it happened.  I don't
 8          have firsthand knowledge.
 9       Q. The agreement?  What agreement?
10       A. There was somewhere in this process we --
11       Q. Oh, you mean the EEOC's conciliation agreement?
12       A. Yes.
13       Q. But you don't know if it has happened at this point?
14       A. I don't have firsthand knowledge, no.
15       Q. Okay.  I'm going to stop here in the interest of time
16          and I'll let Mr. Roach cover some things?
17              MR. ROACH:  Okay.  Very good.  Thank you.
18                          EXAMINATION
19  BY MR. ROACH:
20       Q. Mr. Pranschke, as I introduced myself earlier, my name
21          is Jim Roach, the attorney for Cheryl Perich who has
22          intervened in this lawsuit with the Equal Opportunity
23          Commission.  I have a few additional questions
24          including some additional background questions.
25          You mentioned earlier that you were a witness
00047
 1          in a Blue Cross Blue Shield case where you were called
 2          as a witness for deposition?
 3       A. Yes.
 4       Q. All right.  Were you -- you were called as a witness,
 5          that's why you were being deposed?
 6       A. I was deposed first and then yes, I gave testimony in
 7          a rate hearing.
 8       Q. Okay.  So the deposition was related to the rate
 9          hearing, right?
10       A. Correct.
11       Q. And that's what we're talking about, you were talking
12          about administrator proceeding regarding rates?
13       A. As a company we file rates to the -- I refer to them
14          as OFIS, let me think if I can remember the acronym.
15          Office of Financial Insurance Services.  It's the
16          State of Michigan governmental agency.  During that
17          process -- I don't -- I don't know what you mean by
                             Page 20
```

```
                    pranschke.james_060408.txt
18            administrative --
19   Q.       Somebody within the state rather than within the
20            court?
21   A.       Oh, yes.
22   Q.       So it was an administrative agency --
23   A.       It was an administrative agency, it was a rate hearing
24            overseen by the Office of Insurance Services.
25            Basically Blue Cross Blue Shield wanted additional
00048
 1            rates or increase in rates --
 2   A.       Correct.
 3   Q.       -- and the state is deciding whether or not to allow
 4            that, right?
 5   A.       Yeah.
 6   Q.       Fair enough.  What is your job with Blue Cross Blue
 7            Shield?  What do you do?
 8   A.       My title is director of actuarial services.  I have
 9            three areas reporting to me, we do the annual
10            statements, we do the -- we determine the actuarial
11            liability for the annual statements, we do financial
12            projections for the corporation, and we review the
13            health care trends.  Those are the three areas.  I --
14   Q.       Have you --
15   A.       I was involved in this rate hearing not in one of the
16            jobs that I currently hold or one of the areas that
17            currently reports to me.  I was new to the company, I
18            had some background in rate filings, I was asked to
19            take on the individual rate filing, so I oversaw that
20            process.
21   Q.       Have you been trained as an accountant?
22   A.       No.
23   Q.       You have a college degree, I take it?
24   A.       I do.  In mathematics.
25   Q.       All right.  I know Mr. Weaver asked you initially or
00049
 1            at the beginning of his questions as to whether or not
 2            you reviewed documents for purposes of this
 3            deposition.  Do you recall that question?
 4   A.       Yes.
 5   Q.       Specifically what documents did you review for
 6            purposes of this deposition?
 7   A.       There's documents that our legal staff gave me to
 8            prepare for the deposition that I gave in September.
 9            Basically it's what you should do to answer the
10            questions, be -- I mean, the first one is be truthful,
11            dress appropriately, you know, basically just kind of
12            guidelines of what to expect and how to -- how to
13            appropriately answer.
14   Q.       All right.  Specifically you referred to your legal
15            staff.  What -- who is your -- or what is the legal
16            staff?
17   A.       Oh, Blue Cross Blue Shield legal staff.
18   Q.       Okay.  So you --
19   A.       Oh, it has nothing -- no, we have no legal staff.
20   Q.       For the deposition today -- and maybe I'm getting
21            confused.  For the deposition today, what documents
22            did you look at for preparing for this deposition
23            today?
24   A.       Just the information that Blue Cross Blue Shield's
25            legal counsel gave me to prepare for the other
                                Page 21
```

```
                    pranschke.james_060408.txt
00050
 1            deposition.
 2   Q.       I see.  I --
 3   A.       It's just a general document about --
 4   Q.       Somebody gave you instructions before so you decided
 5            it'd be a good idea to look at those instructions for
 6            this?
 7   A.       Yeah, what to expect, you know.
 8   Q.       Fair enough.  So you haven't looked at such things as
 9            the complaint or these meeting minutes or anything
10            like that that we've talked about today?
11   A.       About a month or so I met with -- with Deano and we
12            reviewed --
13                    MR. WARE:  Okay.  He's only asking you what
14            you reviewed to prepare for the deposition.
15   A.       Okay.  I didn't -- I didn't review anything
16            specifically for the deposition.
17   BY MR. ROACH:
18   Q.       Okay.  So that -- the review of documents, I don't
19            want to ask about the conversations you had with Mr.
20            Ware, but then as to that prior review of documents,
21            that wasn't anything to do with this deposition today?
22   A.       In that meeting I learned that depositions were going
23            to be -- going to be had.
24   Q.       Do you recall what documents for the purposes of that
25            may be?
00051
 1   A.       There was one having to do with our offer.  And off
 2            hand I was trying to remember -- we had a budget
 3            meeting earlier in the week, Monday, and for that I
 4            was trying to remember, you know, what even the offer
 5            was.  I could not put my hands on that document.  But
 6            anyways, he -- Deano shared with me the offer with the
 7            question --
 8                    MR. WARE:  Well, don't tell --
 9                    THE WITNESS:  All right.
10                    MR. WARE:  -- what my question.
11                    THE WITNESS:  I'm sorry.
12                    MR. WARE:  Just the document, he just wants
13            to know the documents.
14                    THE WITNESS:  All right.
15   A.       I don't recall any other documents that I -- that I
16            got.
17   BY MR. ROACH:
18   Q.       Are you aware of the fact that some documents have
19            been produced to the EEOC and to my office as well
20            regarding this case through Mr. Ware?
21   A.       Yes.
22   Q.       Did you assist at all in putting together those
23            documents?
24   A.       No, I did not.
25   Q.       Did you ask anybody within the church or the school to
00052
 1            gather up documents?
 2   A.       No, I did not.
 3   Q.       Do you know who was designated to gather documents?
 4   A.       No, I don't.
 5   Q.       Same question as to the interrogatory answers that we
 6            looked at earlier in the deposition today that's been
 7            marked as Exhibit 1, did you assist at all with the --
 8   A.       No.  I've never seen that.  I did not assist.
                                Page 22
```

```
                    pranschke.james_060408.txt
 9   Q.       Do you have any information as to who assisted with
10            that information?
11   A.       No, I do not.
12   Q.       Have in the past any --
13   A.       Let me -- let me -- I may have had a phone
14            conversation about specific questions like who -- who
15            should be put in for -- for this.  The one that I -- I
16            kind of smiled at was number two, who is responsible
17            or to provide testimony for financial condition.  I
18            don't -- I don't serve in any of the financial
19            positions of our congregation, but I do put together
20            the budget and I'm aware of our financial condition
21            and somebody may have asked me should we put you in
22            there or who should we put.
23                    So I knew this was -- I knew this was going
24            on.  I believe -- again, I speculate that -- that a
25            Mr. Cush was -- was leading that or might have been
00053
 1            the school board.
 2   Q.       We have been -- we received these documents that were
 3            produced to Mr. Ware that's labeled Hosanna Tabor
 4            financial information.
 5   A.       Ah, reminded me, yes, I did prepare.
 6   Q.       Did you prepare these -- I assume it was in a computer
 7            program -- but this financial budget information?
 8   A.       Yeah, this is my document.  This is my document that I
 9            prepare for the budget.
10   Q.       Okay.
11   A.       This is a report from our financial secretary of the
12            giving.  I may have given this to Deano.  I don't -- I
13            don't remember.
14   Q.       What -- where do you get the information from for
15            putting in these numbers?  For instance, the plate?
16   A.       The financial information?
17   Q.       Yeah.
18   A.       Every Sunday the financial secretary and the counters
19            count the money, put it into the -- into the bank,
20            produce this report.
21   Q.       Okay.
22   A.       I mean, it's -- it's a weekly report that tallies
23            this.
24   Q.       Two years ago, if you know, we -- well, first off,
25            let's point to a different number here or a specific
00054
 1            number.  On this document that refers to have a list
 2            of revenues where it says total receipts $507,606 at
 3            the bottom?
 4   A.       Yes.
 5   Q.       Is that an accurate figure to your knowledge?
 6   A.       Yes.
 7   Q.       All right.  Is that for last year?
 8   A.       No.  It would have been year to date October 2007.  I
 9            mean, at least I -- that's the representation.
10   Q.       Based on when -- maybe we need to look -- well, here's
11            some profit and loss statements from January through
12            December 2006, maybe this will be helpful.  What I'd
13            like you to do is to look at these documents and
14            compare the year 2006 to the prior year, 2005, as far
15            as the amount of revenues.
16   A.       This is -- this is not revenue, this is expenses.
17   Q.       Okay.
                                Page 23
```

```
                    pranschke.james_060408.txt
18   A.       Okay.  So in 2006 the annual number was 504,000 of
19            which we borrowed 25,000 and then these others -- we
20            really have two pieces of our receipts.  We have money
21            that is brought into -- to support the operation of
22            the church which includes the -- the weekly
23            contributions by our members plus the tuition plus
24            other giving that is deemed for budget purposes.  Then
25            we have other things that are more or less
00055
 1            pass-through items.  People are contributing towards a
 2            specific -- a specific non-budget item.  Our school
 3            chapel, for instance, it goes to -- to a mission.  So
 4            we collect the school chapel from the school children,
 5            it goes through our books, but it goes out to a
 6            mission.
 7   Q.       Do you recall my question?
 8   A.       Oh, you wanted me to compare --
 9   Q.       2006 and 2005.
10   A.       I don't have a total for 2007.
11   Q.       Actually 2005.  Do you recall whether or not there
12            is -- you received more money in 2006 than you had --
13            than the church had in 2005 or vice versa?
14   A.       Generally our receipts are going down each year, so
15            did we receive more in 2007 -- I mean in 2005 than we
16            received in 2006, I don't specifically remember that,
17            but I would -- I would think that it -- we are
18            receiving less now.
19   Q.       Okay.  2007 though was better than, as far as revenues
20            go, than 2006, right?
21   A.       No, that is not true.
22   Q.       Let's look at 2006.
23   A.       If it includes the borrowing -- in 2007 we borrowed
24            $121,000 --
25   Q.       Oh, is that right?
00056
 1   A.       -- to stay afloat.
 2   Q.       Okay.
 3   A.       And we're planning to borrow almost -- not almost
 4            that, but another 70,000 in this next fiscal year.
 5   Q.       Is there any financial support from any other entity
 6            other than church members?
 7   A.       No.  Well, tuition.  I'm sorry.
 8   Q.       Tuition?
 9   A.       Tuition from members and non-members, whoever sends
10            their children to the school.  Day care, we have
11            income from day care --
12   Q.       All right.
13   A.       -- aftercare, latchkey.  These are our basic -- okay,
14            I take back.  We do participate in a program that is
15            sponsored by an insurance company, Thrivent.  I don't
16            even know their correct title, Thrivent Financial
17            Services?  I don't know, but anyways, they have a
18            program -- they have a program that will -- will in
19            some ways support Lutheran schools, but it is -- it is
20            based on contributions to the school by their
21            membership, Thrivent's membership, and they'll match
22            half of that up to $300.  I know that was all
23            confusing.  But basically it's a program.  They are --
24            they are a fraternal organization and part of their
25            charter is to support Lutheran causes.
                                Page 24
```

```
                                    pranschke.james_060408.txt
00057
 1    Q.   Okay.  So they -- and you said it was perhaps $300
 2         for, what, last year?
 3    A.   No, for a member.
 4    Q.   For a member.
 5    A.   We actually got about $12,000 last year from that
 6         program.
 7    Q.   Do you get any funds from the senate?
 8    A.   No.
 9    Q.   Does the church get anything from the Michigan
10         District of the senate?
11    A.   No.  The only support we get from them is in an
12         advisory capacity.  They allow their staff to help us
13         with programs, advice and that kind of thing.  We are
14         just working with an advisor from district that helped
15         us put together our mission and vision and goal
16         statements for the year --
17    Q.   I want to get --
18    A.   -- no, we have no money.
19    Q.   I want to get more in depth into that, but right now I
20         was just asking about money.  Jumping to a different
21         topic, so we're not both getting confused.  To your
22         knowledge has any claim, charge or any other demand or
23         lawsuit, whatever the case may be, that has been filed
24         or sent to the church regarding an employment issue?
25         That was probably a convoluted question.  I can
00058
 1         rephrase if you like.
 2    A.   I -- I can't -- I can't recall any -- any other
 3         claims.
 4    Q.   All right.  Then let's just take it a level down.  Has
 5         anybody who is employed or associated with the church
 6         or the school who have complained about discrimination
 7         or civil rights issues?
 8    A.   No, not that I'm aware of.
 9    Q.   Just to clarify, I think you told us about voters?
10    A.   Correct.
11    Q.   Voters is, what, a subclass of congregation members?
12    A.   Correct.
13    Q.   You've repeatedly stated in your testimony that a
14         decision was being put up to vote --
15    A.   Correct.
16    Q.   -- by the congregation.  That's not quite accurate, is
17         it?  Because really what you are asking about is the
18         voters to vote on the particular issues; is that
19         right?
20    A.   That's correct.  Just terminology.  That -- every
21         adult member is eligible to be a voter.  So you say
22         you put it out to the congregation, every one in the
23         congregation is eligible to come and participate.
24    Q.   To become a voter?
25    A.   To become a voter.
00059
 1    Q.   All right.  Before you -- if I, for instance, joined
 2         the church, I would have to, in essence, apply for and
 3         get approved to act as a voter, correct?
 4    A.   No.  It's easier than -- you come to a meeting and we
 5         accept you.
 6    Q.   All right.
 7    A.   So it's basically the first part of every one of our
 8         regular congregational meetings, are there any new
                                    Page 25
```

```
                                    pranschke.james_060408.txt
 9         members, are there any new participants, and if so, we
10         accept them as voting members.
11    Q.   Why would you have the difference?  Why is there a
12         difference between just asking everybody in the
13         congregation to vote?
14    A.   I think the difference is that if it's a special
15         meeting and there is a particular topic that's going
16         to be discussed, that people who have had no interest
17         in the past would -- would come and -- and sway the
18         vote one way or the other.  I think that -- I don't --
19         I didn't write the constitution.  I was -- I was in
20         office when we -- when we did the -- when we did our
21         new constitution.
22    Q.   Okay.  On April 10th, 2005, there was a meeting of the
23         voters regarding Mrs. Perich's call, correct?
24    A.   I believe that was the date.  I don't --
25    Q.   Did you understand that Mrs. Hoeft had called
00060
 1         particular voters to attend that meeting?
 2    A.   I did not know that, no.
 3    Q.   Do you have any knowledge whatsoever as to how notice
 4         was provided as to this meeting taking police?
 5    A.   We are required to give -- it has to be in the worship
 6         service that a special meeting is being called, so
 7         that is the only requirement as far as notice of a
 8         special meeting.
 9    Q.   In the past has the congregation or the voters ever
10         voted on rescinding a call?  An involuntary rescinding
11         of a call?
12    A.   Not that I remember.
13    Q.   And you've been there how long?
14    A.   I've not -- I've not been in that type of a position.
15         I've been president maybe 10, 12 years.
16    Q.   You were in what position before that time?
17    A.   I was -- I'm trying to remember the sequence of
18         events.  I was head of the stewardship board prior to
19         that for maybe four years maybe.  I was an elder
20         before that.
21    Q.   Okay.
22    A.   So --
23    Q.   So the -- the --
24    A.   I don't remember; since I've been --
25    Q.   Determination?
00061
 1    A.   -- since I've been out of college, which is 30 some
 2         years, I don't remember a -- rescinding at all.
 3    Q.   Or, in essence, firing somebody?
 4              MR. WARE:  I'm going to object as to --
 5    BY MR. ROACH:
 6    Q.   You can answer.
 7              MR. WARE:  I'm going to object as to the --
 8         what's the word I'm looking -- as to the
 9         characterization of --
10              MR. ROACH:  I think firing is a --
11    A.   Typically -- typically what happens is a discussion is
12         had to -- to get a peaceful release, if it is a call
13         position.  We have done that.  There have been --
14         there have been occasions where we have -- we have
15         asked for a peaceful release and it was granted.
16         Contract teachers, I think -- I don't know whether
17         we've -- I think the contract goes for a year or
                                    Page 26
```

```
                                    pranschke.james_060408.txt
18         whatever and I think we've decided not to renew
19         contracts.
20    BY MR. ROACH:
21    Q.   Going back to my question, when the voter group, as
22         recommended by the board of directors, decides to
23         rescind a call, rescind a call, in essence, this
24         employee is being fired, correct, versus employment is
25         being terminated involuntarily?
00062
 1    A.   Yeah, that's probably fair.
 2    Q.   Okay.  As to these voters meetings -- well, actually
 3         we only know of one now -- regarding this Ms. Perich,
 4         the vote to terminate her employment, what determined
 5         who get to -- who was able to vote?
 6    A.   People -- people sign in to the -- to the assembly and
 7         we don't, you know, don't validate, you know, are
 8         they -- are they a member or whatever.
 9    Q.   To your knowledge do some of those people who attended
10         had not been there for awhile as far as attending the
11         church?
12    A.   Oh, I have -- I have no idea.
13    Q.   Okay.
14    A.   We -- we do have meetings that get more attention than
15         others.
16    Q.   Through Mr. Ware's office we received several meeting
17         minutes, copies of meeting minutes.  I believe there
18         is the January 30th, 2005 shareholder meeting and also
19         the minutes for the April 10th, 2005 meeting regarding
20         the voters, correct?
21    A.   Uh-huh.
22    Q.   Do you know the documents I'm talking about, those
23         minute --
24    A.   I -- I have not reviewed them.  I know that they
25         exist.
00063
 1    Q.   I believe we looked at one of those.
 2    A.   We looked at the January --
 3    Q.   All right.  Are there any other meeting minutes to
 4         your knowledge that were drafted or prepared or any
 5         other notes regarding meetings that -- in which Mrs.
 6         Perich was discussed?
 7    A.   I -- I assume there are school board minutes, but I --
 8         I don't get copies of those.
 9    Q.   All right.  So if we want to see what was taking place
10         in these meetings, the school board minutes, we would
11         need to look at those school board meeting minutes
12         then, correct?
13    A.   Yes.
14    Q.   Who do we look for?  I mean, who has those meeting
15         minutes?
16    A.   I don't know.  We just -- we just changed chair people
17         or chairperson.  I -- I don't know where they -- where
18         they reside.
19    Q.   Okay.  You were involved, at least to some extent,
20         regarding Ms. Perich's employment, correct?
21    A.   I assume I presided over the meeting when we called
22         Mrs. Perich, although there have been been times when
23         I haven't been able to be at a meeting.  I was at
24         several school board meetings when that was discussed.
25    Q.   And --
                                    Page 27
```

```
                                    pranschke.james_060408.txt
00064
 1    A.   And I was at the two congregational meetings where it
 2         was discussed.
 3    Q.   And you were asked also asked to meet with Mrs. Perich
 4         with Mr. Salo prior to the February 13, 2005 meeting,
 5         correct?
 6    A.   I don't -- I don't remember that meeting.
 7    Q.   Did you ever write down any notes as to what happened?
 8    A.   I may have.
 9    Q.   Do you have those notes?
10    A.   Oh, my gosh.  My organizational skills are not real
11         well.
12    Q.   Well, we're going to be --
13    A.   I may --
14    Q.   -- requesting those documents so if they do exist
15         we'll request copies of those just to give you a heads
16         up.  In addition, do you use e-mail?
17    A.   I do.
18    Q.   Have you printed out e-mails in the past or keep
19         e-mails regarding certain subjects on your computer?
20    A.   My -- my e-mails from home I could review to see
21         what -- what is there.  Most things I got, I got at my
22         workplace.
23    Q.   Okay.
24    A.   And I am no longer at the -- at the firm I was at the
25         time that this was going on, so I don't have those
00065
 1         e-mails.
 2    Q.   Okay.  I guess I got lost.  At your prior firm?
 3    A.   Yes.
 4    Q.   Not at Blue Cross Blue Shield?
 5    A.   No.  I've been at Blue Cross two years.
 6    Q.   Okay.  What did you -- where were you employed before
 7         that?
 8    A.   Gabrielle Roeder Smith & Company.
 9    Q.   Is there an internal e-mail communication system
10         within the church and/or the school?
11    A.   All the -- all the teachers have an e-mail address, so
12         I guess that's internal.
13    Q.   But do you know whether or not e-mails are saved?
14    A.   I have no idea.
15    Q.   Any back ups?
16    A.   I -- I do not know that.
17    Q.   Who would we talk to about asking that?  Who takes
18         care of the communication system?
19    A.   Richard Somerset is the one that does most of our
20         computer -- computer work.
21    Q.   He's a member?
22    A.   No.  He's a -- his children are in the school.
23    Q.   Somerset?
24    A.   Set.
25    Q.   Somerset?
00066
 1    A.   S-u-m-m-e-r-s-e-t-t maybe.  I don't know.
 2    Q.   Okay.  If you look at Exhibit 2, Mr. Weaver was asking
 3         you about some of the attachments.  The third page
 4         it's labeled or entitled Hosanna Tabor disability
 5         policy.
 6    A.   Oh, okay.
 7    Q.   And this was attached to those meeting minutes and was
 8         discussed during this meeting on January 30th, 2005,
                                    Page 28
```

```
                      pranschke.james_060408.txt
       9        correct?
      10   A.   I -- I assume it was.
      11   Q.   Okay.  Well, if you look at the page before, going to
      12        item number 11 where it says report on revised
      13        disability policy, refer to attachment, Jim Pranschke,
      14        that's you, right?
      15   A.   Yep.
      16   Q.   All right.  Reviewed the policy with attendees?
      17   A.   Yes.
      18   Q.   Are you referring to this?
      19   A.   Yes.
      20   Q.   Other thing?
      21   A.   Yes.
      22   Q.   Is this a new or revised policy?
      23   A.   It would be a revised policy.
      24   Q.   Why is it being changed, to limit the amount of time a
      25        person would be able to obtain a disability,
  ꜞ
00067
       1        compensation or payments?
       2   A.   Right off hand, I can't -- I can't remember what --
       3        what the change was in this.
       4   Q.   Do you have a copy of the prior policy?
       5   A.   I may.
       6   Q.   Okay.  Looking at Exhibit 2 again, first page, it says
       7        in item No. 9, it says request from Jim Hoeft to
       8        change call to a contract, Jim Pranschke, letter
       9        submitted by Jim Hoeft attached and I don't remember
      10        seeing anything attached.  And it says unanimous vote
      11        to accept Jim Hoeft's request to be a contract
      12        teacher.  Is that accurate, what's written in there?
      13   A.   Yes.
      14   Q.   Jim Hoeft is Stacey Hoeft's husband, son?
      15        Relationship?
      16   A.   Brother-in-law.
      17   Q.   Brother-in-law, all right.  So Jim Hoeft was a call
      18        teacher?
      19   A.   Correct.
      20   Q.   Why is there being a change as to Mr. Hoeft's status?
      21   A.   It was advantageous to him not to have to pay his
      22        Social Security tax.
      23   Q.   All right.  Prior to this meeting date did you know --
      24        or actually going back to December the year before,
      25        isn't it to your knowledge that Ms. Hoeft was told by
  ꜞ
00068
       1        Ms. Perich that she was going to be able to return to
       2        work within two months?
       3                  MR. WARE:  Objection, hearsay.  You can
       4        answer if you want to.
       5   A.   My recollection of the discussion was that often Ms.
       6        Perich gave the information that she was going to be
       7        returning to work shortly.  Shortly came and she did
       8        not return.  Then another date was given, another
       9        diagnosis, another -- and it seemed like it was very
      10        uncertain that the information we were getting was --
      11        was correct or could be relied on.
      12   BY MR. ROACH:
      13   Q.   Does that mean that you were told that Ms. Perich
      14        would be able to return to work within two months back
      15        in December of 2006?
      16   A.   I don't remember that specifically.  I remember that
      17        in the conversation of -- in that school board meeting
                                Page 29
```

```
                      pranschke.james_060408.txt
      18        it was clear that -- that we really had no clear idea
      19        of when, if ever, Ms. Perich would be able to return
      20        to work.
      21   Q.   But isn't it true that Ms. Perich told you I believe
      22        within three days before the January 30th meeting that
      23        she was, in fact, going to be able to return to work
      24        in approximately two to three weeks?
      25                  MR. WARE:  I'm going to object as to the form
00069
       1        of the question.  When you say you, are you referring
       2        to somebody at the organization or him personally?
       3                  MR. ROACH:  The organization.
       4   BY MR. ROACH:
       5   Q.   That somebody told you that Ms. Perich informed Ms.
       6        Hoeft that Ms. Perich will be able to return to work
       7        within two to three weeks later; isn't that correct?
       8   A.   I don't -- I don't remember that specifically, no.
       9   Q.   When you say specifically, I just want to make sure we
      10        have everything covered.  Who told you at least right
      11        before this meeting as to what her status would be as
      12        far as returning to work?
      13   A.   I didn't -- I don't know that I knew what her status
      14        was prior to this meeting.
      15   Q.   Wouldn't you want to know what her status is before
      16        you make decisions or make recommendations as to what
      17        should happen with her disability leave?
      18   A.   No.  We had talked about it at the school board
      19        meeting that the information that was being provided
      20        was unreliable, that it was -- it was said we're going
      21        to return to work, she would return to work in a
      22        month, in two weeks, you know, and it varied.
      23   Q.   All right.  So basically --
      24   A.   And the diagnosis changed and -- and the treatment
      25        changed and there was always new treatment and a new
  ꜞ
00070
       1        hope and information that they were going to -- she
       2        was going to return to work.  She did not.
       3   Q.   All right.
       4   A.   And so it was -- it was very unreliable.
       5   Q.   All right.
       6   A.   So even if she did provide that information, it would
       7        have been deemed unreliable.
       8   Q.   In other words, if even if she told Ms. Hoeft that she
       9        was going to return to work in two or three weeks,
      10        nobody believed it?  You didn't believe her?
      11   A.   I don't know that it was provided, so I don't --
      12   Q.   All right.  Have you ever discussed -- have you ever
      13        talked with Bruce Braun?
      14   A.   Never specifically about this.  I may have had a
      15        conversation.  He took over for George Locke.  I
      16        always get in trouble with these time frames because
      17        it's always longer ago than I thought, but within the
      18        last two years I think I may have talked to him
      19        briefly at some kind of gathering, but never in an
      20        official capacity I don't think I've ever talked to
      21        Bruce.
      22   Q.   To your knowledge has anyone from the school or the
      23        church had discussions with Bruce Braun regarding Ms.
      24        Perich?
      25   A.   I don't know that for sure.
  ꜞ
                                Page 30
```

```
                      pranschke.james_060408.txt
00071
       1   Q.   Do you know why draft letters to Ms. Perich are in the
       2        Michigan District's files?
       3   A.   No, I do not.
       4   Q.   Is there any reason why Stacey Hoeft would be having
       5        conversations with Bruce Braun at Michigan District
       6        regarding Cheryl Perich?
       7   A.   We would -- we at times do offer their -- I mean, I
       8        mentioned that before that we get advice from our
       9        district office.
      10   Q.   Okay.  Maybe now we're getting somewhere.  So the --
      11        the church does get advice from the Michigan District?
      12   A.   When we request, yes.
      13   Q.   All right.  Regarding human resource issues?
      14   A.   I --
      15   Q.   Personnel issues?
      16   A.   I don't know what specifically we've asked.  I know
      17        specifically we used district resources with our
      18        vision and mission and goals.
      19   Q.   So why -- what right or how would you get assistance
      20        from Michigan District?
      21   A.   Call and ask.
      22   Q.   How is that available to the church?
      23   A.   We're all part of the same -- same senate, that's
      24        services they offer to congregations in the Michigan.
      25   Q.   Does the church pay dues or fees to the Michigan
  ꜞ
00072
       1        District?
       2   A.   We give -- we give contributions to them.  It is
       3        not -- it is not a hard and fast contribution.  I
       4        mean, it's not -- it's not dues, per se.
       5   Q.   Okay.
       6   A.   It's similar to what our members -- our members give a
       7        donation when they come to church on Sunday and we in
       8        turn take a portion of that and send it to district,
       9        district in turns a portion of what they receive
      10        and sends it to senate.  That's how -- that's how the
      11        organizations are supported.
      12   Q.   I believe Mr. Weaver asked you about a school board
      13        meeting on February 13th, 2005 regarding Ms. Perich,
      14        correct?
      15   A.   Uh-huh.
      16   Q.   All right.  And this was a school board meeting,
      17        right, on February 13th, 2005?
      18   A.   I believe so, yes.
      19   Q.   So the people who would be there would be, in addition
      20        to yourself, there'd be Kurt Ostrander?
      21   A.   I have no idea who was at that meeting.  Not
      22        everybody --
      23   Q.   Sheila Simpson?
      24   A.   Not everybody attends those meetings.
      25   Q.   Stacey Hoeft you don't have a clue --
  ꜞ
00073
       1                  MR. WARE:  Objection, asked and answered.
       2   BY MR. ROACH:
       3   Q.   Ms. Stacey Hoeft, was she there?
       4   A.   I believe she was there, yes.
       5   Q.   Do you have any recollection as to how big the meeting
       6        was, who was allowed to attend?
       7   A.   No.  I know that Mr. Salo was there and Mrs. Hoeft.
       8        Other than that, I would -- I would just be
                                Page 31
```

```
                      pranschke.james_060408.txt
       9        speculating who else was there.
      10   Q.   Do you recall that someone asked whether Ellen Mills
      11        would be able to attend even though she's not a member
      12        of the school board and you were -- you responded
      13        that she would not be allowed to attend.  Do you
      14        recall that?
      15   A.   I remember reading that in the -- in this document.  I
      16        seem to have a recollection of that request being
      17        made.
      18   Q.   By you?
      19   A.   By -- by me?
      20   Q.   Yeah.
      21   A.   That I requested that Ellen --
      22   Q.   That Ellen Mills would not be allowed to attend.
      23                  MS. PERICH:  It wasn't requested by him, it
      24        was requested to him.
      25   A.   That seems reasonable that I would have decided that.
00074
       1   BY MR. ROACH:
       2   Q.   Okay.  Do you recall some of the other -- some of the
       3        comments that were made during that meeting by the
       4        school members regarding whether or not Ms. Perich
       5        would be able to return to work notwithstanding what
       6        her doctor said through the doctors -- her doctor's
       7        return to work slip, correct?  Do you recall those
       8        comments?
       9   A.   I don't recall specific comments.
      10   Q.   Well, let's bounce a couple off of you.  Do you recall
      11        Stacey saying that she didn't understand how -- how
      12        Ms. Perich could be responsible for a classroom of
      13        children when she wasn't even allowed to drive?
      14   A.   I remember hearing that comment.  I don't know if it
      15        was at that meeting.
      16   Q.   Okay.  Do you remember the comment that -- with Sheila
      17        saying I have a medical background and I know that you
      18        have to be without symptoms for at least three months
      19        before you can be sure that the medicine is working
      20        well enough to know that you won't have symptoms
      21        again.  You can be in front of those children and pass
      22        out, that would scare them.  Do you recall that
      23        comment?
      24   A.   I remember that comment.  I don't know, again, whether
      25        it was in that meeting.  I have -- I mean, I have
  ꜞ
00075
       1        conversations with all these people at -- many times.
       2   Q.   Isn't it true that during the course of this school
       3        board meeting that Ms. Perich wanted to return to work
       4        and was passing -- passing out copies of the return to
       5        work and saying that she will be allowed to return to
       6        work without restrictions?
       7   A.   I don't remember the details of all that.  I know that
       8        she did express a desire to return to work.
       9   Q.   All right.  Did you review the letter that was sent to
      10        Ms. Perich later saying that the board of directors is
      11        going to recommend to the church the termination of
      12        her employment?
      13   A.   I have read it.  I don't think I -- I reviewed it
      14        before it went out.
      15   Q.   Did any -- was anybody -- was it necessary -- let me
      16        strike -- start over.  Was it necessary for anyone to
      17        approve this letter before it was being sent out?
                                Page 32
```

```
                        pranschke.james_060408.txt
       18   A.    I think it was discussed at a school board meeting
       19         that I was in attendance, that that meeting -- that
       20         that letter was to be drafted and sent out.
       21   Q.    SO there should be minutes for that meeting, right?
       22   A.    I'm assuming so, yes.
       23   Q.    Okay.
       24               MR. ROACH:  Let's go ahead and mark that for
       25         me, please.

00076
        1                      MARKED BY THE REPORTER
        2                      DEPOSITION EXHIBIT NUMBER 5
        3                      4:49 p.m.
        4                      (Off the record at 4:49 p.m.)
        5                      (Back on the record at 5:12 p.m.)
        6   BY MR. ROACH:
        7   Q.    I believe where we left off was with this letter
        8         that's been marked as Exhibit 5.  And I can't remember
        9         specifically where we left it, but let me go at it
       10         anyway.  Did you review this letter before it was
       11         being sent to Ms. Perich?
       12   A.    I was involved in the conversation that this was going
       13         to be drafted, but --
       14   Q.    All right.
       15   A.    -- no, I did not review this.
       16   Q.    Do you see anything in this letter that is not
       17         accurate?
       18   A.    No.
       19   Q.    As of the January 30th, 2005 shareholder meeting,
       20         there had not -- the church had not hired a
       21         replacement for Ms. Perich yet, correct?
       22   A.    I don't know that.  I -- I -- my recollection was that
       23         there was someone going to take over when -- when
       24         the -- the holiday break was over.
       25   Q.    Okay.  Well, up to -- at some point at least there was

00077
        1         no replacement or substitute that was hired, correct?
        2   A.    Yes.  It was anticipated that Ms. Perich was going to
        3         return.
        4   Q.    All right.  I believe, if we look at the January 30th,
        5         2005 meeting minutes, we look at the last page, number
        6         two, the last -- the bullet point?
        7   A.    Uh-huh.
        8   Q.    It states it is important to the school's operation
        9         that Ms. Perich ask for people (sic) release from her
       10         call to facilitate the search for a replacement.  Do
       11         you read that to understand that Mrs. Replacement
       12         (sic) had not been hired to re --
       13   A.    That -- that seems to imply that.
       14   Q.    Okay.
       15   A.    I don't remember those facts exactly.
       16   Q.    Is it true that a recent graduate from Concordia was
       17         hired?
       18   A.    Oh, I have no idea who was hired.  That was a long
       19         time ago.
       20   Q.    So you have no clue as to --
       21   A.    I -- I do not know, no.
       22   Q.    So you don't know whether or not the person they hired
       23         was a called or a contract employee as opposed to a
       24         call employee?
       25   A.    I'm fairly confident we would have had a contract.
                                Page 33
```

```
                        pranschke.james_060408.txt
00078
        1   Q.    All right.  And when you called those folks as being
        2         contract employees, is there in fact a contract with
        3         these people?  The hires?
        4   A.    That would make sense, wouldn't it?  I don't know that
        5         for sure.  I don't know if -- if there is a formal
        6         document.  Again, I assume there is.
        7   Q.    Does the school or the church have personnel files?
        8   A.    I believe so, yes.
        9   Q.    All right.  So if we wanted to find or obtain the
       10         personnel file for this employee that was hired in
       11         January or February or April, whatever the case may be
       12         in 2005, we'd get that personnel file and see who it
       13         is and a copy of the contract and all that?
       14   A.    I would imagine.  I've never seen what the contents of
       15         a personnel file is.  I've had no reason to review any
       16         contract or personnel files.
       17   Q.    You, if I recall your testimony -- and it went for a
       18         little while and maybe I was a little confused at the
       19         end -- Mr. Weaver ask asked you about a conversation
       20         you may have had with Ms. Perich after that -- the
       21         time she returned to work on February 22nd, 2005,
       22         correct?
       23   A.    He asked me about a conversation --
       24   Q.    Actually, let's strike that.  Not -- after the
       25         February 13th, school board meeting.

00079
        1   A.    I believe I said I didn't know when the meeting --
        2         when call was.
        3   Q.    All right.
        4   A.    And -- and I'm not -- I mean, the more we talk about
        5         it I think it did occur, but I don't remember.
        6   Q.    Well, maybe we can refresh your recollection as to the
        7         substance of that conversation.  Did you in fact
        8         discuss with her about Ms. Perich going back to her
        9         doctor and asking the doctor to put her on disability?
       10   A.    Did I initiate this call or did -- did Ms. Perich?
       11   Q.    As I understand it you did, but I'm not certain.
       12   A.    Okay.  I don't -- I don't remember the detail of that.
       13   Q.    Okay.  Well, even if you don't remember the detail, so
       14         to speak, did you have a conversation with Mrs. Perich
       15         about her going back to her doctor and getting the
       16         doctors to change the records so that she is not
       17         eligible to return to work so she can receive --
       18   A.    Oh, no.  I would have never sent a doctor to return to
       19         work.
       20   Q.    Huh?
       21   A.    I would have never said to change the record that she
       22         would not be eligible to return to work.  That would
       23         not have been a discussion.
       24   Q.    Well, what discussion would it have been?
       25   A.    I don't -- I don't recollect asking her to go talk to

00080
        1         her doctor at all.
        2   Q.    Didn't you say that -- you told her to call the doctor
        3         and ask him about it, if he stays with that date, the
        4         return to date and won't change it, I'll ask the
        5         congregation to give you some monetary help if you ask
        6         for a peaceful release.
        7   A.    I don't remember anything about asking her to talk to
        8         her doctor.  I do remember saying that we would try to
                                Page 34
```

```
                        pranschke.james_060408.txt
        9         give some monetary help if she would give a peaceful
       10         release.  In other words, we would -- we would
       11         increase the offer that we had -- had made.
       12   Q.    But that an increase in the offer or making it more
       13         generous, whatever the case may be, it was never put
       14         into writing after that date?
       15   A.    I don't believe so, no.
       16   Q.    This peaceful release, why is it called a peaceful
       17         release?
       18   A.    Because it is contrasted to rescinding a call.
       19   Q.    Peaceful means it's voluntary?
       20   A.    Yes.
       21   Q.    All right.  Is there -- of course it's never happened
       22         before, so --
       23   A.    Oh, no, peaceful releases are done all the time.  If
       24         a -- if a teacher would accept a call to another
       25         congregation or a pastor --

00081
        1   Q.    Okay.
        2   A.    -- they would -- they would request a peaceful release
        3         from their call to Hosanna Tabor.
        4   Q.    All right.  Is there any documentation, like those
        5         with -- for peaceful release?
        6   A.    Typically I think they would send a letter to request
        7         that.
        8   Q.    So just basically means I resign?
        9   A.    No.  I request a peaceful release from my call is what
       10         it would say.
       11   Q.    I understand, but is it the equivalent of saying I
       12         quit or I resign?
       13   A.    No, because it's a call, it's a relationship between a
       14         congregation and a -- and a member or a servant, so
       15         it's not -- I guess in the -- in the secular world,
       16         yeah, it would be a resignation.
       17   Q.    Okay.  So on April 10th, 2005 there was a vote taken
       18         by the congregation to terminate Ms. Perich's
       19         employment, correct?
       20   A.    To rescind her call, yes.
       21   Q.    Which is the equivalent of termination, right?
       22               MR. WARE:  Okay.  I'm going to object to
       23         argumentative because you keep doing the same thing.
       24         Every time he answers a question you recharacterize
       25         his answer.  That's argumentative.

00082
        1               MR. ROACH:  I'll take the answer over the
        2         objection.
        3   BY MR. ROACH:
        4   Q.    That's the same thing as voting for the termination?
        5   A.    Rescinding the call is, again, severing the
        6         relationship that we have with this called servant.
        7   Q.    All right.  And her employment has been terminated,
        8         correct?
        9   A.    But she hadn't been working anyways, but, yes.
       10   Q.    Did you recommend to the voters that she be fired?
       11               MR. WARE:  Objection, facts not in evidence.
       12         There was no recommendation that she be fired.
       13               MR. ROACH:  I'll take the answer over the
       14         objection.
       15   A.    I presented the -- the recommendation from the board
       16         of directors.  It might have been the school board, I
       17         don't remember which.
                                Page 35
```

```
                        pranschke.james_060408.txt
       18   BY MR. ROACH:
       19   Q.    So it wasn't your recommendation that you were
       20         presenting, it was the board of director's
       21         recommendations?
       22   A.    I'm a member of the board of directors.
       23   Q.    All right.
       24   A.    No, it was not my personal recommendation.
       25   Q.    All right.  Was that -- so there was a decision made

00083
        1         of which you were a part of to --
        2   A.    And I -- again, I don't remember -- I don't remember
        3         whether it was the board of directors that brought
        4         that motion to the congregation or if it was the
        5         school board.
        6   Q.    Okay.
        7   A.    But I was privy of it before we called a special
        8         meeting.
        9   Q.    Maybe -- I was trying to follow the relationship
       10         between the board of directors and the school board
       11         and the congregation and the other boards.  Do the --
       12         does the school board provide recommendations as to
       13         either providing a call or hiring an employee, a
       14         teacher?
       15   A.    Yes.
       16   Q.    What about the board of directors, do they provide
       17         recommendations as to --
       18   A.    Typically it is a call committee that provides the --
       19         the slate of candidates basically.  The process is
       20         you -- you ask district for candidates that are --
       21         would meet your need as far as a call.  Typically, I
       22         mean, we've had as many as nine candidates.
       23   Q.    People who are eligible for a job?
       24   A.    Yes.
       25   Q.    All right.

00084
        1   A.    And then the call committee -- often the call
        2         committee for -- for a teacher is made up of the board
        3         of directors and they are -- I mean not -- I'm
        4         sorry -- the school board and there may be other
        5         members at large but it is up to the school board
        6         chair to convene that call committee.  And if you are
        7         calling a pastor, it's the board of elders that serves
        8         that function.
        9   Q.    All right.  And I'm still confused so maybe we can
       10         clarify this.  You have the board of directors?
       11   A.    Correct.
       12   Q.    Of which you were an ex-officio member, correct?
       13   A.    No, board of directors I am a member.
       14   Q.    You are a member.  Then you have the school board and
       15         you are an ex-officio member?
       16   A.    Correct.
       17   Q.    The call committee is a committee of which, the school
       18         board or the board of directors?
       19   A.    I don't know the answer to that.  It may be of the
       20         congregation.
       21   Q.    So it's almost like a separate board but called a
       22         committee?
       23   A.    It's not -- it's not a board, it's a temporary
       24         assignment and -- and typically -- so it's hard to --
       25         it's hard to separate, you know, what typically
                                Page 36
```





```
                         pranschke.james_060408.txt
 9     place hereinbefore set forth; that the witness was by
10     me first duly sworn to testify to the truth, and
11     nothing but the truth; that the foregoing questions
12     asked and answers made by the witness were duly
13     recorded by me stenographically and reduced to
14     computer transcription; that this is a true, full and
15     correct transcript of my stenographic notes so taken;
16     and that I am not related to, nor of counsel to either
17     party nor interested in the event of this cause.
18
19
20
21                     _____
22                     Jodi L. Jones, CSR-6591
23                         Notary Public,
24                      Oakland County, Michigan
25       My Commission expires:  September 14, 2013
⎣
00095
 1                      INDEX TO EXAMINATIONS
 2
 3     Witness                                          Page
 4     JAMES EDWARD PRANSCHKE
 5
 6     EXAMINATION BY MR. WEAVER .......................   4
 7     EXAMINATION BY MR. ROACH ........................  46
 8
 9                        INDEX TO EXHIBITS
10
11     Exhibit                                          Page
12
13     DEPOSITION EXHIBIT NUMBER 1 .....................   9
14     DEPOSITION EXHIBIT NUMBER 2 .....................  20
15     DEPOSITION EXHIBIT NUMBER 3 .....................  29
16     DEPOSITION EXHIBIT NUMBER 4 .....................  40
17     DEPOSITION EXHIBIT NUMBER 5 .....................  76
18     DEPOSITION EXHIBIT NUMBER 6 .....................  85
19
20
21
22     (Exhibits attached to transcript.)
23
24
25
⎣
```

Page 41