Page 1

CHERYL PERICH
July 3, 2008

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                  SOUTHERN DIVISION

 4

 5    EQUAL EMPLOYMENT OPPORTUNITY

 6    COMMISSION,

 7              Plaintiff,

 8       vs.                      Case No. 2:07-cv-14124

 9                                Hon. Patrick J. Duggan

10    HOSANNA TABOR EVANGELICAL LUTHERAN

11    CHURCH AND SCHOOL,

12              Defendant.

13       and

14    CHERYL PERICH,

15              Plaintiff/Intervenor,

16       vs.

17    HOSANNA TABOR EVANGELICAL LUTHERAN

18    CHURCH AND SCHOOL,

19              Defendant.

20    _____

21

22

23

24

25
```

**ORIGINAL**

---

Page 2

CHERYL PERICH
July 3, 2008

```
 1       The Deposition of CHERYL PERICH,

 2       Taken at 31780 Telegraph Road, Suite 200,

 3       Bingham Farms, Michigan,

 4       Commencing at 9:07 a.m.,

 5       Thursday, July 3, 2008,

 6       Before Cheri L. Gleyre, RPR, CSR-6548.

 7

 8

 9    APPEARANCES:

10

11    OMAR WEAVER

12    Equal Employment Opportunity Commission

13    477 Michigan Avenue

14    Suite 865

15    Detroit, Michigan  48226

16    (313) 226-3407

17       Appearing on behalf of the Plaintiff.

18

19    DEANO CARLOS WARE

20    Deano C. Ware, P.C.

21    24801 Five Mile Road

22    Suite 16

23    Redford, Michigan  48239

24    (313) 541-8433

25       Appearing on behalf of the Defendant.
```

---

Page 3

CHERYL PERICH
July 3, 2008

```
 1    JAMES E. ROACH

 2    Vercruysse, Murray & Calzone, P.C.

 3    31780 Telegraph Road

 4    Suite 200

 5    Bingham Farms, Michigan  48025

 6    (248) 540-8019

 7       Appearing on behalf of the Plaintiff/Intervenor.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 4

CHERYL PERICH
July 3, 2008

```
 1    Bingham Farms, Michigan

 2    Thursday, July 3, 2008

 3    9:07 a.m.

 4

 5                   CHERYL PERICH,

 6    was thereupon called as a witness herein, and after

 7    having first been duly sworn to testify to the truth,

 8    the whole truth and nothing but the truth, was

 9    examined and testified as follows:

10       MR. WARE:  Hi.  Good morning, Cheryl.

11       THE WITNESS:  Good morning.

12       MR. WARE:  I'm going to abbreviate the

13    preamble that Mr. Weaver and most attorneys normally

14    give before a deposition because I know you've sat

15    through the majority of the depositions, but first of

16    all, have you ever had your deposition taken?

17       THE WITNESS:  No, I have not.

18       MR. WARE:  Well, first of all, we'll just

19    ask if I ask a question that if you can answer, if it

20    calls for a yes or no answer, say either yes or no and

21    not uh-huh or uh-uh, and that's just to help the court

22    reporter.  In addition, if I'm talking and you're

23    trying to answer a question, just kind of either wait

24    until I finish, and the same thing with you, if you're

25    trying to finish up something just kind of let me know
```



Page 5

CHERYL PERICH
July 3, 2008

```
 1    if I -- you know, I tend to kind of cut you off if you
 2    want to finish it because she can't pick us up if
 3    we're both talking at the same time.
 4               In addition, if you don't know the answer to
 5    a question, simply say you don't know.  If you don't
 6    remember something, simply say you don't remember
 7    because the purpose of this is not to trick you up
 8    with anything, so -- by the same token if you're
 9    guessing or if you think, then you can qualify your
10    answer with well, I guess or I think or in a manner
11    like that, just a kind of qualification like that.
12    And other than that, if you need something, like some
13    water or you want to take a break or something, let me
14    know, okay?
15               THE WITNESS:  Okay.
16               MR. WARE:  And then, you know, if you can't
17    hear me, let me know or if you can't understand a
18    question, let me know.  If you answer a question I'm
19    going to assume you understood the question, okay?
20               THE WITNESS:  Okay.
21                     EXAMINATION
22    BY MR. WARE:
23    Q.   First of all, state your name for the record and spell
24         your last name for the court reporter?
25    A.   Cheryl Perich, P-E-R-I-C-H.
```



Page 6

CHERYL PERICH
July 3, 2008

```
 1    Q.   And, Ms. Perich, how old are you?
 2    A.   53.
 3    Q.   Where do you currently reside?
 4    A.   3306 Edgeworth, E-D-G-E-W-O-R-T-H, Ferndale, Michigan
 5         48220-3422.
 6    Q.   How long have you resided in Ferndale, Michigan?
 7    A.   Let's see, just an approximation in years.
 8    Q.   Are you trying to count back to your childhood because
 9         I can change the question to as an adult?
10    A.   No, I'm counting back to when my oldest son was in
11         ninth grade back from the time he graduated, so I'm
12         just thinking about it that way, so I was thinking it
13         was '99.
14               MR. ROACH:  You can just provide a range,
15         Cheryl.  You don't have to be specific if you don't
16         know the exact year.
17    BY MR. WARE:
18    Q.   You don't remember?
19    A.   I really -- I don't remember.
20    Q.   That fine.  That's an answer.
21    A.   I'm trying to remember that it was -- it was the same
22         year I started -- it was the same year that I started
23         teaching at Calvary and I think that you probably have
24         those records.  Okay.  Sierra graduated in 2001, so
25         that would be -- that would be 2000 -- oh, that's
```



Page 7

CHERYL PERICH
July 3, 2008

```
 1    right because I was counting the youngest, so that was
 2    2001, so fall would be 2000.  Oh, that's why, I was
 3    counting the wrong child, so graduated in 2001, so
 4    it's 2000, so that's '99, '98, '97.  Yep, it was the
 5    fall of '97 when I moved there.  I was there as a
 6    child, but when I moved back there was like August of
 7    '97.
 8    Q.   So approximately 11 years?  This is 2008.
 9    A.   Uh-huh.
10               MR. WEAVER:  You have to say yes.
11    A.   Yes.
12    BY MR. WARE:
13    Q.   I can't remember what that question was.  Okay.  And
14         what's the highest level of education that you've
15         obtained?
16    A.   Bachelor's plus more than -- I can't remember exactly
17         how many graduate classes, but I know it was more than
18         30 semester hours of graduate-level classes.
19    Q.   And would that be toward a master's, graduate classes?
20    A.   No, because it wasn't spread -- you have to get
21         graduate level -- in order to do a master's your
22         classes have to be within five years, and mine were
23         spread out within different years toward different
24         things.  The first classes I took were to keep my
25         certificate good, and then my next classes I took
```



Page 8

CHERYL PERICH
July 3, 2008

```
 1    because I was thinking about becoming a reading
 2    specialist, so I took a lot of reading classes.
 3               And then I found out that there really
 4    weren't that many jobs for reading specialists and
 5    there were seemed to be a lot of jobs for early
 6    childhood at that time, so then I started taking
 7    classes toward my early-childhood endorsement, so then
 8    I took the classes and got my early-childhood
 9    endorsement.
10               So the classes were spread out over a number
11    of years and they were in different areas --
12    Q.   Okay.
13    A.   -- so it really didn't all gel together to be able to
14         get a master's, although I probably have either enough
15         credits or almost enough credits to get a master's,
16         but it was within various different areas and not all
17         together, you know, not within the five years.
18    Q.   That's good.  Your B.A., what is that in?
19    A.   Elementary education with a major in language arts and
20         a minor in social studies.
21    Q.   Okay.  Do you have a teaching certificate?
22    A.   Yes, I do.
23    Q.   And is that through the State of Michigan?
24    A.   Yes, I have a -- a K-8 teaching certificate through
25         the State of Michigan and I also have the
```

CHERYL PERICH
July 3, 2008

```
 1        early-childhood endorsement on that, have the
 2        endorsement for the language arts and social studies
 3        and then I have the -- which -- and then I have the
 4        early-childhood endorsement, which -- and then on
 5        that, and I also have a teaching certificate, a
 6        lifetime teaching certificate in the state of Texas
 7        for 1st through 6th.
 8   Q.   You said a lifetime teaching certificate from the
 9        State of Texas?
10   A.   Right.
11   Q.   Have you ever resided in the state of Texas?
12   A.   Yes, I did.
13   Q.   About how long ago was that?
14   A.   Oh, that was a long time ago.  That was back in --
15        let's see, I moved down there in 1978 and stayed there
16        a little over a year.  I didn't realize it, but the
17        part of Texas that I -- I mean, Texas is a big state.
18        Some parts of the state are wonderful for allergies
19        and other parts are horrible for allergies, and the
20        part I moved to was the part that was the worst for
21        allergies.
22             And so I developed asthma while I was down
23        there, and I really had a rough time while I was down
24        there, and they tried to treat a lot of problems I had
25        there.  And finally the allergy doctor said the only
```



CHERYL PERICH
July 3, 2008

```
 1        thing he could suggest I do was move back to Michigan.
 2   Q.   So you moved back to Michigan in 1979?
 3   A.   Actually I think it was -- I don't remember if it
 4        was -- I think it was toward the end of '78 actually.
 5        I not only had asthma, but I actually lost my voice
 6        and they couldn't figure --
 7             MR. ROACH:  Ms. Perich, just respond to the
 8        questions.  Respond to the questions.
 9   BY MR. WARE:
10   Q.   You moved back to Michigan, was it around --
11   A.   I don't know.  It was either toward the end of '78 or
12        '79, I don't remember which.
13   Q.   So between the year 1978 and '79, is that when you
14        received your lifetime teaching certificate in Texas?
15   A.   I received my lifetime teaching certificate the -- I
16        had a provisional teaching certificate, Texas
17        certificate, when I went down there that lasted for
18        one year, and then I took a Texas history class
19        that -- the following summer.  After I completed that,
20        that's when I got my lifetime Texas teaching
21        certificate.
22   Q.   So were you down there a year or a year and a half?
23   A.   Approximately a year and a half.
24   Q.   Okay.  So you got the lifetime teaching certificate
25        right before you left?
```



CHERYL PERICH
July 3, 2008

```
 1   A.   Well, a little while before I left, yeah.  It was the
 2        summer prior to the time I ended up having to leave
 3        because of the health problems that -- with the area
 4        that I was living in.
 5   Q.   Do you have any other education or professional
 6        training besides the B.A., the 30 hours of graduate
 7        classes and your two teaching certificates with
 8        endorsements?
 9   A.   No.
10   Q.   And where were you first employed coming out of
11        college, let's start there?
12   A.   When I first graduated from college I couldn't find a
13        teaching position, so I was -- I just substitute
14        taught.
15   Q.   Well, let me clarify.  You graduated from -- your
16        B.A., was that at Concordia?
17   A.   No, that was -- I wanted to go to Concordia but I
18        couldn't afford it, so I ended up -- so I went to OCC
19        for two years, that was the most affordable, and then
20        I went to Michigan State the next two years.
21   Q.   So you got a B.A. from MSU?
22   A.   Yes.
23   Q.   I'm an MSU graduate.  Okay.  So coming out of MSU
24        where did you get your first employment?
25   A.   I subbed in -- I was -- I tried to find employment and
```

CHERYL PERICH
July 3, 2008

```
 1        there wasn't employment to be found, so I was subbing
 2        for a year.
 3   Q.   Well, I mean substitute, whatever, I include that, so
 4        where did you sub at?
 5   A.   I subbed at, let's see, Hazel Park, Fitzgerald,
 6        Madison --
 7   Q.   Okay.  If it's just a school I just need the city, I
 8        don't need the actual school.
 9   A.   Those are the names of the public school districts.
10   Q.   Oh, okay.  Hazel Park.  What was the other district,
11        you said Fitzgerald?
12   A.   Hazel Park, Fitzgerald School District, Madison School
13        District, Lamphere School District.
14   Q.   And what year would this have been?
15   A.   That would have been from 1977 to '78.
16   Q.   Okay.  And then you went to Texas, right?
17   A.   Yes, I got tired of subbing.
18   Q.   Did you work in Texas?
19   A.   Yes, I did.
20   Q.   And what school district would that have been for?
21   A.   That was for the Huffman Independent School District.
22   Q.   And would that have been from 1978 to '79 or so?
23   A.   Yes, I believe so.  I'm not sure.
24   Q.   Okay.  And then you came back from Texas to Michigan
25        or did you go somewhere else?
```



CHERYL PERICH
July 3, 2008

```
 1        Yes, I came back to Michigan.
 2   Q.   Okay.  And where were you first employed when you
 3        returned?
 4   A.   I started subbing for the same school districts while
 5        I was looking and -- while I was looking for work.
 6   Q.   So how long would that have been, what period of time,
 7        from 1980, I'm assuming, or 1979?
 8   A.   Well, let's see, I was subbing and then when we were
 9        in this area --
10   Q.   I mean, I don't need the exact dates if you can just
11        give me the years or range of years and we can kind of
12        keep moving?
13   A.   It's hard to think way back then.  That's a long time
14        ago.
15   Q.   I know, I'm just trying to get some ranges so we can
16        get to 2000 I believe when you started with
17        Hosanna-Tabor.
18   A.   Well, I subbed for a while and then I taught Head
19        Start in the Lansing area, but I don't remember
20        exactly what year I started there.  I subbed for a
21        while here, then my husband got transferred -- well,
22        actually got -- he got a new job in Lansing.  His
23        position was -- at his job was going to be -- well,
24        anyway, he got a new job in the Lansing area, so we
25        moved there and I got a position with teaching Head
```



CHERYL PERICH
July 3, 2008

```
 1        Start there.
 2   Q.   Okay.  So do you remember where you were employed just
 3        prior to being hired at Hosanna-Tabor on a contract
 4        basis?
 5   A.   Yes.
 6   Q.   Where was that?
 7   A.   Calvary Lutheran School.
 8   Q.   And how long had you been at Calvary Lutheran?
 9   A.   Two years.
10   Q.   So that would have been 1998 to about 2000?
11   A.   Whatever is two years prior to me coming there.  It's
12        hard to -- without looking at a calendar it's kind of
13        hard to remember the exact dates.
14   Q.   I don't know if I have any of that, but was Calvary
15        Lutheran the first Lutheran school you were employed
16        at?
17   A.   No, it wasn't.
18   Q.   Where were you at before Calvary Lutheran?
19   A.   Emmanuel Lutheran School in Macomb.
20   Q.   And that -- how many years were you there?
21   A.   I was there for four years.
22   Q.   And was that the first --
23   A.   Yes.
24   Q.   Okay.  So you started with the Lutheran schools around
25        1994 at Emmanuel, then in 1998 you went to Calvary and
```



CHERYL PERICH
July 3, 2008

```
 1        in 2000 you started with Hosanna-Tabor, does that
 2        sound about right?
 3   A.   I think I started earlier than that.  I'm missing some
 4        years.  I think it was probably around '92 when I
 5        started.  I think I left -- if I remember I think it
 6        was around either -- I thought it was '92 or '93.  I
 7        was thinking it was '96 when I left Emmanuel.  It
 8        might have been '97, but I know I was there for four
 9        years.
10   Q.   But Emmanuel Lutheran was the first Lutheran school
11        you were employed with, right?
12   A.   Yes.
13   Q.   You mentioned your husband, are you married?
14   A.   No, I was married previously.
15   Q.   Okay.  Are you --
16   A.   He's now deceased.
17   Q.   So you're a widower?
18   A.   Yes.
19   Q.   Do you have any children?
20   A.   Actually if I was male I would be a widower.  I'm a
21        widow.
22   Q.   I knew that was wrong when it came out.  Do you have
23        any children?
24   A.   Yes, I do?
25   Q.   How many?
```

CHERYL PERICH
July 3, 2008

```
 1   A.   I have two.
 2   Q.   What are their ages?
 3   A.   22 and 25.
 4   Q.   Boys, girls?
 5   A.   Boys.
 6   Q.   The 22-year-old, what's his name?
 7   A.   John.
 8   Q.   And the 25-year-old?
 9   A.   Eric.
10   Q.   Do you remember the date you were first employed with
11        Hosanna-Tabor Lutheran School?  If not, I can show you
12        an I9 to refresh your recollection.  I don't know if
13        that's the first one in the employment file.  Does
14        that refresh your memory?
15   A.   Okay.  Yes, that would have been the year, August of
16        '99.
17   Q.   Okay.  So you first began employment with
18        Hosanna-Tabor Lutheran School in August of 1999?
19   A.   Uh-huh.
20   Q.   I just want to back up on one area if I didn't ask
21        you.  What grades did you teach at Emmanuel Lutheran?
22   A.   I taught three-year-old preschool two days a week and
23        on the other days I was substituting.
24   Q.   So that was just general coverage, just other general
25        classes?
```

CHERYL PERICH
July 3, 2008

```
 1   A.   All of the -- any class.
 2   Q.   Okay.  Was that for the whole four years you did
 3        preschool and substituting?
 4   A.   Uh-huh.
 5   Q.   And then at Calvary what grades did you teach?
 6   A.   Well, the first year I was teaching three-years-olds,
 7        Tuesday and Thursday, morning and afternoon.
 8   Q.   And would that be preschool again when you say
 9        three-year-olds?
10   A.   Three-year-old preschool, Tuesday and Thursday, a
11        morning class and an afternoon class on Tuesday and
12        Thursday, and then Monday, Wednesday and Friday a
13        four-year-old class in the morning and a four-year-old
14        class in the afternoon.  The following year I was
15        assigned to as a seventh and eighth-grade homeroom
16        teacher in the morning and I taught seven and eighth
17        grade science, and let's see, seventh and eighth-grade
18        art, fifth and sixth-grade math, seventh-grade math.
19        What else?  It seems like there was something else.
20             I think I'm forgetting something else, but
21        it was a very full morning.  I think -- I can't
22        remember what else, but there was a lot of subjects
23        that was between the seventh and eighth and then
24        fifth and sixth.  Oh, I also had taught fifth and
25        sixth-grade science also besides that.  And then we
```



---

CHERYL PERICH
July 3, 2008

```
 1        had -- and then we had -- and then in the afternoon I
 2        taught the three-year-old preschool two days a week
 3        and the four-year-old preschool three days a week, so
 4        I had a very, very, very short amount of time to eat
 5        my lunch and get over to where the preschoolers were
 6        about to arrive.  It was a very crammed-full day.
 7   Q.   At Emmanuel were you a contract or co-op teacher?
 8   A.   I was a contract teacher and I was hired with the
 9        agreement that I would be taking college classes
10        toward -- so that I could be working toward becoming a
11        call teacher.
12   Q.   What are colloquy classes?
13   A.   Colloquy classes are classes that a person takes if
14        they didn't go to a Lutheran college to be able to --
15        the classes that you -- like religion type classes
16        that you would have had if you had gone to a Lutheran
17        college, although they -- in the colloquy I now
18        understand that they have expanded so that colloquy
19        people are now taking actually more classes than the
20        people who actually go to the Lutheran college.  I
21        took eight -- I had to take eight classes and the
22        other people that went to the Lutheran college took
23        six.
24   Q.   Now, let me --
25   A.   And then once you take the colloquy classes you --
```

---

CHERYL PERICH
July 3, 2008

```
 1        you're --
 2             MR. ROACH:  Mrs. Perich, please focus on the
 3        question.  I think you answered it.
 4   BY MR. WARE:
 5   Q.   I guess what I'm asking is are these religion classes,
 6        what you call colloquy classes, are they religious
 7        courses?
 8   A.   Most of them are.
 9   Q.   Are they doctrinal courses?  Do you understand what I
10        mean by doctrinal, I mean, is it something that
11        indoctrinates you into the Lutheran --
12   A.   Well, I'm a lifetime Lutheran so I already don't -- so
13        I don't -- didn't really need to be indoctrinated into
14        what the Lutheran faith is, but the classes are
15        just -- some of the classes are -- you know, there's
16        an Old Testament class, a New Testament class and
17        various different classes that give you a deeper
18        understanding of -- I don't remember all the different
19        classes, but there's different classes that --
20   Q.   Would it be fair to characterize those as religious
21        classes or Bible classes?
22   A.   Most of them are religious type classes, yes.
23   Q.   Other than the religious classes what other types of
24        classes did the colloquy process help --
25   A.   I don't remember, but I think there was a couple
```



---

CHERYL PERICH
July 3, 2008

```
 1        classes that were not strictly a religious type class
 2        but they were like -- but they were -- but they
 3        were -- but they were added to the colloquy program
 4        and they were -- they were supposed to be helping
 5        people get ready to teach in a Lutheran school.
 6   Q.   Okay.  But you don't remember the specific classes?
 7   A.   I don't really remember the specifics.  It's been a
 8        while since I took them.
 9   Q.   So let's back up.  Now, you said at Emmanuel you were
10        a contract teacher with an agreement to take the
11        colloquy.  Did you actually start your colloquy
12        process then?
13   A.   Yes, I did.
14   Q.   And that would have been in -- what year would that
15        have been that you started the colloquy process?
16   A.   As I said before, I don't really remember what year I
17        went there.
18   Q.   Had you completed it by the time you got to Calvary
19        Lutheran?
20   A.   No, I had one more class to take when I went to
21        Calvary.
22   Q.   How long does the process run, how many years did it
23        take?
24   A.   Well --
25   Q.   What I'm trying to see, so if you went to Calvary in
```

CHERYL PERICH
July 3, 2008

1    1998 and you said you had one more class, so had you
2    been in it a year, two years by the time you got to
3    Calvary?
4  A.  There was -- I was at Calvary -- I was at Emmanuel for
5    four years.  I took my first class the first year I
6    was there.  There was one year I couldn't take any
7    classes because I couldn't afford it.  They did pay
8    half, Emmanuel paid half after -- you had to pay the
9    full amount to begin with, but after you --
10 Q.  That's fine.  I don't --
11 A.  But they'd reimburse you for half, but I couldn't
12   afford it for one of the years, but I did complete
13   seven out of the eight in those four years.  Calvary
14   didn't pay anything, but I was able to pay -- I was
15   able to complete the other one while I was at Calvary.
16 Q.  So that's what I'm trying to get.  So from a period of
17   1994 to 1998, because you completed it -- well, did
18   you complete it at Calvary?
19 A.  If we just saw that I came to Hosanna-Tabor in '99,
20   then it couldn't -- then it couldn't have been from
21   '94 to -- then those other dates aren't right.
22 Q.  Okay.  So you said you were at Calvary Lutheran for
23   two years?
24 A.  Because I was at Calvary for two years and I was at
25   Emmanuel for four years prior to that.



CHERYL PERICH
July 3, 2008

1  Q.  Okay.  So you would have been at Calvary from '97 to
2    '99?
3  A.  Let's see, '99/'98 school year and '98/'97 school
4    year, so I would have gone there in -- started the
5    beginning of the '97 school year.
6  Q.  So if we take four years off of '97, that would have
7    been '93 that you started at Emmanuel.  '93 to '97,
8    does that sound right?
9  A.  Is that the beginning of the -- did we have me
10   beginning in '97?
11 Q.  I don't know.  The school year is broken up.  I'm just
12   trying to get a range, so a four-year range from '93
13   to '97 is Emmanuel Lutheran, '97/'99 is Calvary
14   Lutheran, and as you indicated we saw in August of '99
15   you were starting at Hosanna-Tabor?
16 A.  That sounds like it might be approximately correct.
17   I'm not sure if that's the exact -- because it would
18   be the four years and two years.
19 Q.  Okay.  And so from 1993 through '97 you were
20   completing your colloquy process, just taking classes
21   when you could?
22 A.  If that -- yes.
23 Q.  Okay.  So you started that almost as soon as you
24   started your employment with Emmanuel?
25 A.  Yes.



CHERYL PERICH
July 3, 2008

1  Q.  Okay.  Now, did they ever give you a call at Emmanuel?
2  A.  I didn't have my col -- I didn't have my -- I wasn't
3    eligible for a call yet at the time I needed to look
4    for full-time employment.
5  Q.  Okay.  When you were at Calvary was that a contract or
6    call position?
7  A.  It was a contract position.
8  Q.  And did that have the same stipulation, that you would
9    complete your colloquy for the call, I mean, if it was
10   ever brought up?
11 A.  I don't remember.
12 Q.  Okay.
13 A.  I do remember that I told them that I was working on
14   it, so they might not have stipulated that because
15   they already knew I was working on it or they may have
16   said something about it.  I really don't remember.
17 Q.  Did you ever receive a call at Calvary?
18 A.  I had not -- I was not eligible for a call yet at the
19   time.
20 Q.  You were there two years?
21 A.  Yes.
22 Q.  Did you complete your colloquy in '97, that would have
23   been sometime during your first year there?
24 A.  I didn't complete my colloquy requirements until the
25   summer after -- the summer after I left there.



CHERYL PERICH
July 3, 2008

1  Q.  The summer after you left Calvary?
2  A.  Right.
3  Q.  Okay.  So that would have put you into the summer of
4    '99 when you completed your colloquy process?
5  A.  Yes.
6  Q.  Okay.  So you were working on your colloquy from 1993
7    to 1999?
8  A.  Right.
9  Q.  Six years.  How did you find out about the position at
10   Hosanna-Tabor in 1999?
11 A.  Nancy Faith was a teacher in the room next door to my
12   room at Calvary and Nancy Faith was -- not was, is
13   Scott Faith's mother, and Scott Faith was the
14   principal at Hosanna-Tabor at the time.  So Nancy
15   Faith happened to know that there was a position
16   available at Hosanna-Tabor and she let me know about
17   it.
18 Q.  Was there any announcement in the district's
19   publications?
20 A.  I really don't remember.
21 Q.  What was the first thing you did to apply for the
22   position?
23 A.  I called Scott Faith.
24 Q.  And then what happened?
25 A.  Then he set up an interview with -- I'm not sure if it

Page 25

CHERYL PERICH
July 3, 2008

```
 1        was the school board or a call committee, but there
 2        was a whole lot of people in the room.  He didn't say
 3        who all it was, so I'm not sure, you know, the call
 4        committee or school board or a combination of both,
 5        but there was a lot of people, very full room.
 6   Q.   So you did attend -- you had an interview, right?
 7   A.   Yes.
 8   Q.   Okay.  And what happened after the interview?
 9   A.   Nothing for a while.
10   Q.   When something did happen what happened?
11   A.   I called Scott several times and he said they were
12        going to get a new pastor, and it's always practice
13        that if the new pastor's wife is a teacher that the
14        teacher gets the position before anyone else, so he
15        had to wait to see if the new pastor's wife was a
16        teacher.
17   Q.   Was that going to be Pastor Eggers, if you know?
18   A.   They didn't know at that point.
19   Q.   I mean, is that who they wound up getting?
20   A.   They did end up getting Pastor Eggers, but at that
21        point they didn't know who they were going to get.
22   Q.   Okay.
23   A.   And they didn't get Pastor Eggers until the fall of
24        the year, but he thought they were going to get
25        someone sooner and if he didn't know if that pastor
```



Page 26

CHERYL PERICH
July 3, 2008

```
 1        would have a wife that was a teacher or not, so he
 2        couldn't move on that yet.
 3   Q.   So how did you ultimately get offered the position --
 4        I mean, you said you kept calling Scott, so did Scott
 5        tell you come on in, we can hire you now?
 6   A.   Yes.
 7   Q.   And Scott Faith, that was the principal, right?
 8   A.   Yes.
 9   Q.   Did you get any kind of letter or anything from the
10        school prior to Scott telling you you got the
11        position, like a letter from a board or the call
12        committee?
13   A.   No.
14   Q.   Okay.  And this was a contract position --
15   A.   Yes.
16   Q.   -- at first?
17             So when you got hired at Hosanna-Tabor you
18        didn't go through the district at all?
19   A.   No, because I personally knew someone that knew about
20        a position.
21   Q.   And when you got offered the contract or the position
22        did they specify what grade you were being hired for?
23   A.   Yes, it did specify that I was being hired as a
24        kindergarten teacher.
25   Q.   Any other grades or work?
```



Page 27

CHERYL PERICH
July 3, 2008

```
 1   A.   The other work was -- I forget the exact wording, but
 2        it was to work with missions.
 3   Q.   You said what?
 4   A.   Missions.  I can't remember the exact wording of it,
 5        but I was to promote the missions and the offerings
 6        for missions and things like that.
 7   Q.   Okay.  So when you began employment in August of '99
 8        what grades were you teaching?
 9   A.   Kindergarten.
10   Q.   Anything else?
11   A.   No, that was in my contract that I was contracted
12        for -- as a kindergarten teacher.
13   Q.   Did you have any other assignments besides teaching
14        the kindergarten class?
15   A.   I had the -- working as the mission -- the missions --
16        I can't think of the name they called it, but the
17        missions -- saying what missions we're going to -- the
18        offering were going to go for the chapel offerings
19        each month and promoting those with the children
20        and --
21   Q.   Okay.  Let me specify though.  Were you responsible
22        for like an art class, a gym class, spelling bee team
23        or anything during this first year in 1999?
24   A.   I wasn't responsible for spelling bee team that year.
25        I taught art to my kindergartens, I taught gym to my
```



Page 28

CHERYL PERICH
July 3, 2008

```
 1        kindergarteners.
 2   Q.   So that was included in your description as the
 3        kindergarten teacher?
 4   A.   Yes.
 5   Q.   You gave them art instruction and gym instruction as
 6        well?
 7   A.   Right.
 8   Q.   You returned in the year of 2000 to Hosanna-Tabor?
 9   A.   Yes, I did.
10   Q.   Okay.  And in 2000 were you offered a contract or were
11        you offered a call?
12   A.   I don't remember the exact year that I was offered the
13        call.
14   Q.   Let's see if I have something.  Well, let me show you
15        this.  You completed your colloquy between -- on
16        February 29th of 2000?
17   A.   Okay.  I was -- on February 29, 2000 I was --
18        according to this letter I was now eligible to be
19        considered for a call.
20   Q.   Okay.  So that means you had completed your colloquy?
21   A.   I had previously completed my colloquy, but they had
22        to publish my name in several periodicals and things
23        like that first before they could say I was eligible.
24   Q.   Okay.  So you hadn't completed your colloquy but you
25        still needed to be published or added to the district
```



CHERYL PERICH
July 3, 2008

```
 1       roster in February of 2000?
 2   A.  Right.
 3   Q.  Now, if you -- you started -- the school year starts
 4       in August of '99, right?  Is that correct, school year
 5       for Hosanna-Tabor?
 6   A.  Right.
 7   Q.  So in February of 2000 that would have actually been
 8       within the same school year of 1999, right?
 9   A.  Yes.
10   Q.  And there was some previous testimony that around
11       February or March the school starts to look at its
12       budget for the next August, right?
13               MR. ROACH:  Objection, foundation.
14   BY MR. WARE:
15   Q.  If I tell you there was some previous testimony to
16       that effect -- did anybody contact you during that
17       time about letting you know whether you were going to
18       be getting a call or a contract or you had intentions
19       on coming back?
20   A.  I don't remember if they contacted me about a call or
21       not.  They always ask you if you have intentions for
22       coming back around that time, and I did tell them I
23       had intentions for coming back.
24   Q.  So around this same time, around February 2000,
25       someone would have asked you if you had intentions on
```



CHERYL PERICH
July 3, 2008

```
 1       coming back?
 2   A.  Yes, and I did say yes.
 3   Q.  Okay.  Did they ask whether or not that was as a
 4       called or contract teacher?
 5   A.  I don't remember.
 6   Q.  Do you know if you had informed them at that time that
 7       you had completed your colloquy?
 8   A.  I know that as soon as I completed it I did let them
 9       know.
10   Q.  So at the end of your -- go ahead, I'm sorry.
11   A.  I was very excited that I completed it after those
12       long years of working on it, and both the pastors and
13       the -- the two pastors and the principal was very
14       excited for me also.
15   Q.  Now, at the end of your first year do you remember
16       what position you were offered for the second year?
17   A.  Yes, kindergarten teacher.
18   Q.  Okay.  And was that a call or --
19   A.  As I said, I don't remember when they offered me the
20       call.
21   Q.  Okay.  I'm trying to get something with a date on it.
22       I've got your documents from your personnel file.
23       Some of this doesn't have dates.  See if that
24       refreshes your memory.
25   A.  There's the name of the -- I couldn't remember.  I
```



CHERYL PERICH
July 3, 2008

```
 1       knew it was mission something.  Mission coordinator
 2       was my other duty.
 3   Q.  Did that refresh your memory as to whether you were
 4       asked to come back as a contract or call teacher?
 5   A.  It just says August 15, 2000 general call information,
 6       so it would have been as a call teacher that I came
 7       back on August 15th of 2000 so -- and I was called to
 8       serve specifically as a kindergarten teacher.
 9   Q.  Okay.  And you testified earlier that you were very
10       excited about completing your colloquy, right?
11   A.  Yes, I was.
12   Q.  Because you had worked on it probably nine years to
13       complete that, right?
14   A.  A number of years.  It was quite a long time.
15   Q.  And that was all toward receiving a call, right?
16   A.  Yes.
17   Q.  Okay.  So when you were offered the call was that
18       something that you wanted, I mean, was it voluntary,
19       was that your whole objective was trying to get with a
20       school where you could receive a call?
21   A.  Yes.  My understanding was that all Lutheran schools
22       wanted you to be a call -- called teacher, and the
23       only reason why they had any contract teachers were
24       that sometimes they couldn't find enough called
25       teachers so they had to hire a contract teacher, but
```



CHERYL PERICH
July 3, 2008

```
 1       the only time they hired contract teachers was when
 2       they couldn't find enough called teachers.
 3   Q.  Where did you get that understanding from?
 4   A.  Well, when I was in Lansing and there was a position
 5       available they told me I was highly qualified, but
 6       they couldn't hire me because I -- I wasn't
 7       synodically trained, meaning I couldn't be called.  I
 8       didn't have -- I hadn't gone to a Lutheran school and
 9       I didn't have the colloquy.
10               Emmanuel didn't usually hire people without
11       a colloquy or having gone to a Lutheran school, but
12       since I would agree to take the colloquy classes they
13       said they would do that as long as I'd agree to take
14       those.  Calvary, all their other teachers were called
15       teachers except me, and they had been looking all
16       summer for somebody, and here it was August and they
17       needed someone badly and then they found me, so they
18       were thankful to have someone.
19               So it just -- with this experience it looked
20       to me that that was the way it was -- it worked is
21       that everybody wanted teachers to be called teachers,
22       and I really thought that that's what the synod wanted
23       and that's what the district wanted was they wanted
24       the Lutheran schools to have teachers that were called
25       teachers, teachers who had been synodically trained,
```



CHERYL PERICH
July 3, 2008

```
 1        either had gone to the Lutheran schools or have their
 2        colloquy and not have -- not have contract teachers,
 3        but if they couldn't find enough called teachers, then
 4        they could hire the contract teacher.  That was my
 5        understanding.
 6   Q.   Okay.  So it was your understanding that the Lutheran
 7        schools in district wanted all of their teachers to be
 8        ministers?
 9                 MR. ROACH:  Objection.
10                 MR. WEAVER:  Objection, mischaracterizes
11        prior testimony.
12   A.   That really wasn't what I said.
13   BY MR. WARE:
14   Q.   So you can say no, the answer would be no, that wasn't
15        your understanding.  Is that your answer?
16   A.   That is my answer.
17   Q.   Okay.  So what was your understanding of what a call
18        was?
19   A.   A call was placing you in a teaching position in a
20        Lutheran school and saying that you have received
21        training in the religious classes that you would have
22        gotten if you had gone to a Lutheran college.
23   Q.   That's all a call was as far as you understood it was
24        just something saying you got some religious classes;
25        is that your answer?  That's all your call meant to
```



CHERYL PERICH
July 3, 2008

```
 1        you was that you had took some religious classes?
 2                 MR. ROACH:  Was that a question or a
 3        statement?
 4                 MR. WARE:  It's a question.
 5                 MR. ROACH:  Maybe you can phrase it as a
 6        question.
 7   A.   I believe I really already answered that.
 8   BY MR. WARE:
 9   Q.   You said you -- you've been a Lutheran all your life,
10        right?
11   A.   Yes.
12   Q.   Did you do catechism?
13   A.   Yes, I did.
14   Q.   Lutheran catechism?
15   A.   Yes, I did.
16   Q.   And those did involve religious instruction, right?
17   A.   Yes, they did.
18   Q.   So then why would you have to accept a call because
19        you had took some religious class?
20                 MR. ROACH:  Objection, argumentative.
21   BY MR. WARE:
22   Q.   If that was your understanding.  Did you ever ask
23        anybody, hey, I took all this stuff in catechism?
24                 MR. ROACH:  Objection, relevance,
25        argumentative.
```

CHERYL PERICH
July 3, 2008

```
 1   A.   I've asked them if I had been a Lutheran all my life
 2        why do I need to take these classes, and they said
 3        because you didn't go to a Lutheran college and take
 4        the classes that you have there.  What you had in
 5        catechism was a low -- was not as -- it was not as
 6        in-depth as what was the -- as what we teach in a
 7        religion class when you go to college, so you're going
 8        to get a much deeper understanding of the faith when
 9        you take these classes.
10   BY MR. WARE:
11   Q.   And that was it, that's all they told you was the
12        distinction?
13                 MR. ROACH:  Objection, argumentative, lack
14        of foundation.  Who is who, what, they?
15   BY MR. WARE:
16   Q.   That was it, that was all that person told you was the
17        distinction?
18                 MR. ROACH:  Who?
19   A.   Does this have anything to do with this case?
20   BY MR. WARE:
21   Q.   Okay.  I get to ask the questions at the deposition --
22                 MR. ROACH:  Well, then I'm going to object.
23   BY MR. WARE:
24   Q.   -- not you.
25                 MR. ROACH:  Counsel, Counsel --
```

CHERYL PERICH
July 3, 2008

```
 1                 MR. WARE:  Jim, write down the questions you
 2        want to go back over when you have cause.
 3                 MR. ROACH:  I will object and say --
 4                 MR. WARE:  Don't ask any questions --
 5                 MR. ROACH:  I am sorry, Mr. Counsel --
 6                 MR. WARE:  No, no, you're not --
 7                 MR. ROACH:  -- I have the right to say --
 8                 MR. WARE:  -- going to cut me off.
 9                 MR. ROACH:  Well, then we're going to stop
10        right now and call the judge.
11                 MR. WARE:  No, we're not stopping nothing.
12        Oh, well, you can call the judge for sure.
13                 MR. ROACH:  I will call the judge.
14                 MR. WARE:  Go call the judge.  Go call the
15        judge right now because I'm sick of this.  Call the
16        judge, the magistrate, stop the recording.
17                 MR. ROACH:  No, you're not stopping.
18                 MR. WEAVER:  We're staying on the record.
19                 MR. WARE:  Okay.  Call the judge or the
20        magistrate right now and they can listen to this and
21        what you're doing.  None of my questions are improper.
22        I'm not going to stop, and you're going to stop
23        interrupting me, so you can call the judge.  Do it
24        right now, call the judge, please.  We can drive down
25        to the court and finish the dep.  Ask the judge if we
```



**Page 37**

CHERYL PERICH
July 3, 2008

1  can come to the court and finish this deposition.
2      MR. ROACH:  Are you done?
3      MR. WARE:  No.  Call the judge, don't
4  threaten me.  Get your phone and get the judge on the
5  intercom.  I'm sick of you two.  Get the judge on the
6  intercom.  You all have done this at every single
7  deposition.  You've cut me off, you've interrupted me,
8  you've tried to interpose evidentiary issues like
9  you're some Court at a deposition where you know I can
10  ask not only relevant questions but questions that may
11  lead to relevant answers.  So get the judge on the
12  phone or stop interrupting me and threatening me with
13  the judge and sanctions and other stuff.
14      MR. ROACH:  Are you done?  Keep going.
15      MR. WARE:  Make a note that Ms. Perich is
16  leaving the deposition room without having been
17  excused.
18      THE WITNESS:  Please make a note --
19      MR. ROACH:  No, no.  He has not instructed
20  you to do anything.
21      Are you done?
22      MR. WARE:  This is my noticed deposition.
23  I'm going to conduct this deposition --
24      THE WITNESS:  I can't listen to his yelling
25  anymore, I just can't.



**Page 38**

CHERYL PERICH
July 3, 2008

1      MR. ROACH:  Are you done?
2      (Whereupon the Witness left the deposition
3      room at 10:03 a.m.)
4      MR. WARE:  Make a note that Ms. Perich has
5  left the deposition room without being excused --
6      MR. ROACH:  Keep going.
7      MR. WARE:  -- and that her counsel has not
8  asked her to come back.
9      MR. ROACH:  Are you done or do you want to
10  keep going?
11      MR. WARE:  No.  You can go ahead, but I'm
12  not going to be getting interrupted by you.
13      MR. ROACH:  Let me know when you're done.
14      MR. WARE:  Speak.
15      MR. ROACH:  Thank you.  Second, I -- or not
16  second, first, I have the right -- and it's now my
17  turn to talk, by the way.  I have a right to object to
18  anything.  I can put my objections on the record.
19  Number two, I do not appreciate and the witness
20  doesn't appreciate you yelling and pointing your
21  finger at my face and in my face.  I would object to
22  the complete lack of respect and professionalism on
23  your side.  Now --
24      MR. WARE:  Are you done?
25      MR. ROACH:  -- can I object?

**Page 39**

CHERYL PERICH
July 3, 2008

1      MR. WARE:  Are you done?
2      MR. ROACH:  I am done.
3      MR. WARE:  Okay.  I will go on the record
4  and object to the total incivility that you and
5  Mr. Weaver have shown me throughout all of these
6  depositions.  You have always continually cut me off,
7  both of you have double-teamed objection over the
8  record.  I have set through each and every one of your
9  depositions.  This is my first, and I have not
10  interrupted any of you during any of the questions
11  you've asked where if you two have made it a pointed
12  practice to cut me off in the middle of questions, to
13  interrupt me, to tell witnesses not to answer my
14  questions, to speak directly to witnesses in the
15  middle of me questioning them, like you just did with
16  Ms. Perich, and then to try to get me to rephrase my
17  questions or to tell me what questions I should or
18  should not ask or I can or cannot ask, total
19  incivility.
20      So I do apologize for being upset and for
21  pointing my finger, but I'm not going to be
22  intimidated during this process by the EEOC and by
23  your large firm.  I'm not going to let either one of
24  you two intimidate me.
25      MR. WEAVER:  Okay.  Now it's my turn to

**Page 40**

CHERYL PERICH
July 3, 2008

1  speak.
2      MR. WARE:  Go ahead, Omar.
3      MR. WEAVER:  Mr. Ware, I completely resent
4  your representation of my conduct during this
5  litigation.  I have never been uncivil to any opposing
6  counsel.  I've never tried to intimidate any opposing
7  counsel.  You will be the first one to ever complain
8  about my conduct, if you do that.
9      Secondly, I've said this to you before, I've
10  said this to you yesterday when I tried to impose an
11  objection during Mr. Salo's deposition.  You keep
12  comparing what we do to what you do, and I've said to
13  you it is your prerogative to object if you see fit.
14      I always try to make a good judgment call
15  when I, you know, make an objection before a witness
16  answers.  It is not to cut you off, it is simply to
17  place my objection before the witness answers.  I
18  think I've made one objection so far this morning and
19  I don't think there was anything wrong with it, and I
20  completely agree with the recent objections that
21  Mr. Roach made with respect to the line of questioning
22  you just gave Ms. Perich.  In my opinion some of them
23  are argumentative and they do lack foundation and they
24  do assume facts not in evidence.  Those objections are
25  going to be made.  We're not trying to interrupt your



CHERYL PERICH
July 3, 2008

1   examination, but we must protect our interests on the
2   record.
3          And I agree with Mr. Roach that you should
4   probably tone it down a little bit because, as you can
5   see, Cheryl can't handle that.  It's not easy to see
6   eye to eye when attorneys are sitting across the
7   table, but I think we should make an effort to do that
8   and get through this deposition because I can tell you
9   right now, the judge will not be happy if we come to
10  him because we can't finish a plaintiff's deposition,
11  I mean, that's all I'm going to say.
12         And one more thing, I've never instructed a
13  witness not to answer my questions while you were
14  examining them because up to this point none of the
15  witnesses have been our witness.  We can only instruct
16  Cheryl not to answer a question, and as we all know,
17  that only -- that is only proper when you go into
18  privileged information.  You haven't done that yet, so
19  I won't instruct her to do anything like that.  So any
20  implication on the record that I've tried to instruct
21  the witness not to answer your questions, I will not
22  only disagree with but I resent.
23         MR. WARE:  All right.  Well, Mr. Weaver,
24  then I stand corrected.  With Mr. Roach I know
25  specifically instructed Bruce Braun and other



CHERYL PERICH
July 3, 2008

1   witnesses not to answer my questions.  With regards to
2   Ms. Perich today I think both counsel can note I have
3   had a measured voice.  I have given her time, all the
4   time she needed to answer questions.  I've tried to be
5   very slow and patient with Ms. Perich.
6          And up until when Mr. Roach started yelling
7   and telling me what questions to ask and not ask, she
8   seemed to be answering the question and never once
9   indicated that she was upset.  So to that extent, you
10  know, I am not trying to upset the witness.  I don't
11  have any problem with somebody saying, Mr. Ware,
12  you're upsetting her, can you talk slower, can you
13  give her a chance to answer.  That was not the type of
14  interruption that Mr. Roach interposed.  Instead he's
15  trying to make clarifications that are more proper on
16  his cross than during my direct.
17         If you want to clarify her answers to
18  questions, you should clarify them with your own
19  questions, not in the middle of me asking my questions
20  simply because you don't want a certain answer to come
21  out.
22         MR. WEAVER:  I just want to make one point
23  on that, and I know what you're talking about.  You
24  know, I will never try to tell another attorney how to
25  practice law, but in my experience -- and I'll give

CHERYL PERICH
July 3, 2008

1   you an example.  Yesterday I asked Mr. Salo a question
2   that just was very unclear and very vague.  You made
3   an objection, I listened to it, rephrased the question
4   because I thought the objection was valid.  Some of
5   your questions were somewhat vague when you examined
6   her about, well, isn't it true that they told you this
7   and who told you that.  Our point is who is they, I
8   mean, you've got to lay a foundation to know exactly
9   who you're identifying if you want to examine a
10  witness about what she was told.
11         MR. WARE:  The witness had used the word
12  they, and that's why I kept repeating it, because
13  rather than put something in her mouth, I repeated the
14  phrase she used when she said they.  I understood the
15  objection, but I was trying to repeat what she had
16  said, the they that she was referring to.  It's not my
17  place to put, you know, people and places into her
18  mouth.
19         MR. ROACH:  In response, I have no idea what
20  you're talking about regarding me instructing
21  Mr. Brawn not to answer a question.  I don't believe I
22  did, and I didn't.  As far as my knowledge I didn't.
23  It's not my witness.  You were cross-examining that
24  witness.
25         Number two, the problem that arose in this



CHERYL PERICH
July 3, 2008

1   conference room is that when I attempted to object you
2   talked over me and started yelling, and to me that's
3   unacceptable if -- and to allow me to talk.  Every
4   time I tried to talk you started yelling again to keep
5   me from saying anything.  That is not acceptable,
6   that's not the way to conduct a deposition, and if
7   we're going to get this deposition done we have to
8   behave professionally.
9          All right.  Finally, I did object because
10  you were asking a question, just like Mr. Weaver said,
11  with saying what did they say, who did they, you know,
12  referring to a who that was -- I had no idea what you
13  were talking about, and if you were asking about what
14  a specific person asked her or told her, that would be
15  fine, but to refer to somebody who is undefined,
16  that's a problem and I have a right to object.
17         And finally, even if my objections are
18  wrong, and maybe our objections are later decided by a
19  judge and maybe I lose on that argument, I still have
20  the right to object, and you should be allowed and you
21  need to allow me to object.
22         (Whereupon the Witness entered the
23         deposition room at 10:11 a.m.)
24         THE WITNESS:  I'm sorry I left.  I probably
25  should have asked for a break first.



CHERYL PERICH
July 3, 2008

1          MR. ROACH:  Don't worry about that.  Don't
2    worry about that.
3          THE WITNESS:  But after the extreme yelling
4    I was in tears and I just needed to get away to be
5    able to calm down.
6          MR. WARE:  Mr. Roach, do you want to take
7    some time with your witness?
8          MR. ROACH:  Well, let's take a break for
9    about ten minutes or so and give Ms. Perich time to
10   recover from the onslaught.
11         MR. WARE:  Can you?
12         (Recess taken at 10:12 a.m.)
13         (Back on the record at 10:29 a.m.)
14   BY MR. WARE:
15   Q.   Before I continue with my questioning, Ms. Perich, and
16        I want to -- I'm going to do this -- I probably should
17        have done it at the beginning of the deposition, but
18        I'm going to do it now before I ask you any other
19        questions.  Are you taking any medication or are you
20        suffering from any medical condition which might
21        interfere with your ability to answer questions today?
22   A.   I'm -- the medicine will not interfere as long as I'm
23        able to get -- to be able to take a lunch break at
24        11:30 because I need to eat lunch at the time I take
25        my medicine.



CHERYL PERICH
July 3, 2008

1    Q.   Are you suffering from any medical conditions that
2         would affect your memory or recollection?
3    A.   No.
4    Q.   Are you suffering from any medical conditions that
5         would affect your ability to speak truthfully or your
6         veracity in answering questions?
7          MR. ROACH:  I'll object.
8    BY MR. WARE:
9    Q.   Or that would affect your veracity in answering any
10        questions?
11   A.   I don't know what the word veracity means.
12   Q.   Or the authenticity of the statements you're making.
13        Is there any medication or medical condition that
14        might affect any of that?
15   A.   I always speak truthfully.
16         MR. WARE:  Okay.  Well, I'm going to make a
17   note for the record that I've observed during this
18   deposition several times Ms. Perich' hand shaking.  I
19   don't know if it's uncontrollably or involuntarily.
20   I'm also going to note for the record that Ms. Perich
21   abruptly left the room when me and Mr. Roach were
22   arguing with each other, very upset and indicating
23   that she had to leave, whether she was excused or not.
24         And it also appears, and this is my personal
25   opinion, that her counsel was trying to protect her



CHERYL PERICH
July 3, 2008

1    with regards to certain questions because she may get
2    upset or be unable to continue, and if that's the
3    case, no one has advised me of any condition she has,
4    no one has advised me of any medication she's taking
5    that would affect her ability to answer questions,
6    because if the witness is unable to answer questions,
7    and the questions are going to get tougher, then I
8    think the proper thing would be to file a motion with
9    the Court to stay these proceedings either until we
10   can get some doctor's approval that you are in a
11   condition to answer these types of questions or --
12         MR. ROACH:  All right.
13         MR. WARE:  -- to get something indicating
14   that you're not going to be unnecessarily upset or
15   your health is not going to be at risk by proceeding.
16         MR. ROACH:  All right.
17         THE WITNESS:  Okay.
18         MR. ROACH:  No, no, you're not going to say
19   anything.
20   BY MR. WARE:
21   Q.   Let your counsel speak.
22         MR. ROACH:  You're not going to say
23   anything.
24         MR. WARE:  I'm not finished yet.  I'm not
25   finished.  You can make your record.  I'm making a

CHERYL PERICH
July 3, 2008

1    record.
2          MR. ROACH:  You can make --
3          MR. WARE:  I'm not finished.  I told you
4    before we started --
5          MR. ROACH:  Counsel, again you have to let
6    me talk.
7          MR. WARE:  Not when I'm not finished making
8    my record.
9          MR. ROACH:  It's my turn.
10         MR. WARE:  Because you say so?  I just said
11   I'm not finished.
12         MR. ROACH:  All right.  Keep going.
13         MR. WARE:  At this point as the defendant's
14   attorney I must make a record that I feel that -- I'm
15   very concerned about jeopardizing Ms. Perich's health
16   by the nature of the questions that have yet to be
17   asked, and it is totally I believe inappropriate or
18   improper for her counsel to interfere with or stop me
19   from answering (sic) particular questions simply
20   because the witness is quite going to get upset.  And
21   if that's the case, then I believe somebody -- and no
22   one has told me at this point that she's unable to
23   answer certain questions, that she gets upset very
24   easily and that there's a health risk if we proceed
25   with questions, because all I've done is ask questions

CHERYL PERICH
July 3, 2008

1    and you have gotten physically, physically --

2        MR. ROACH:  Ignore him.

3        MR. WARE:  I've seen the witness' physical

4    characteristics of either being upset, her arm has

5    shaken at times uncontrollably.  I don't know if she

6    left the room to take medication, but she did leave

7    the room without being excused.

8  BY MR. WARE:

9  Q.  Did you take any medication when you left, Ms. Perich?

10       MR. ROACH:  I am instructing you not to

11   answer until a question has been asked.  Once the

12   attorney is -- Mr. Ware's done making a statement on

13   the record I will respond.

14       Please let me know when you're done.

15       MR. WARE:  To conclude -- to conclude, I'm

16   very concerned at this point about whether or not

17   continuing with questioning Ms. Perich is going to

18   jeopardize her physical and emotional health.

19       MR. ROACH:  Thank you, Mr. Ware.  If there

20   are medical issues, the medical issues were created by

21   your client's misconduct.  You are not a doctor, you

22   are not -- you do not have the education or

23   credentials to make any medical judgment as to

24   Ms. Perich.  I find your comments insulting, I think

25   they're degrading and I think they're intimidating,



CHERYL PERICH
July 3, 2008

1    and I'm instructing Ms. Perich to completely ignore

2    what you said because it is completely objectionable

3    and you have no right to make those types of

4    statements.

5        If you have appropriate questions, please

6    ask them.  Do not attempt to insult or degrade or

7    accuse Ms. Perich of anything.

8        Finally, Ms. Perich left because you chose

9    to yell at me and at her, all right?  You --

10       MR. WARE:  I'm going to object, I never

11   yelled at the witness.

12       MR. ROACH:  Am I allowed to finish?

13       MR. WARE:  We can read the transcript if

14   you're going to put a lie on there because I never

15   yelled at the witness.

16       MR. ROACH:  You're interrupting.

17       MR. WARE:  And I've already had it reread.

18   I never yelled at the witness.

19       MR. ROACH:  I'm sorry.  Can I finish?

20       MR. WARE:  Yeah, I did yell at you after you

21   yelled at me when you cut me off.  You can finish.

22       MR. ROACH:  No, that's not what happened.

23       MR. WARE:  We can read the transcript of who

24   started yelling first.

25       MR. ROACH:  I objected when you started



CHERYL PERICH
July 3, 2008

1    yelling at me trying to talk --

2        MR. WARE:  No, you objected when I kept --

3    interrupting my line of questioning.

4        MR. WEAVER:  Are you going to let him -- he

5    didn't interrupt you.

6        MR. ROACH:  I was very patient while you

7    talked.  My turn.

8        MR. WARE:  Okay.

9        MR. ROACH:  You chose to start a commotion

10   by yelling at me and the witness, by yelling -- not

11   only yelling at me but shaking your finger at me

12   repeatedly.  It upset Ms. Perich.  It would upset a

13   lot of people in the face of that type of misbehavior.

14   I don't blame her a bit for stepping out of the

15   conference room until you calmed down.  Since then you

16   have apparently calmed down and she is now ready to

17   continue with this deposition.  If you would like to

18   continue the deposition, please do.

19       MR. WEAVER:  I just want to add to that that

20   I concur with everything Mr. Roach has just said and I

21   disagree with Mr. Ware's representation that there's a

22   possible health issue of Ms. Perich today.  In my eyes

23   it's not a health issue, it's a conduct issue on the

24   part of opposing counsel.  Ms. Perich already

25   testified that she was not on any medication that

CHERYL PERICH
July 3, 2008

1    would impair her ability to testify today or any

2    medication that would in any way affect her

3    recollection.

4        That being said, there's no need to stay the

5    proceedings and I believe we should continue, assuming

6    there won't be any other problems with conduct on the

7    part of opposing counsel.

8        MR. WARE:  Okay.  I'm going to just clarify

9    the record that I don't have any problems with my

10   conduct.  My clients are entitled to a spirited and a

11   vigorous defense and they're going to get it, whether

12   opposing counsels object or like it or not.  Now we

13   can proceed.

14       Can you recall the last question we asked

15   before I was interrupted the first time by Mr. Roach?

16       (The requested portion of the record was

17       read by the reporter at 10:38 a.m.)

18       MR. ROACH:  Objection, misstates the

19   testimony and is ambiguous.

20  BY MR. WARE:

21  Q.  Ms. Perich, do you remember who told you what a

22   call -- who first told you what a call was, who that

23   person was?

24  A.  No, I don't.

25  Q.  Do you remember --

CHERYL PERICH
July 3, 2008

1  A.  I do remember that there was -- that I had talked

2      about what one professor said when I asked him the

3      question about why I would need to take the colloquy

4      classes even though I had been a Lutheran all my life,

5      and I explained that question.

6  Q.  Let me stop you there.

7  A.  I've thought about what another professor would have

8      answered, told me.

9  Q.  I'm going to stop you there because what a professor

10     told you, I'm assuming -- would that have been after

11     you had started the courses, right?

12 A.  Yes.

13 Q.  Okay.  So prior to you starting the courses when did

14     you first learn of what a call was in the Lutheran

15     church?

16 A.  After I was in the courses, all I knew was that you

17     needed to -- in order to -- when I first graduated

18     from MSU I thought it would be really great to teach

19     in a Lutheran school, so I applied at some Lutheran

20     schools and they told me I couldn't teach in their

21     schools because I hadn't gone to a Lutheran college.

22     And that's all they told me.  I didn't know there was

23     such a thing as a colloquy.  I don't to this day know

24     if there such a thing back then or not, but no one

25     told me if there was.  Many years later, you know,



CHERYL PERICH
July 3, 2008

1      about the colloquy program -- and I forgot what the

2      question was.

3  BY MR. WARE:

4  Q.  That's fine, you answered it.  You said you were a

5      lifetime Lutheran?

6  A.  Yes.

7  Q.  What Lutheran church did you attend growing up?

8  A.  Good Shepherd Lutheran Church.

9  Q.  Were you there as an adult as well?

10 A.  I was there as an adult until I moved to Texas.

11 Q.  So how old would you have been around then?

12 A.  23.

13 Q.  Okay.  Were you a member at Good Shepherd Lutheran?

14 A.  Yes -- or 23 years.

15 Q.  Did Good Shepherd Lutheran have a school?

16 A.  No.

17 Q.  During your time in colloquy where you testified you

18     first learned what a call was did the professor ever

19     indicate to you that if you accepted a call you would

20     be considered a commissioned minister in a Lutheran

21     church?

22 A.  I don't remember.

23 Q.  Did there come a point during the colloquy process

24     that you came to understand that if you accepted a

25     call you'd be considered a commissioned minister?



CHERYL PERICH
July 3, 2008

1  A.  Yes, I think there probably was, but that's much

2      different than an ordained minister.

3  Q.  When did you learn that they would consider you a

4      commissioned minister?

5  A.  I don't remember.

6  Q.  Was it before or after you completed the colloquy?

7  A.  I don't really remember.

8  Q.  Did you ever consider dropping out of the colloquy

9      process because you were going to be considered a

10     commissioned minister?

11 A.  No, because if they had -- if they had considered me

12     an ordained minister I would have, but the -- not

13     because of -- but the commissioned minister I -- they

14     explained that to me to say that -- in a way to say

15     that that was just --

16 Q.  Okay.  Let me stop you there before an objection is

17     interposed.  Who is they?

18 A.  The people in the colloquy program, so I guess, yeah,

19     it was -- I learned about it in the colloquy program,

20     so the colloquy program was -- I think it was one of

21     the professors in the colloquy program, if I remember

22     right.  I'm just guessing, I'm not sure, but I'm

23     pretty sure.  I think that's where I learned about it

24     was in the colloquy program.

25         And if they had said I would be an ordained



CHERYL PERICH
July 3, 2008

1      minister I would have dropped out then because I don't

2      believe that women should be an ordained minister.

3      But they said that commissioned minister -- the reason

4      they said teachers in Lutheran schools used to not be

5      considered ministers at all, they were just -- they

6      just could be a teacher as long as they had completed

7      these religious courses, but the only reason they're

8      considered commissioned ministers now is so that they

9      can get a -- so that they could get a -- they could

10     get a housing allowance.

11         And of course the other -- the good side of

12     it is you get the housing allowance, the bad side is

13     you have to pay the self-employment tax, but they said

14     it usually evens out and a lot of times it's to your

15     benefit because you get the housing allowance, which

16     is more beneficial than the self-employment tax.

17         So they said they had tried to put that into

18     place just to benefit the teachers and, you know,

19     benefit them as far as their taxes because if they got

20     their housing allowance, then that would mean they'd

21     be paying tax on less money.  They wouldn't be paying

22     tas on the housing allowance, they would only be

23     paying tax on the other amount that they -- the

24     amount -- they'd take the amount that they made minus

25     the amount that was considered the housing allowance



CHERYL PERICH
July 3, 2008

1    and only pay tax on the other amount, so they said

2    that was why that was put into place.  Other than that

3    it was the same as they -- they were previously, just

4    regularly, you know, before they were considered

5    teachers.

6  Q.  So did you ever get a housing allowance after you

7    received your call?

8  A.  I got a small housing allowance, but it really wasn't

9    beneficial to me.  It really -- I paid more in the

10   Social Security tax than the amount of housing

11   allowance that I got.

12  Q.  You had to pay your own taxes?

13  A.  Yeah.

14  Q.  So at some point though during the colloquy process

15   you understood you would be considered a commissioned

16   minister?  Let me rephrase that.

17        Was it your understanding that you would be

18   considered a commissioned minister after you completed

19   the colloquy process or once you were called?

20  A.  I'm not sure at what point that takes place.

21  Q.  Let me show you a document entitled supplement to

22   diploma of vocation.  Is that a document that you've

23   seen before?

24  A.  Yes.

25  Q.  Did you complete that or did somebody else complete



CHERYL PERICH
July 3, 2008

1    it?

2  A.  Scott -- well, someone else completed it.  Scott Faith

3    presented it to me.  I'm not sure if he completed it

4    or someone from the board.  I really don't know who

5    completed it.

6  Q.  Do you remember whether or not that's something that

7    would have been presented to you after you completed

8    your colloquy process, meaning through Concordia, or

9    would it have been presented to you after you had

10   received a call, I mean, if you remember?

11  A.  I don't remember.

12  Q.  You do remember Scott Faith presenting it to you?

13  A.  I do remember him presenting it to me.  I don't know

14   if he's the one that prepared this or if someone else

15   prepared it, but I remember him presenting it to me.

16  Q.  Do you remember receiving any other document because

17   that document's titled supplement to diploma, so did

18   you actually receive a diploma from Concordia?

19  A.  Yes.

20  Q.  And did the diploma have minister of religion on it?

21  A.  I'm not sure.  I think -- I don't know if it had

22   religion or if it had Lutheran teacher degree, I'm not

23   sure.

24  Q.  That's fine.  I was just going to see if that would

25   refresh your memory.  Is that the diploma you referred



CHERYL PERICH
July 3, 2008

1    to earlier?  I'm showing you a document entitled

2    diploma of vocation.  Have you ever seen that document

3    before?

4  A.  Yes, but it's been a while.

5  Q.  Do you recall whether you received that after the

6    colloquy process or when you received your call?

7  A.  I don't remember, but I'd have to look at this to see.

8    I can't tell by looking at this.  No, this was when I

9    received the call.  By looking at this I can tell it

10   was when I received the call.

11  Q.  Okay.  And that does state on there minister of

12   religion commissioned, do you see that?

13  A.  Yes, commissioned.

14  Q.  And that was your understanding, that you would be a

15   minister of religion commissioned?

16  A.  Commissioned, not ordained.

17  Q.  Okay.  So in your second year with Hosanna-Tabor in

18   August of 2000, by August of 2000 you had already

19   completed your colloquy and you had -- do you remember

20   when you were offered a call?  I mean, if you have

21   something that would refresh your memory --

22  A.  The paper was there that --

23        MR. ROACH:  Counsel, the date is right on

24   that document you were looking at.  Why press her for

25   dates that are right there?



CHERYL PERICH
July 3, 2008

1  BY MR. WARE:

2  Q.  Which one would you want to look at?

3  A.  It's been a while, so it's --

4  Q.  No, you can refresh your memory with whatever you want

5    to look at.

6  A.  I remember I had completed my colloquy, I was eligible

7    for a call, and then --

8  Q.  Okay.  The question was, and I don't know if your

9    counsel listened to the question --

10  A.  Excuse me, you told me to tell you -- at the beginning

11   you told me to tell you if you interrupted, and I

12   wasn't done.

13  Q.  Okay.  I'm sorry.

14  A.  I remember that I was eligible for a call, and then

15   when I was called, Scott Faith apologized for not

16   calling me as soon as I was eligible for a call.

17  Q.  So you remember when it was offered?  I know the

18   document has a date of when you were called, meaning

19   assuming there was already a vote by the congregation,

20   but do you remember when you were first offered the

21   call?  And to help you out, you said your colloquy was

22   completed in February.  I think the document has a

23   date of March 29th, so I'm assuming somewhere between

24   February and March you would have been offered the

25   call.  Is that what you're indicating, or is that not



Page 61

CHERYL PERICH
July 3, 2008

```
 1        the date?
 2   A.   No, March 29th is the date that I received the call
 3        and -- actually he told me about the call after the
 4        time that -- after this.  He actually told me about me
 5        having the call after the fact.  It was later than
 6        March when I actually knew I had the call --
 7   Q.   All right.
 8   A.   -- so I was eligible for it prior to this, and then I
 9        actually had the call but I didn't know I had the
10        call.
11              He told me about it later and he apologized
12        for not calling me when I was eligible and then he
13        apologized again for not telling me I had the call
14        when I really did have the call because it was later
15        in the spring because he said, I've been really busy.
16   Q.   So if I understand you, it's your testimony that you
17        were never offered the call, they just called you,
18        right, and then you were told that you had been called
19        by the congregation?
20   A.   Right.
21   Q.   Okay.  And that would have been sometime after March
22        of 2000?
23   A.   Because the practice is if you have a teacher that's
24        on your staff that is contract and they become
25        eligible for a call that the the -- that they're supposed
```



Page 62

CHERYL PERICH
July 3, 2008

```
 1        to call you immediately.  That's district policy.
 2   Q.   And that happened in your case?
 3   A.   Well, not immediately, that's why he apologized twice.
 4        He didn't -- they didn't call me immediately, and then
 5        later on when they did call me he didn't tell me about
 6        it until later.
 7   Q.   Do you know how much later it would have been after
 8        March?
 9   A.   It was close to the end of the school year, so that's
10        why I got two apologies.
11   Q.   Now, you're not aware of any other reason other than
12        his just negligence or whatever to inform you of the
13        call before the end of the school year?
14   A.   He said he was real busy and just didn't get around to
15        it.
16   Q.   So at the start of August of 2000 you were a called
17        teacher with Hosanna-Tabor?
18              MR. ROACH:  Objection, asked and answered.
19   BY MR. WARE:
20   Q.   Well, I think I asked if you were a teacher.  I'm
21        asking now if you were a called teacher, right, in
22        August of 2000?
23   A.   Well, they put on this that they called me as of
24        March 29th, but I already had a contract that was
25        through the end of that year, so --
```



Page 63

CHERYL PERICH
July 3, 2008

```
 1   Q.   Okay.
 2   A.   -- I don't know, I mean, I don't know if it was -- I
 3        don't know if you start it with March 29th or you
 4        start it with the following August, because they do
 5        have on here March 29th of 2000 that I was called.
 6   Q.   Okay.  I guess what I'm asking is at the start of that
 7        school year, which I'm assuming was August, you
 8        started the August 2000 school year as a called
 9        teacher?
10   A.   Yes --
11   Q.   Okay.
12   A.   -- because I was called.
13   Q.   Do you remember what classes you were teaching again
14        for the August 2000 school year?
15   A.   Yes, I was called specifically to be -- as a
16        kindergarten teacher.  In my call document it was
17        listed as kindergarten teacher.
18   Q.   Okay.  I might have asked about that.  And then in
19        August 2001 were you still with Hosanna-Tabor?
20   A.   It's hard for me to keep all these dates in my mind
21        without looking at a calendar.  I taught kindergarten
22        for five years straight through, okay?
23   Q.   Okay.  So I'm just starting with the next school year,
24        which would be August of 2001.  You started -- is it
25        correct that you started back with Hosanna-Tabor that
```

Page 64

CHERYL PERICH
July 3, 2008

```
 1        school year as a called teacher?
 2              MR. ROACH:  Objection, asked and answered.
 3   BY MR. WARE:
 4   Q.   For 2001?
 5   A.   Am I allowed to write these things down so I can keep
 6        track of years?
 7   Q.   I mean, if it will help you I don't have any objection
 8        with you writing things down.
 9   A.   You know, am I here this year, this year?  I know I
10        was there five years -- I know I taught kindergarten
11        five years.  No, it was four years I taught
12        kindergarten.
13   Q.   So we just completed August 2000?
14   A.   Okay.  Did we establish -- I started there in what
15        year?
16   Q.   1999, August of 1999.
17   A.   Okay.  '99 to 2000 kindergarten contract and then on
18        March 29th became a called teacher.  Okay.  So 2000 to
19        2001 I came back as a called teacher and was called
20        specifically as a kindergarten teacher.
21   Q.   Okay.  Then my present question is the August 2001
22        school year, you came back?
23   A.   Yes, and I had been called as a kindergarten teacher,
24        so I was still a kindergarten teacher.
25   Q.   And then August 2002?
```



CHERYL PERICH
July 3, 2008

```
 1   A.   Yes, 2002 to 2003 kindergarten, had been called as a
 2        kindergarten teacher, so I was still a kindergarten
 3        teacher.
 4             MR. ROACH:  You skipped one.
 5             THE WITNESS:  Oh, that won't work if I skip
 6        a year.
 7   BY MR. WARE:
 8   Q.   Okay.  I'm going to kind of stop you there because I
 9        want to kind of pause that line of questioning.  Now,
10        in 2002, and if we started with August of 2002 that
11        would go through June of 2003 for the school year, did
12        you have any disciplinary problems at the school at
13        Hosanna-Tabor?
14             MR. ROACH:  Objection, relevance.
15   A.   I don't remember what school year it was.  A year
16        was -- there was a write-up put in my employee file
17        and I disagreed with the write-up.  It was not
18        correct.
19   BY MR. WARE:
20   Q.   And what did the write-up concern?
21   A.   I don't remember specifically what I was accused of,
22        but I can tell you what in actuality happened.  A
23        child who had been having discipline problems from the
24        beginning of the year -- and I had been working with
25        her and her parent to improve her discipline, and she
```



CHERYL PERICH
July 3, 2008

```
 1        had improved in quite a number of different ways but
 2        she still had a ways to go, so as one area would
 3        improve there would be something else crop up in
 4        another area, as often happens.
 5             So the -- the way the classroom was
 6        structured is after they had -- they needed to -- they
 7        had a little bit of work to do, it's a very small
 8        amount, and then they were going to -- they had --
 9        they'd have snack and then they could have some play
10        time.  Well, this child wanted to sharpen her pencil
11        and she was coming at me with a very sharp pencil --
12        so -- and she -- and she says, I'm going to stab you,
13        and she had her pencil held in a stabbing -- in a
14        position like she was going to stab me.
15             So I gently put my hands around each of her
16        arms.  She had her other hand in like a fist position
17        and the one in like a stab -- the one with the pencil
18        was in a stabbing position.  I didn't want to get hit
19        with the fist, I didn't want to get stabbed with the
20        pencil, so I put my hands around her -- each of her
21        arms gently and I said, no, you're not going to stab
22        me.  I'm going to take you over to your table so you
23        can finish your work.
24             And the chair was already out.  She hadn't
25        pushed it in when she got up, so I said, now, sit down
```



CHERYL PERICH
July 3, 2008

```
 1        in your chair, and she sat down.  And just to make
 2        sure that every -- that I was safe and the kids -- the
 3        other kids at the table were still safe, I didn't let
 4        go of her arms at that point, so I used my leg to push
 5        her chair in, and I pushed the chair in with my leg
 6        and I said, now I want you to do your work because I
 7        don't want you to miss out on all that fun because as
 8        soon as you finish your work you get to eat your snack
 9        and get to go have fun with the other kids.
10             So I then slowly let go of her hands and
11        kept my hands a little bit away from her arms just to
12        make sure that she was going to do because I wanted to
13        keep those other kids safe.  And then she started to
14        do her work and all was fine.  So as the day continued
15        on and she never said that -- she was not a shy child.
16        She's -- you know definitely if anything was bothering
17        her she would definitely say so, and she never said
18        that her arms hurt or anything, so I know that -- you
19        know, I know that when I put my arms around her that
20        it wasn't too tight.  So that was only to keep myself
21        safe and the other kids around her safe and redirected
22        her.
23   Q.   Do you know if that incident was observed by a parent?
24   A.   The tail end -- the tail end of the -- of it was
25        observed by a parent.  There was a parent walking in
```



CHERYL PERICH
July 3, 2008

```
 1        the hallway.  She didn't hear her say I'm going to
 2        stab you, she just -- and she didn't see me put my --
 3        starting to put my around arms her, she just saw --
 4        when I put my hands around her arms, she just saw me
 5        with my hands on her arms and taking me (sic) over to
 6        the chair and pushing her in.
 7             She didn't know what she had done prior to
 8        that and she -- oh, yeah, I remember now what this
 9        parent had said.  She said, this teacher is
10        manhandling this child and I wouldn't want other
11        people to come into this school if they're going to
12        have a teacher manhandling a child.  Well, I wasn't
13        manhandling a child, I was handling a discipline
14        problem and keeping myself and the other children
15        around her safe and giving her some good redirection.
16        And she got redirected and she had a good rest of the
17        day, and she really was making good progress.
18   Q.   Would you agree with me that the teacher -- well, not
19        the teacher -- the parent though made a big raucous of
20        this with the -- I guess with the administration?
21   A.   Yes, and the sad thing is that even though I had
22        taught there several years and I -- and he knew me to
23        be a good teacher and always truthful, he got
24        concerned because she was saying, well, I was going to
25        talk to other parents about coming to the school but I
```



CHERYL PERICH
July 3, 2008

1    couldn't -- I could not go -- I could not promote your
2    school and I couldn't talk to parents about coming to
3    your school if things like this are going to happen
4    unless I knew that you were going to do something in
5    regards to this happening, so he --
6 Q. When you said he, you mean Mr. Faith?
7 A. Mr. Faith.
8 Q. Okay.
9 A. So I believe this is why he put the write-up in my
10   file, was to appease this parent because he wanted
11   this parent to spread the word about our school
12   because otherwise he was afraid that she was going to
13   spread bad news about the school instead of good news.
14          The problem was she was not even a
15   dependable parent.  Right after she signed her child
16   up for school that summer -- the summer before he
17   started there -- that was the first year that her
18   child had been there.  The summer before he started
19   there she had said, you know, the school he had been
20   at had closed down, had just closed down, and she
21   said, well, he had been having trouble in school, do
22   you have anybody here that does tutoring.
23          And we did have a teacher that usually did
24   tutoring during the summer, and she'd set up times for
25   tutoring a lot of times they wouldn't show up,



CHERYL PERICH
July 3, 2008

1    wouldn't call, nothing.  Sometimes she'd call and make
2    some excuse that really didn't make sense, and then
3    during -- and then --
4 Q. Well, let me just clarify.  Are you talking about the
5    parent that reported it or the parent --
6 A. Yeah, the parent that reported it.
7 Q. -- of the child that you had to grab?
8 A. No, the parent that reported it.
9 Q. Okay.
10 A. I mean, so this is what happened the summer before
11   they came, and then after the time she -- with this
12   parent.  And then after the time of this report, which
13   she didn't know at that time, but later on the same
14   parent, the one that reported it, when her child
15   didn't turn in homework he would tell one reason why
16   he didn't turn in the homework and the parent would
17   tell a different reason.  She'd make up excuses for
18   him and lie.  And they'd figure out that the kid's
19   answer made more sense than the parent's answer.
20 Q. Do you remember this had been around October of 2002?
21 A. That sounds approximately right.  It was probably
22   either September or October, it was in the fall of the
23   year.
24 Q. Had there been any other incidents with you as far as
25   being hands-on with children prior to that?

CHERYL PERICH
July 3, 2008

1 A. Prior to the previous school year there was a -- there
2    was a child who -- at nap time a child was -- decided
3    to do somersaults off of her cot and cartwheels off of
4    her cot, so this was for her safety that I was
5    hands-on.  I was -- I would catch her and put her back
6    on her cot.  And, you know, I'd watch the kids while
7    they're napping and they'd have all their eyes shut
8    and you'd think they were sleeping and I'd start
9    grading papers or doing some planning, and then I'd
10   look up and this girl would all of a sudden be
11   standing on a shelf.  So I'd go over there and tell
12   her to get down and she wouldn't, so I'd lift her
13   down.  Those are the types of hands-on things that I
14   did.
15          Well, if she -- she was -- I talked to the
16   family and I found out that she was seeing a child
17   psychologist and then once -- and her problems
18   escalated, they kept getting worse and worse, so I --
19   Scott Faith suggested that I ask permission to talk to
20   the psychologist that she was seeing.  And after I
21   explained to the psychologist what was going on in the
22   classroom the psychologist said, give me some -- well,
23   she needs some time away from the classroom for a
24   while and just give me about four weeks just to work
25   with her when she's not in the classroom and let's see

CHERYL PERICH
July 3, 2008

1    if we can improve her behavior before we send her back
2    to your school.
3 Q. Okay.  Now, with regards to you and the incident, did
4    Mr. Faith at some point counsel you and give you what
5    he recommended were steps to follow as opposed to
6    being so hands-on with the children, do you remember
7    that?
8 A. Yes, he did.
9 Q. Okay.  I'm going to show you a document which is an
10   interoffice memo from Mr. Faith to you.  Does that
11   refresh your memory?
12          MR. ROACH:  I'm going to object once again
13   to the relevancy of this.
14 BY MR. WARE:
15 Q. Do you remember receiving that?
16 A. I do remember receiving this.
17 Q. And I'm not going to get all into that, but there
18   was -- they recommended, was it six points, right, or
19   items?
20 A. Yes.
21 Q. And you disagreed with those recommendations, right?
22 A. Well, I didn't disagree with the fact that these are
23   good things to do, I disagreed with the fact that
24   those things would have not worked in that situation.
25   Step into the hallway and count to ten, well, when a



CHERYL PERICH
July 3, 2008

1   child's got a sharp pencil about to stab someone, that
2   would have -- if I stepped into the hallway, that
3   would have put the other children in the classroom at
4   danger.
5           Have another adult remove the student from
6   the classroom, I don't think so.  Any adult that's
7   around here was going to get stabbed.
8           Have another adult witness the events, there
9   wasn't time to go get another adult when she was about
10  to do that.
11          Seek assistance from the principal, the
12  principal was in teaching a math class at that time.
13          Watch your voice level with the children, my
14  voice level wasn't loud when I was doing this.
15          Remove the child away from the angry child,
16  this was happening right -- you know where the pencil
17  sharpen -- you probably know where the pencil
18  sharpener is in the kindergarten classroom.  You've
19  had a child in the kindergarten classroom, right?
20  Q.  I can't put nothing on the record, but I don't
21  honestly remember.
22  A.  Anyway, I can tell you.  The pencil sharpener, it's
23  right next to the door.  She'd just got done
24  sharpening her pencil, so if I was trying to remove
25  the class away from the angry child, they'd be going



CHERYL PERICH
July 3, 2008

1   right past that child that had that sharp pencil that
2   was ready to stab me, and if I tried to get them out
3   of there she'd stab anyone.  That would have been
4   putting those children in danger, which I can't do.  I
5   can't put those other children in danger, so in that
6   situation these things would not have worked.  In some
7   situations some of these things would work.  Depending
8   upon situations you could use one of these things or
9   other things.  My voice level was not a problem.
10  Q.  But you did let the school know you didn't agree with
11      those recommendations for that situation, right?
12  A.  For that situation, I did -- I did definitely say that
13      these things would not work, and number 5 wasn't a
14      problem, so there certainly was nothing I needed to
15      change, and, I mean, my voice got a tiny bit louder
16      than normal, but I wasn't -- certainly wasn't yelling
17      at the child.  And the rest of these, no way would
18      have worked at that time.
19  Q.  That's fair.  I just wanted to kind of understand that
20      you had let them know you didn't agree with the
21      recommendations.  So that was August of 2002, and
22      other than that I think the only other item that
23      they -- that somehow got documented in your record was
24      something about class coverage, right?
25  A.  Yes, which I don't really understand --

CHERYL PERICH
July 3, 2008

1   Q.  And I don't want to get into that.
2   A.  -- why that's in there.
3   Q.  But was there anything other than that, those two, the
4       class coverage and the incident with the child, was
5       there anything other than those two in 2002?
6   A.  No.
7   Q.  Okay.
8   A.  Nothing in there at any other time.
9   Q.  Then in August of 2003 again you returned as a called
10      teacher, right?
11  A.  2003, are we on -- did you say 2002 or 2003?
12  Q.  We just finished with August of 2002 because we were
13      talking about the incidents in October 2002.
14  A.  I just want to know what year you're on right now.
15      I'm just clarifying what year are you talking about
16      right now?
17  Q.  We're going to be going into 2003 and 2004.
18  A.  Okay.
19  Q.  So in August 2003 you returned again as a called
20      kindergarten teacher?
21  A.  That's what I thought I would be returning to because
22      my call was as a kindergarten teacher, but Scott Salo
23      came into my classroom at the end of the year, even
24      though Kurt Ostrander was really still the school
25      board president at the time because Scott Salo wasn't

CHERYL PERICH
July 3, 2008

1   the school board president until a little bit later,
2   or chairperson, but anyway I guess Scott Salo was the
3   one that came in with the news that they wanted me to
4   teach fourth grade.  He said we're going to be
5   changing some teachers around and Scott Faith let me
6   know that you have taught the older grades and you
7   wouldn't have a problem with teaching older grades.
8           I said, well, I have taught the older
9   grades, I won't have a problem with it, but I've been
10  called to kindergarten and I really enjoy teaching
11  kindergarten.  He said, well, we've decided we'd like
12  you to teach fourth grade and you've got the skills to
13  teach fourth grade.  So they moved people around that
14  year.
15          And then it was brought up at one of the
16  staff meetings that we had all been called to specific
17  positions and now all of a sudden we're in different
18  grades than what we've been called for, so after we
19  were moved to different positions they changed all of
20  our calls to read called to Hosanna-Tabor as a teacher
21  and not as a specific grade-level teacher, but that
22  was after they changed us to a different grade, not
23  before.
24  Q.  Okay.  Well, I might get back to that.  So in August
25      of 2003 you were called still as a kindergarten



CHERYL PERICH
July 3, 2008

```
 1    teacher but they wanted you to teach fourth grade,
 2    right?
 3  A.   No, that was -- that was 2003 -- at the end of 2003 I
 4       was a -- I was a called teacher as a kindergarten
 5       teacher, then it was -- they wanted me to teach fourth
 6       grade, and I think it was -- and then they assigned --
 7       they said they wanted me to teach fourth grade and
 8       then they had a board meeting and assigned everybody
 9       their new grades.  And after they assigned us the new
10       grades, it was sometime I think later in June or July,
11       something like that, that they had a voters' meeting
12       and decided that they could change all the calls from
13       specific grades to just as a teacher.
14  Q.   Okay.  But what I'm trying to get at, would that have
15       been -- you said the end of 2003?
16  A.   Right.
17  Q.   So would that have been prior to the August 2003
18       school year --
19  A.   Right.
20  Q.   -- or after that year had started?
21  A.   It was in -- at the end of the -- at the very end
22       of the school year after the students left and
23       everything --
24  Q.   Okay.  So I'm going to stop you there because I'm
25       not -- I think you're ahead of me.  I'm trying to get
```



CHERYL PERICH
July 3, 2008

```
 1    from August '03 to approximately June of '04.  Is that
 2       what you're talking about, that period, because you're
 3       looking on your paper, I see, at 2002 to 2003, so I'm
 4       assuming that period you're looking at goes from
 5       August of '02 to June of '03?
 6  A.   Okay.  The end of the 2003 school year, after the
 7       students left and teachers were still working, that's
 8       when we were told we were going to teach different
 9       grades.  Later than that --
10  Q.   Okay.  Well, I haven't --
11  A.   -- sometime in June or July --
12  Q.   -- got to that year.
13  A.   -- of 2003 -- I think it was June or July of 2003,
14       then there was a voters' meeting, and that's -- that's
15       when the calls were changed to being instead of called
16       to whatever grades we were in, whatever we were
17       originally called from, they changed it to -- called
18       to a specific grade, they changed all the calls to
19       just called to teacher.
20  Q.   So are you saying in August of 2002, that's when Scott
21       addressed you about teaching fourth grade?
22  A.   No.
23  Q.   Well, you said in June of 2003 they changed the calls
24       to be specific, and you testified earlier that prior
25       to that change you had been approached by Scott about
```



CHERYL PERICH
July 3, 2008

```
 1    teaching fourth grade?
 2  A.   No, 2002 to 2003 I taught kindergarten.  The end of
 3       the 2003 school year when the students were done with
 4       school, the teachers were still working, that's
 5       when -- that's when Scott said he wanted me to teach
 6       fourth grade and that's when everybody else got --
 7       whoever was getting changed grades got their new
 8       teaching assignments.
 9            And then -- and then it was either later in
10       June or July, one or the other, that they had a
11       voters' meeting and they changed the -- they
12       changed -- at that voters' meeting they decided that
13       they could change everyone's calls to -- from being
14       their specific grade level to -- that they had been
15       called to to just being called to teacher.
16  Q.   Okay.  So I think I understand what you're saying now.
17       So --
18  A.   So once I started this --
19            MR. ROACH:  No, no.  Ms. Perich, wait for a
20       question, please.
21            MS. WARE:  Thank you.
22  BY MR. WARE:
23  Q.   Okay.  So in August of 2003 through June of '04 -- and
24       this would have been the year right before you started
25       having your problems with your illness -- you were
```



CHERYL PERICH
July 3, 2008

```
 1    doing some fourth-grade teaching; is that correct?
 2  A.   I wasn't just doing some fourth-grade teaching, I was
 3       the fourth-grade teacher.
 4  Q.   Okay.  Now, in August of 2004 you were called back
 5       again, right, and was that going to be back in the
 6       fourth grade or kindergarten?
 7  A.   You know -- well, to put this -- I've got a -- I need
 8       to answer -- I need to add something to this.  When
 9       you're called you don't like get called back again and
10       called back again and called back again.  When you get
11       a contract you get a one-year contract and then they
12       decide if they're going to give you another one-year
13       contract.
14            When you're called you're a called teacher
15       at that school until another school district -- I
16       mean, another -- I mean, another Lutheran school calls
17       you and you decide if you want to accept that call and
18       go there or decline that call and stay at that school.
19       So you just are -- continue to be a called teacher,
20       they don't keep calling you.
21  Q.   Okay.  But when I say you were called back again, I
22       mean there was no -- no -- during none of these
23       intervening periods, request for a peaceful release or
24       any indication that they were going to try to rescind
25       your call?
```



CHERYL PERICH
July 3, 2008

1   A.   No.

2   Q.   So in August of 2004 you came back again on a called

3        status and you were to be teaching what grade that

4        year?  This would have been the school year that you

5        got sick in.

6   A.   You're talking about the 2003 to 2004?

7            MR. ROACH:  Following year.

8   A.   2005 to 2006 I --

9   BY MR. WARE:

10  Q.   No, 2004.  August 2004 to -- it would have went up to

11       2005.

12  A.   Okay.  That's the year that I would have been coming

13       back as a -- yes, as a called teacher, and I would

14       have been teaching third and fourth grade that year.

15  Q.   Okay.  So it wasn't a combined classroom?

16  A.   Yes, they only had -- there was only one third-grader

17       and the rest were fourth-graders and --

18  Q.   Would that have been your first year doing a combined

19       classroom?

20  A.   Yes, but I knew the third-grader and I knew most of

21       the fourth-graders so -- and I was quite familiar

22       with -- and I had taught the fourth-grade curriculum

23       the year before, so I'd only be adding a third-grade

24       curriculum to it, so it wasn't going to be that much

25       of a challenge.



CHERYL PERICH
July 3, 2008

1   Q.   But had you ever done it before, taught a combined

2        classroom?

3   A.   Oh, I taught a combined classroom when I was that

4        seventh and eighth-grade homeroom teacher.  That was a

5        combined classroom.

6   Q.   So when you mentioned science and math for seventh and

7        eighth, those were combined classrooms?

8   A.   Yes.

9   Q.   When did you first get -- I guess when did you first

10       get sick or have your first episode in August of 2004?

11           MR. ROACH:  I'm sorry, I misunderstood or

12       misheard the question.  When again?  You just asked

13       when and then you said August 2004.

14  BY MR. WARE:

15  Q.   Right.  I believe you first went out sick -- it was in

16       August, right, of 2004 school year?

17  A.   I wasn't able to -- I wasn't able to teach during

18       that -- there at all during that -- right, I wasn't

19       able to teach during that school year.  I was -- from

20       the beginning of that school year I was out on

21       disability.

22  Q.   Okay.  So do you remember what happened when you first

23       had your first episode or incident that year, exactly

24       what happened?  I have an e-mail I can show you that

25       might refresh your memory.  I think this date is



CHERYL PERICH
July 3, 2008

1        August 11th.  I don't know if you need to read all

2        that, I just want to know if that refreshes your

3        memory as to what happened?

4            MR. ROACH:  Do you remember the question,

5        Cheryl?

6            THE WITNESS:  What was the episode like.

7            MR. ROACH:  When?

8   BY MR. WARE:

9   Q.   What exactly happened?  I don't think the e-mail

10       really explains what exactly happened that preceded

11       this e-mail having to be sent?

12  A.   I don't think we -- I don't think I really knew what

13       it was that was -- that was happening.  The doctors

14       were still trying to figure out what it was that was

15       happening.

16  Q.   Did you ever start teaching classes that year?

17  A.   No.

18  Q.   Okay.  So was there any particular event at home or at

19       the store that kept you from being able to start the

20       classes, meaning did you pass out somewhere or fall

21       asleep somewhere?

22  A.   Well, sometimes we thought it -- we thought it was a

23       lot of different things.

24           MR. ROACH:  Cheryl, focus on his question.

25       His question was what they thought.  Mr. -- I believe,



CHERYL PERICH
July 3, 2008

1        and he'll correct me if I'm mistaken, he's asking as

2        to what actually occurred that showed some indication

3        that you were sick, for instance whether you were

4        walking and fell down or you were at a golf outing or

5        something like that and something happened that caused

6        you to seek medical assistance.

7   BY MR. WARE:

8   Q.   Right, that's the question.

9   A.   Right, when I was at the -- when I was at that

10       end-of-the-year golf outing on August 15th I had

11       asthma problems worse than I had ever had before, and

12       the inhaler would work for a little while, and every

13       time I used it it worked for less and less amount of

14       time.  And then we went to lunch afterwards and when I

15       got -- when we were there I used the inhaler -- one of

16       the times I used the inhaler it didn't work at all and

17       I was just -- I really had -- just really couldn't

18       hardly breathe.

19           So a staff member rushed me over to

20       emergency at Garden City.  All the staff members tried

21       to figure out which was the closest hospital and they

22       decided Garden City was -- tried to decide if Garden

23       City or Botsford would be closer, and they decided

24       Garden City would be closer to where we were at at the

25       time, so they rushed me over to emergency at Garden



Page 85

CHERYL PERICH
July 3, 2008

1      City.
2              MR. ROACH:  And you answered the question.
3  BY MR. WARE:
4   Q.   You said August 15th; is that correct?
5   A.   Yeah.
6   Q.   Okay.  So these e-mails are dated August 11th and
7        12th, so that incident would have been after these
8        e-mails?
9   A.   That happened -- that happened on July -- that
10       happened on -- I mean, that happened June 15th.
11  Q.   June 15th, okay.  All right.
12  A.   Did I say August?
13             MR. ROACH:  You did.
14  A.   That's because I was looking at this sheet that said
15       August.  And, you know, it's really the time I usually
16       eat lunch, so it's --
17             MR. WARE:  Okay.  Well, you know what, if
18       you want we can break for lunch.  She did say she
19       needs to break.
20             (Recess taken at 11:35 a.m.)
21             (Back on the record at 12:39 p.m.)
22  BY MR. WARE:
23  Q.   I think when we left off, Ms. Perich, I was asking you
24       about the first incident, which you indicated was
25       June 15th of '04 at a golf outing.  Do you remember

*BIENENSTOCK*
COURT REPORTING & VIDEO
248.644.8888

---

Page 86

CHERYL PERICH
July 3, 2008

1        that?
2   A.   Yes.
3   Q.   And you said this was as asthma attack?
4   A.   This was an asthma attack.
5   Q.   Okay.  So by the time of the start of the school year
6        in August -- when does the school year normally start?
7   A.   The teachers usually go back on the 15th unless that's
8        a weekend.  If it's a weekend we go back the first day
9        after the -- the first -- then on -- we go back on the
10       15th of August unless it's the weekend, and then we go
11       back on the Monday after that.
12  Q.   So by August 15th did you know you weren't going to be
13       able to start the school year?
14  A.   On August 15th the doctor was still working on --
15       well, he was still working on a solution to the
16       problem, but we were trying to -- between the doctor
17       and I we were trying to find out if I would be able
18       to -- and I was --
19             MR. ROACH:  I think you provided the answer.
20  BY MR. WARE:
21  Q.   Okay.  So to the doctor, which doctor are you
22       referring to?
23  A.   Dr. Kou.
24  Q.   Is that K-O-U?
25  A.   Yes.

*BIENENSTOCK*
COURT REPORTING & VIDEO
248.644.8888

---

Page 87

CHERYL PERICH
July 3, 2008

1   Q.   Okay.  And he's out of -- he is out of Beaumont or
2        Northpoint?
3   A.   Northpoint.
4   Q.   And was that -- were you being treated by Dr. Kou for
5        the asthma?  So the asthma had resolved?
6   A.   Well, I still had asthma at that time point but it
7        wasn't to the -- I wasn't having severe problems with
8        it.
9   Q.   So that was being controlled by your asthma
10       medication?
11  A.   Right.
12  Q.   So between when you had the asthma incident on
13       June 15th of '04 and August 15th of '04 when the
14       school year wouldn't have started, what other medical
15       incident occurred?
16  A.   Well, when I was in the hospital in Garden -- Garden
17       City Hospital the doctors there recognized a problem
18       that I didn't recognize.  It was the doctors that
19       thought I had a medical problem and told me that it
20       would be unsafe to be released from the -- unsafe for
21       me to be released from the hospital.  They didn't --
22       hadn't pinpointed the problem yet, but they knew there
23       was a medical problem, so the one -- I guess -- I
24       think I -- what was the question?
25  Q.   So, well, you kind of answered it.  You said you were

*BIENENSTOCK*
COURT REPORTING & VIDEO
248.644.8888

---

Page 88

CHERYL PERICH
July 3, 2008

1        hospitalized at Garden City Hospital when another
2        medical problem was discovered, right?
3   A.   Right.
4   Q.   So that problem hadn't been diagnosed by the time the
5        school year was supposed to start on August 15th?
6   A.   Well, they had -- they had diagnosed what they
7        thought -- they had diagnosed it, but they had --
8   Q.   Now, I'm just talking about the time.  I mean,
9        subsequent it might have been incorrect, but at the
10       time they had diagnosed it as what?
11  A.   At that time they had diagnosed it as neurocardiogenic
12       syncope syndrome.
13  Q.   Okay.  And then was there a referral for that to
14       Dr. Kou, is that how you wound up with Dr. Kou?
15  A.   No.  I was seeing Dr. Harber for the neurocardiogenic
16       syncope syndrome, and the medicine you take for that
17       takes quite a while to take effect so you have to take
18       it for a long time -- quite a long time to figure --
19       to know if it's going to work.  And then once you find
20       out one medicine doesn't -- no one medicine works, so
21       you can take -- there's several different kinds of
22       medicine that can work for that and it doesn't
23       always -- you can -- people can have that and one
24       medicine might not work for them, it might be a
25       different medicine that works for them, but you don't

*BIENENSTOCK*
COURT REPORTING & VIDEO
248.644.8888

CHERYL PERICH
July 3, 2008

```
 1      know until you've taken it for a certain length of

 2      time.

 3   Q.  Well, let me clarify this.  When you say that, what

 4      are the symptoms or indications of neurocardiogenic

 5      syncope?

 6             MR. ROACH:  Foundation.  Objection,

 7      foundation.

 8   BY MR. WARE:

 9   Q.  Do you know what the symptoms or indications of that

10      condition are?  If you don't know, you can say you

11      don't know.

12             MR. ROACH:  If you don't know, just say you

13      don't know.

14   A.  I'm really not sure.

15   BY MR. WARE:

16   Q.  Okay.  Were you experiencing anything in particular

17      that they -- that you believe they said might be

18      related to that condition?  Okay.  And I don't want

19      you to have to do hindsight, I mean, I don't want you

20      to kind of look back in retrospect and say, oh, that

21      was because of this.  I'm just saying at the time was

22      there anything that was going on with you physically

23      that they were trying to see if that was related to

24      the neurocardiogenic syncope?

25   A.  I'm sure there was, but it's -- it's looking back
```



CHERYL PERICH
July 3, 2008

```
 1      it's kind of hard to remember, you know, all the

 2      different -- what it was that they were looking at.

 3      And really when they first started looking into it I

 4      didn't really even know why they didn't want me to

 5      leave the hospital and why they thought I had a

 6      problem other than the asthma, which we were gradually

 7      getting that under control, so -- and I -- so --

 8   Q.  Well, let me move on.  As far as the school year that

 9      was supposed to start on August 15th, '04, was it

10      Dr. Harber or Dr. Kou that gave you the opinion that

11      you wouldn't be able to start the school year?

12   A.  His name is Dr. Kou.

13   Q.  Kou, I'm sorry.  And you were seeing him -- was that

14      for the neurocardiogenic syncope?

15   A.  No, he's an electrophysiologist.  And I had been

16      experiencing some irregular heartbeats, and Dr. Harber

17      thought that it might be possible that since I had

18      really taken a medication from all the different --

19      from each of the different classifications of

20      medicines that usually work for neurocardiogenic

21      syncope syndrome and none of them had worked for me

22      but yet I had started to have these irregular

23      heartbeats, that maybe the reason why those medicines

24      weren't working for me was because of the irregular

25      heartbeat.  So he sent me to Dr. Kou because of the
```

CHERYL PERICH
July 3, 2008

```
 1      irregular heartbeat and thought if we got that

 2      resolved that maybe the medications for

 3      neurocardiogenic -- neurocardiogenic -- you know,

 4      would work.

 5   Q.  Right.  All right.  So let me pick up from there.

 6   A.  That was his premise.

 7   Q.  All right.  Let me pick up from there so we can kind

 8      of move along.  So Dr. Kou felt --

 9   A.  Dr. Kou.

10   Q.  Dr. Kou felt with the irregular heartbeat you couldn't

11      start the school year?

12   A.  Dr. Kou was okay with the idea of me going in on the

13      teacher workdays and seeing how I did with that and

14      then making a decision at that point.  I was having

15      some syncope, I had been having some syncope episodes

16      and --

17   Q.  Well, let me stop you.  What's a syncope episode?

18   A.  It's like -- I should say I was having some things

19      that they thought were syncope episodes.  Syncope is

20      when you pass out, it's the medical term for passing

21      out.  They thought they were syncope episodes, okay?

22      They were terming it as that.  We later found out that

23      really wasn't what was happening, but with

24      neurocardiogenic -- but he was monitoring my -- he had

25      me on a medication to control my heart and was trying
```



CHERYL PERICH
July 3, 2008

```
 1      to get my -- and it was supposed to keep my heartbeats

 2      regular and then he put -- and then he put a heart

 3      monitor on me to see if even with that medication if I

 4      got any irregular heartbeats, so he was thinking that

 5      that medication may work to keep it from being

 6      irregular.

 7   Q.  When you say that medication, do you know what the

 8      medication was, the name of it?

 9   A.  No.

10   Q.  Okay.

11   A.  So he figured -- you know, he wanted to see if the

12      medication would work to keep it from being irregular,

13      so he put the heart monitor on me just to see if it

14      would still be irregular even with that medication.

15             MR. ROACH:  Counsel, am I correct that your

16      initial question was who made a decision to suggest

17      her not returning to work at that time?

18             MR. WARE:  Yes, and then the follow-up was

19      was that as a result of the irregular heartbeat, and I

20      think her answer kind of extended was, no, it was the

21      result of the syncope episodes.

22             MR. ROACH:  Maybe I skipped a question, but

23      Ms. Perich, focus on the question itself.  You don't

24      have to go into additional information unless you're

25      asked.
```



CHERYL PERICH
July 3, 2008

1   BY MR. WARE:

2   Q.   So was that the gist of your follow-up is that it

3        wasn't the irregular heartbeat that you said Dr. Kou

4        or Kou --

5   A.   Kou.

6   Q.   -- that Dr. Kou was concerned about, it was the

7        syncope, which is why you weren't released to return

8        to work, right?  Or was it a combination of both, I

9        mean, that might be a fairer question?

10  A.   It was probably a combination of both.

11  Q.   Okay.

12  A.   He had not really made the decision yet until Stacey

13       Hoeft had -- I had talked to her on the phone and told

14       her the situation and told her I was planning on

15       coming in and doing the CPR training, first-aid

16       training and working my classroom and seeing how

17       things went and, you know -- and then if things

18       weren't going good for me then I'd -- you know, that I

19       wouldn't be able to work for a while, but if things

20       could continue to go okay then I would.

21            And then shortly -- I don't know, a few days

22       later she called me and said her and Pastor talked

23       about it and they would like me to go on disability

24       leave, but she assured me that they're -- she assured

25       me she's not trying to push me out, my job would be

CHERYL PERICH
July 3, 2008

1        there for me.

2   Q.   So there was no initial indication by any physician

3        that you needed to be on some disability; is that your

4        answer?

5   A.   Right.  She said just talk to your doctor and see if

6        he would agree to fill out disability forms because it

7        was Stacey Hoeft and Pastor that had talked and

8        decided that they would prefer that I be on

9        disability.

10  Q.   Did you talk to your doctor about that?

11  A.   I talked to one of the ladies in the office, I don't

12       remember if it was the receptionist or the nurse, and

13       they said that they would talk to the doctor and see

14       if he'd be willing to fill out the forms.

15  Q.   Was this Dr. Harber?

16  A.   Kou.

17  Q.   Dr. Kou.  So did Dr. Kou agree to fill out the

18       disability forms?

19  A.   Yes.

20  Q.   And that was at your request?

21  A.   That was at my request based on Stacey Hoeft asking me

22       to do that.

23  Q.   Now, when Ms. Hoeft asked you to do that, was there

24       any paperwork or anything you had to fill out as part

25       of starting a disability as far as for the school?

CHERYL PERICH
July 3, 2008

1   A.   Yes, there's some paperwork.  I don't remember if I

2        filled it out or if it was just a -- I don't remember

3        if I filled out something too or if it was just the

4        doctor that filled out something.

5   Q.   Do you recall whether it was paperwork for Broadspire

6        or -- the disability carrier at that time, or was it

7        paperwork for the school, meaning like a request being

8        made to Ms. Hoeft?

9   A.   No, it wasn't -- it wasn't for the school, it was for

10       the -- it was for the disability -- it was for -- to

11       be on disability insurance.

12  Q.   So when Ms. Hoeft approached you about recommending

13       that you go on disability she -- that actually

14       included applying for disability insurance as well,

15       right?

16  A.   Right.

17  Q.   Okay.  Now, at that time did you understand -- did

18       anybody explain to you how that worked, the

19       disability, whether it was going to be a paid

20       disability, a disability leave, whether you had to use

21       up like -- what do they call them -- whether you had

22       to use up your days off or sick days first?

23  A.   She said that the school would pay my -- pay me my

24       full paycheck for two weeks and then after that they

25       would pay 30 percent of my pay and the insurance --

CHERYL PERICH
July 3, 2008

1        and then the disability insurance would pay the rest.

2   Q.   Did you get that in writing anywhere or was that

3        stated anywhere, I mean, was there -- did she tell you

4        that on the phone, a letter, e-mail?

5   A.   I don't remember if she told me on e-mail.  I know she

6        told me on the phone.  She might have put it in an

7        e-mail, but I know she told me on the phone when she

8        was talking to me.

9   Q.   What about the employee manual, did you get directed

10       to that, or employee handbook?

11  A.   No, she didn't direct me to that.

12  Q.   Did you look it up yourself in the handbook?

13  A.   No, I didn't need to look it up because she already

14       told me what was going to happen.

15  Q.   You didn't need to look it up at that time or you

16       didn't need to look it up once you had spoken to

17       Stacey?  Well, let me clarify that.  Did you at some

18       point look it up in the employee handbook, the

19       disability policy?

20  A.   Yes, at some point I did.

21  Q.   But not at that time?

22  A.   No, because she explained to me that both her and

23       Pastor wanted me to be on disability leave but they

24       weren't trying to push me out in any way, they really

25       want me to be there.  They were -- that my class would

CHERYL PERICH
July 3, 2008

```
 1    still be there for me and they just wanted me to relax
 2    and get well.
 3  Q.  Now, during this period of time you were -- I guess I
 4    could say you were engaged in communicating with
 5    Ms. Hoeft through a series of e-mails; is that
 6    correct?
 7  A.  Yes.
 8  Q.  Can you see this, Ms. Perich, these e-mails?
 9  A.  I can't read them from here.  I can see that you're
10    holding some e-mails.
11  Q.  Did you have communication with Ms. Hoeft through
12    e-mails?
13  A.  Yes, I did.
14  Q.  I'm going to show you an e-mail dated August 13th of
15    2004.  Did you author that e-mail?
16         MR. ROACH:  Do you remember the -- focus on
17    his question.  Do you remember if, if you can
18    remember, what his question is?
19  A.  Yes.
20  BY MR. WARE:
21  Q.  Okay.  I'm going to give you this package and I'll
22    take that one that's got my highlights.  And then can
23    you turn to an e-mail dated August 14th of 2004?  Did
24    you author that e-mail at the time of 11:27 a.m.?
25  A.  Looking at August 14th?
```



CHERYL PERICH
July 3, 2008

```
 1  Q.  Yeah.
 2  A.  It says from Cheryl Perich, so I guess so.
 3  Q.  Turn to an e-mail dated August 23rd, 2004 with the
 4    subject a spelling bee.
 5  A.  Uh-huh.
 6  Q.  Did you author that e-mail?
 7  A.  Yes.
 8  Q.  And then an e-mail of August 31st, 2004 with a subject
 9    of how you doing?
10         MR. ROACH:  I object based on the misreading
11    of the subject.
12         MR. WARE:  Well, then we must not be looking
13    at the same one.
14         MR. ROACH:  There's a Re:  How you doing?
15  BY MR. WARE:
16  Q.  Did you author that e-mail?
17         MR. ROACH:  The one that I was just
18    referring to?
19  BY MR. WARE:
20  Q.  Yes, with the Re:  How you doing?
21  A.  Yes.
22  Q.  Then there's an e-mail -- if you can turn to
23    September 10th, 2004, and it has a subject of doctor's
24    appointment.  Do you see that?
25  A.  I do.
```



CHERYL PERICH
July 3, 2008

```
 1  Q.  Did you author that e-mail?
 2  A.  Yes.
 3  Q.  And then September 16th, 2004?
 4  A.  September 16th.
 5  Q.  Yes.  And you see the subject there?
 6  A.  New disability update.
 7  Q.  Yes, did you author that e-mail?
 8  A.  Yes.
 9  Q.  And then turn to an e-mail September 25th, 2004, the
10    subject, a disability letter or Re:  Disability
11    letter.  Do you see that?
12  A.  I do.
13  Q.  Did you author that e-mail?
14  A.  Yes.
15  Q.  And below that, at least on my copy, there's an e-mail
16    that purportedly is from Ms. Hoeft dated
17    September 24th, 2004 and it begins with Cheryl.  Did
18    you actually receive that e-mail from Ms. Hoeft?
19  A.  Probably.
20  Q.  And then can you turn to an e-mail from October 13th
21    of 2004?
22         MR. ROACH:  I'm sorry, what date?
23         MR. WARE:  October 13th.
24  BY MR. WARE:
25  Q.  And this has a time of 2:30 p.m. and a subject of
```

CHERYL PERICH
July 3, 2008

```
 1    doctor's appointment.  Do you see that?
 2  A.  Yes.
 3  Q.  Did you author that e-mail?
 4  A.  Yes.
 5  Q.  And then to October 13th, 2004 at 8:59 p.m. and it has
 6    a subject Re:  Doctor's appointment.  Did you author
 7    that e-mail?
 8  A.  Yes.
 9  Q.  And do you have an e-mail in there from November 3rd
10    of 2004?  It would be November 3rd.
11  A.  There's no November 3rd, there's November 2nd -- oh,
12    this says November 3rd.
13  Q.  Right.  It has a little icon of a disability letter
14    doc attached to it.  Did you author this e-mail?
15  A.  It's kind of hard to know because it -- it comes
16    different than the other ones that actually look like
17    they come off of a computer.  These other ones look
18    like they actually came off of -- all the e-mails are
19    sent to the computer.  This one looks different.  It's
20    hard to tell.
21  Q.  It does, can you read it and tell if you authored the
22    text or if that was your communication, do you
23    remember?
24  A.  I have no way of knowing if that is authentically what
25    I said.
```



CHERYL PERICH
July 3, 2008

```
 1  Q.   You don't recall writing this?
 2  A.   I remember saying some of the things, but I really
 3       don't -- I have no way of knowing if this is
 4       authentically what I said.  This appears different
 5       than the other ones.  I really have no way of knowing.
 6  Q.   Do you have any copies of your own e-mails?
 7  A.   I have some copies, but my computer, the hard drive
 8       got damaged and I tried to -- I wanted to get it fixed
 9       so we could save everything and it wasn't possible.
10       We just had to --
11  Q.   Okay.  That answers the question.  Can you go to
12       November 14th of 2004?  It has a subject Re:
13       Disability appeal update, November 15th?
14  A.   I thought you said to look for November 14th.
15  Q.   Did you author that e-mail?
16  A.   It does appear that way on this.
17  Q.   Can you go to November 17th, 2004, it has a subject of
18       doctor visit.  Did you author that e-mail?
19  A.   Yes, I did.
20  Q.   Can you go to November 18th of 2004, it has a subject
21       of Re:  Doctor's visit and a time of 12:53 p.m.  Did
22       you author that e-mail?
23  A.   Yes, I did.
24  Q.   And below that there is an e-mail dated November 17th,
25       2004, and it indicates here from Ms. Hoeft.  Do you
```



CHERYL PERICH
July 3, 2008

```
 1       recall receiving that e-mail from Stacey Hoeft?
 2  A.   I do.
 3  Q.   And can you go to the e-mail dated November 22nd of
 4       2004 with a subject of phone call?  Did you author
 5       that e-mail?
 6  A.   Yes, I did.
 7  Q.   Can you go to an e-mail dated December 16, 2004 with a
 8       subject doctor appointment, dash, test results.  Did
 9       you author that e-mail?
10  A.   Yes.
11  Q.   Can you go to an e-mail dated January 3rd, 2005 with a
12       subject new disability update.  Did you author that
13       e-mail?
14  A.   Yes.
15  Q.   Can you go to an e-mail dated January 7th, 2005 with
16       the subject Re:  E-mail from Jan. 3.  Did you author
17       that e-mail?
18  A.   No.
19  Q.   Are we looking at the same e-mail?
20  A.   It says Re:  E-mail from January 3 and it says from
21       Stacey Hoeft to Cheryl Perich.
22  Q.   No, I'm sorry.  This is January 7th, 2005 at 6:01 p.m.
23           MR. ROACH:  A different e-mail.
24  A.   You said January 7, 2005.  You didn't tell a time.
25  BY MR. WARE:
```

CHERYL PERICH
July 3, 2008

```
 1  Q.   I'm sorry, I didn't know there was more than one
 2       January 7th.  And it has subject Re:  E-mail from
 3       Jan. 3.  Did you author that e-mail?
 4  A.   Yes.
 5  Q.   And then can you go to the e-mail from January 10th of
 6       2005 at 3:37 p.m. with the subject of latest news from
 7       Broadspire.  Did you author that e-mail?
 8  A.   Yes.
 9  Q.   And can you go to an e-mail dated January 10th, 2005,
10       4:37 p.m., and it's an e-mail from Ms. Hoeft allegedly
11       to you.  Do you remember receiving this e-mail from
12       Ms. Hoeft?
13  A.   Can you ask that question again, please?
14  Q.   Do you remember receiving this, the January 10th, '05,
15       4:37 p.m. e-mail, from Ms. Hoeft?  Yes?
16  A.   Yes, I do.
17  Q.   Okay.  Can you go to an e-mail dated January 12, 2005
18       at 6:54 p.m. with the subject Re:  Latest news from
19       Broadspire?  Did you author that e-mail?
20  A.   Yes.
21  Q.   Do you see an e-mail dated January 15th, 2005 with the
22       subject good news?
23  A.   Uh-huh.
24  Q.   Did you author that e-mail?
25  A.   Yes.
```

CHERYL PERICH
July 3, 2008

```
 1  Q.   Could you go an e-mail dated January 19th, 2005 at
 2       1:27 p.m., subject Re:  Doctor's appointment.  Did you
 3       receive that e-mail from Ms. Hoeft?
 4           MR. ROACH:  I'm sorry, can you identify
 5       which one?
 6  BY MR. WARE:
 7  Q.   The time is 1:27 p.m.
 8  A.   Oh, I was looking at the wrong one.
 9           MR. ROACH:  Is the number 48 next to that?
10  A.   Yes.
11           MR. WARE:  Yes.
12  BY MR. WARE:
13  Q.   Do you recall receiving that e-mail from Ms. Hoeft?
14  A.   I will read it and then I'll know if I remember it.
15       Yes.
16  Q.   Okay.  Can you go to an e-mail dated January 20th,
17       2005, the subject of update?
18           MR. ROACH:  This is number 50?
19           MR. WARE:  Yes.
20  BY MR. WARE:
21  Q.   Did you author that e-mail?
22  A.   Yes.
23  Q.   Then there's -- can you go to the e-mail for
24       January 21st, 2005 which has a number 51 circled next
25       to it, a subject -- well, it says to Stacey Hoeft, it
```




Page 105

CHERYL PERICH
July 3, 2008

```
 1      has no subject on it.  Did you author that e-mail?
 2  A.  Yes.
 3  Q.  And could you go to an e-mail from January 21st, 2005
 4      at 3:10 p.m., subject just says Re.  Did you receive
 5      that e-mail from Ms. Hoeft?
 6  A.  I don't remember.
 7  Q.  Okay.  Can you go to an e-mail dated January 21st, '05
 8      at 5:09 p.m.?
 9              MR. ROACH:  This is number 53?
10              MR. WARE:  Yeah.
11  BY MR. WARE:
12  Q.  Did you author that e-mail?
13  A.  Yes.
14  Q.  Can you go to an e-mail dated January 21st, 2005 at
15      7:56 p.m.?  Did you author that e-mail?
16  A.  No, I did not.
17  Q.  I'm sorry, do you recall receiving that e-mail from
18      Ms. Hoeft?
19  A.  Yes.
20  Q.  And I just want to back up.  Did your January 21st,
21      '05 e-mail at 5:09 p.m. refresh your recollection as
22      to whether or not you received the e-mail that it
23      responds to from January 21st, '05 at 3:10 p.m. from
24      Ms. Hoeft?
25  A.  No.
```



---

Page 106

CHERYL PERICH
July 3, 2008

```
 1  Q.  So you still don't recall receiving that e-mail?
 2  A.  No.
 3  Q.  Can you go to an e-mail dated January 22nd, 2005?
 4              MR. ROACH:  That's number 5?
 5              MR. WARE:  Yes.
 6  BY MR. WARE:
 7  Q.  It's subject Re:  Re:  It's at 2:01 p.m.  Did you
 8      author that e-mail?
 9  A.  Yes.
10  Q.  And can you go to the e-mail dated January 24th, 2005
11      at 4:01 p.m.?
12              MR. ROACH:  Number 56?
13              MR. WARE:  Yes.
14  BY MR. WARE:
15  Q.  Did you author that e-mail?
16  A.  Yes.
17  Q.  And can you go to an e-mail dated January 27th, 2005
18      at 2:46 p.m.  Did you author that e-mail?
19  A.  January 27th at 2:46?
20  Q.  Yes, January 27, 2005, 2:46 p.m. with the subject more
21      good news.
22              MR. ROACH:  Number 60?
23              MR. WARE:  Yeah.
24  BY MR. WARE:
25  Q.  Did you author that e-mail?
```



---

Page 107

CHERYL PERICH
July 3, 2008

```
 1  A.  Yes.
 2  Q.  And can you go to an e-mail dated January 31, 2005 at
 3      7:45 a.m. with the subject your last e-mail?  Did you
 4      author that e-mail.
 5  A.  Yes.
 6              MR. ROACH:  Are you done with that, Counsel?
 7              MR. WARE:  I'm missing the last --
 8  BY MR. WARE:
 9  Q.  I'm showing you an e-mail dated February 21st, 2005
10      and I believe it has a subject of decision on peaceful
11      release.  Did you author that e-mail?
12  A.  Yes, I did.
13  Q.  And then e-mail dated February 22nd, 2005, and I guess
14      the subject is communication to the school board.  Did
15      you author that e-mail?
16  A.  I did based on -- I did -- I did do -- I did author
17      this based on Stacey's request.
18  Q.  And that has a time of --
19  A.  7:53 p.m.
20  Q.  Okay.
21              MR. ROACH:  And, Counsel, please correct me
22      if I'm mistaken, but I believe all these e-mails are
23      part of what has been previously marked as Exhibit 15,
24      this collection of e-mails?
25              MR. WEAVER:  To the deposition of Stacey
```



---

Page 108

CHERYL PERICH
July 3, 2008

```
 1      Hoeft I think.
 2              MR. ROACH:  Yes.
 3              MR. WARE:  Right, they are part of the same
 4      collection.
 5              MR. ROACH:  So the document -- I just want
 6      it clear on the record that the documents you are
 7      referring to, the various e-mails, those are part of
 8      Exhibit 15 that were marked previously?
 9              MR. WARE:  Yes.
10              MR. ROACH:  That's what I was --
11  BY MR. WARE:
12  Q.  Now, Ms. Perich, before I authenticated the e-mails,
13      when we were talking about your disability you
14      indicated that there was never a form or anything you
15      had to do for the school, right?
16              MR. ROACH:  Objection, mischaracterizes the
17      testimony.
18  BY MR. WARE:
19  Q.  Is that correct?
20  A.  That is correct, it was a verbal communication.
21  Q.  Not that, but, I mean, there was a form but it was for
22      Broadspire, right?
23  A.  But your question was was there a form I had to fill
24      out for the school.
25  Q.  Right.
```



CHERYL PERICH
July 3, 2008

1  A.  So I'm saying for the schools, and I'm assuming that
2      meant for the school's disability leave.
3  Q.  Yes.
4  A.  And so my answer is that the school's disability leave
5      was taken based on a verbal communication.
6  Q.  Okay.  And that was between you and Ms. Hoeft?
7  A.  Between myself and Ms. Hoeft on the telephone based
8      on --
9  Q.  Go ahead.  I'm sorry, I cut you off.
10 A.  That's okay.
11 Q.  So in addition to the e-mails that we went through
12     there were also other verbal communications between
13     you and Ms. Hoeft while you were out on disability?
14 A.  Well, I had tried -- when I was -- before I came
15     back -- was going to come back to work -- since I was
16     still experiencing some health problems, I wanted to
17     talk to her before I came back to work.  And I was
18     trying to call her at the office, school office, and
19     tried several times and she wasn't there each of the
20     times that I called.  So the secretary gave me her
21     home phone number to reach her, so I ended up reaching
22     her at home.  And then she said, you know, the better
23     way to reach me really is by e-mail because I'm back
24     and forth between school and home, and then she gave
25     me her work e-mail address and she said, I check this


CHERYL PERICH
July 3, 2008

1      at home, I check it from school, from home, and so,
2      you know, you can use this whenever.  So she answered
3      me whether it was daytime or evening or weekend off
4      that same e-mail address.
5  Q.  So from that point on was the majority or all of your
6      communications with her through e-mail?
7  A.  All of it was from e-mail after that by her request.
8  Q.  Did you communicate with any other employees at the
9      church or school during this period?  I mean, that's
10     kind of broad.  Let me -- when you first went on
11     disability were you communicating with any other
12     employees or board members at the school?
13 A.  When I first went on disability?  Well, Ellen Mills
14     would send me e-mails and tell me cute little things
15     that her first-graders would do.  She knows that --
16     she knows that I like to hear things going on in the
17     school, and I would tell her things about my doctor
18     appointments and how things were going with my health,
19     but I always e-mailed Stacey about it first.  Because
20     she's my boss I figure I should tell my boss first and
21     then I'd e-mail Ellen about it as well.
22         Well, and then the -- but -- so I kept her
23     up to date with my health and she kept me up to date
24     with cute little things her first-graders were doing
25     and it kind of -- because she knows I like to hear


CHERYL PERICH
July 3, 2008

1      about school things and it was -- you know --
2  Q.  Did you talk to her on the phone too or was it just
3      e-mails with Ellen?
4  A.  She's long distance and so, you know, with me being in
5      Ferndale and her being in Redford, it was pretty
6      expensive to call there.
7  Q.  Anyone else besides Ellen?
8  A.  No.
9  Q.  Now, when you -- when you went out on your disability
10     were you ever asked for a return date by anyone at the
11     school, any teachers or board members?
12 A.  No, they never told me that there was any certain date
13     that I had to return to -- return by.  They --
14 Q.  Were you aware of any return date stated in the
15     employee handbook or elsewhere?
16 A.  Well, I knew that once you're well and you had a
17     return-to-work slip then that's your -- that's the end
18     of your disability leave, so that's -- that would be
19     your end of your -- you know, if you're on a -- if
20     that's the type of leave you're on is disability leave
21     and you're -- you're not getting disability anymore
22     because now you're well and your doctor's giving you a
23     return-to-work slip, that would be the end of your
24     disability leave, so that would be your day you'd be
25     due to return.


CHERYL PERICH
July 3, 2008

1  Q.  When did you become aware of that?
2  A.  It's common sense.  If you're -- if -- everyone at
3      that meeting that we had on the 13th had a copy of my
4      return-to-work slip, so -- and the doctor had said --
5      and the disability company knew that I -- already knew
6      that I wasn't disabled anymore, that I was -- the
7      doctor had given me the okay to go back to work, so if
8      you're not on disability and your doctor's given you
9      the okay to go back to work and your leave type is
10     disability leave, then you can't be considered -- you
11     cannot be considered to be on disability leave if
12     you're no longer disabled and your doctor has given
13     you a note to say that you are now able to go back to
14     work with no restrictions, so that's the day that
15     you're -- that's the first day that you're not on
16     leave anymore.
17 Q.  Okay.  I'm going to show you --
18 A.  So through logical reasoning --
19 Q.  I'm going to show you page 3-3 from the Hosanna-Tabor
20     Lutheran Church employee handbook and then on -- in
21     addition 3-4.  Have you seen that before?
22 A.  Let me read it first, please.  Yes.
23 Q.  Okay.  Do you remember when you would have first seen
24     that?
25 A.  No.



CHERYL PERICH
July 3, 2008

1   Q.   I'm including that page in the Hosanna-Tabor Lutheran
2        Church employee handbook.  Can you look through that
3        and let me know when you saw that page whether it was
4        as part of that handbook there that I just provided to
5        you?
6               MR. ROACH:  Mr. Weaver, have you got a copy
7        of this handbook marked as an exhibit?
8               MR. WEAVER:  Not at this point, no, just two
9        pages worth.
10              MR. ROACH:  I think, Counsel, it would be
11       appropriate if you --
12              THE WITNESS:  This is given in separate
13       pages, so how do I know this was really in the
14       handbook or if they stuck it in there separate at a
15       separate time?  If I had the handbook, my own
16       handbook, with me I'd know if this was the exact same
17       thing that I saw.
18              MR. ROACH:  Regardless of whether or not you
19       can identify this as the personnel manual in place at
20       the time, if Mr. Ware is going to ask questions about
21       these I think we need to mark this as a document and
22       mark this as an exhibit so we know what we're talking
23       about later, since I don't have a copy.
24              THE WITNESS:  I have my copy at home of the
25       employee handbook, but this is all --


CHERYL PERICH
July 3, 2008

1               MR. ROACH:  Would you like me to make copies
2        for you?
3               MR. WARE:  Yeah, that's fine.  I'm trying
4        not to re-mark stuff, so I'm not sure if it was marked
5        or not.
6               THE WITNESS:  I don't know if some of these
7        pages were put in after the fact or if this is -- all
8        of this is the same as what it was back then.
9               MR. ROACH:  So you cannot verify --
10              THE WITNESS:  I can't verify it.
11              MR. ROACH:  -- this as being --
12              THE WITNESS:  I can't verify it as being the
13       same, I really can't.
14              MR. WARE:  Do you want to mark it or not?
15              MR. ROACH:  Yeah, I want to mark it.  Let me
16       go ahead and take a break.  Is there anything else you
17       want copied to mark as an exhibit?
18              MR. WARE:  No.  I'm trying not to mark as
19       much stuff as possible.
20              (Recess taken at 1:44 p.m.)
21              MARKED BY THE REPORTER:
22              DEPOSITION EXHIBIT A
23              1:59 p.m.
24              (Back on the record at 2:06 p.m.)
25   BY MR. WARE:

CHERYL PERICH
July 3, 2008

1    Q.   Ms. Perich, you have a copy of what's been marked as
2         Exhibit A in front of you.
3               MR. ROACH:  No, you just look at this.
4    BY MR. WARE:
5    Q.   And I believe you indicated that -- well, did you
6         indicate you have an employee handbook but you can't
7         verify if it's the same as this one?
8    A.   Right, because I don't have one with me, so I'd like
9         to add to that comment that that previous area of the
10        handbook that you had me look at and said do you
11        remember looking at this, I cannot verify that what I
12        looked at in the employee handbook was the same as
13        what I look at here.  I really don't know.  That was
14        three years ago, so I would have to look at my
15        employee handbook to see if this is the same as that.
16   Q.   And just for the record, the front page of this
17        handbook says adopted May of 2004, and you can't
18        recall whether yours has that same date?
19   A.   Well, that's true, the front page says that, but how
20        do I know if you put in other things in between?
21   Q.   You don't, so --
22   A.   I don't.
23   Q.   -- I'm just asking you if you see that on this copy
24        we're marking for future reference, that this copy
25        we're looking at refers to being adopted in May of

CHERYL PERICH
July 3, 2008

1         2004?
2    A.   I see that on the front of this, but I still don't
3         have any way of knowing if you put in other things in
4         between that was adopted any other time, so without
5         being able to compare to my own copy I don't know if
6         this is a true representation of what the handbook was
7         at that time.
8    Q.   That's fair.  And then if we open this one up -- can
9         you open?  You'll note that the pages in the left
10        corner has a designation 12/99?
11   A.   Yes.
12   Q.   And I believe this appears to be numbered sequentially
13        with the table of contents that has a Roman numeral I
14        and then page number in the section 1 beginning 1-1
15        and ending in section 9 with 9-3.  Do you see that?
16   A.   9-3 is a blank page.
17   Q.   Right, and that's the last page with the page numbers,
18        and then there's an index page labeled I-1 and I-2.
19        Do you see that?
20   A.   Yes.
21   Q.   Okay.  And I'm going to hand you what we're going to
22        mark as Deposition Exhibit B.
23              MARKED BY THE REPORTER:
24              DEPOSITION EXHIBIT B
25              2:10 p.m.



Page 117

CHERYL PERICH
July 3, 2008

BY MR. WARE:

2  Q.  Have you ever seen this document before?

3  A.  The first time I saw it was during 2008.  I received a
4      copy of a book from the synod that was labeled
5      2007-something.  It was -- I can't remember what the
6      title of the book was, but we had that book here
7      during Bruce Braun's deposition --

8          MR. ROACH:  Ms. Perich --

9  A.  -- but I don't have it now.

10         MR. ROACH:  -- answer his questions.

11 A.  The question was have I seen it.  I've seen it before,
12     yes.

13 BY MR. WARE:

14 Q.  And that was in 2008?

15 A.  2008 was the first time I ever saw it.

16 Q.  Just for the record, the document starts with page 37
17     and it has a title 1-10 dispute resolution of the
18     synod.  Is that the document you're referring to?

19 A.  Yes.

20 Q.  Now, I believe my last question when we were
21     discussing your being on disability in 2004 you had
22     indicated that you had never been given or asked for a
23     certain date that you would return; is that correct?

24 A.  No, they assured me that I would have -- that my job
25     would be there for me when I got well.



---

Page 118

CHERYL PERICH
July 3, 2008

1  Q.  Okay.  As part of that though did they ever ask you
2      for a time line of when you thought you'd be back?

3  A.  No.

4  Q.  During your communication with Ms. Hoeft did you have
5      occasion to give her some estimates on when you
6      thought you'd be able to be back?

7  A.  Yes.

8  Q.  Okay.  And do you know when you would have gave her
9      your first one or when that would have started?

10 A.  That was in December after I was definitively
11     diagnosed with narcolepsy.

12 Q.  So as far as you recall the first time you gave her
13     some idea of returning would have been in December of
14     '04?

15 A.  Yes.

16 Q.  And do you remember how long you told them you thought
17     it would be from December?

18 A.  Yes, I said -- I had said two to three months.
19     Dr. Spitzer told me it would take two months to
20     gradually build me onto the medication, and he wasn't
21     sure if he would need to take me off any of the other
22     medication or not at that point, and if he did need
23     to, then it would take a little bit more time, so
24     that's why I added the other month in, but we weren't
25     sure on that.

---

Page 119

CHERYL PERICH
July 3, 2008

1  Q.  By December of '04 had you received a diagnosis of
2      what you were suffering from?

3  A.  Yes.  As I just said, when I gave her the time line of
4      the two to three months, that was after I had been
5      definitively diagnosed with narcolepsy.  That's why I
6      was able to give her that time line.

7  Q.  Who diagnosed you with narcolepsy?

8  A.  Dr. Spitzer.

9  Q.  Okay.  And with regards to the neurocardiogenic
10     syncope, did that turn out to be a misdiagnosis?

11 A.  Yes, it was.

12 Q.  So that never had to be resolved, it was just a
13     misdiagnosis?

14 A.  Yes.

15 Q.  What about the vascular migraines?

16 A.  Yes, that's a misdiagnosis also.

17 Q.  So that was something that didn't have to be resolved,
18     it was a misdiagnosis?

19 A.  Yes.

20 Q.  Now, did you ever let Ms. Hoeft know that those two
21     diagnoses were misdiagnoses?

22 A.  I don't remember if I did or not.

23 Q.  But you did tell her that you had been properly --
24     finally properly diagnosed with narcolepsy?

25 A.  Yes, I remember explaining to her that there were

---

Page 120

CHERYL PERICH
July 3, 2008

1      three different tests that I was given, a blood test,
2      a nighttime sleep test and a daytime sleep test, and
3      in order to be for sure that you -- the doctor to be
4      sure that you had narcolepsy you had to be -- have
5      positive results for at least two of those tests, and
6      I had positive results on all three of the tests, so
7      he was positive that I had narcolepsy since you had to
8      be -- get positive on two of them and I was positive
9      on all three of them, so he knew for sure that this
10     was what it was.

11 Q.  Now, do you know what the symptoms affecting
12     narcolepsy are?

13 A.  Yes, I do.

14 Q.  And what are those?

15 A.  Well, a person can go into a deep sleep and when they
16     go into the deep sleep you can't -- people don't --
17     can't wake you up until you're done sleeping, and you
18     don't hear them or anything, and that can happen any
19     time throughout the day.  The other thing that can
20     happen is cataplexy and cataplexy is you can -- either
21     one set of muscles or several sets of muscles or all
22     your muscles can relax, and if one set of muscles
23     relaxes your head can kind of go to the side or you
24     can kind of slouch down, but if all your muscles relax
25     that's when you can fall to the floor.  That's why

Page 121

CHERYL PERICH
July 3, 2008

1    they thought I was passing out, because I had fallen
2    to the floor.  And most people get the deep sleep at
3    one time and the cataplexy at a different time, so
4    they fall to the floor and they're aware of what's
5    going on around them but they usually can't talk to
6    anybody during this time but they can still hear
7    people.  What we found out was that my deep sleep and
8    my narcolepsy was happening at the exact same time, so
9    that's why mine was so hard to diagnose.
10  Q.  You mean your deep sleep and your cataplexy?
11  A.  Yes, my deep sleep and my cataplexy were happening at
12       the exact same time, so that's why it's hard to
13       diagnose.  You can have deep sleep -- you can go into
14       a deep sleep with your eyes open or with your eyes
15       shut.  If I go into a deep sleep with my eyes shut and
16       it was just relaxing some muscles, you know, then it
17       just looked like I was passing out.  If I went into a
18       deep sleep and I was relaxing all muscles, you know,
19       and my eyes are shut, you know, I was -- I'd pass --
20       I'd look like I was passing out on the floor but
21       nobody could wake me up, so sometimes they thought I
22       was unconscious.
23  Q.  Let me stop you there and just ask a question.  When
24       you said no one could wake you up, was this family
25       members, because you never passed out at the school,



---

Page 122

CHERYL PERICH
July 3, 2008

1    did you?
2    A.  No.
3    Q.  So when you said no one could wake you up, you meant
4         family members?
5    A.  Family members.  One time I did it in an emergency
6         room, but even they couldn't figure out what was going
7         on because it was so rare.  I mean, for one thing
8         narcolepsy is a rare disorder, so regular doctors
9         really don't know much about it.  And then even within
10       narcolepsy the way mine presented itself was rare
11       because with narcolepsy usually your deep sleeps and
12       cataplexy come at two separates times.  Mine didn't,
13       mine came together.  So if my eyes were open and I had
14       the cataplexy and the deep sleep, it would look like I
15       was having a seizure.  And a doctor witnessed one of
16       these and he thought I was having a seizure, so you
17       see, this is why there was so many different
18       diagnoses, because it looked like various different
19       things because of the deep sleep and the cataplexy
20       coming all at the same time.
21  Q.  So --
22  A.  Oh, and the reason why -- and the sleep -- and at
23       night the sleep -- the reason why you go into these
24       deep sleeps during the daytime is because your sleep
25       cycles get messed up at night.  Most people go into



---

Page 123

CHERYL PERICH
July 3, 2008

1    several various different sleep cycles before they get
2    to the REM sleep, and with narcolepsy you go into REM
3    sleep immediately.  And --
4         MR. ROACH:  Ms. Perich, wait for a question.
5    I think his last question has been answered.
6    BY MR. WARE:
7    Q.  Okay.  So my last question was simply did you know
8         what the symptoms or effects of narcolepsy were, so
9         you went through that as well as cataplexy, which I'm
10       assuming --
11  A.  That's part of the narcolepsy is -- that's part of the
12       symptoms of it, but the medication I have that I --
13       that Dr. Spitzer put me on completely controls all of
14       those symptoms.
15  Q.  So as of December 2004 were you on that medication?
16  A.  As of December 2004 I started one of the medications
17       and you have to slowly, gradually increase that
18       medication, and then when you get to a certain point
19       on that medication, then he puts you on the other
20       medication.  There's a couple different medications
21       you have to be on.
22  Q.  When did you start the other medication?
23  A.  I don't remember.  It's -- the --
24       MR. ROACH:  You answered.
25  BY MR. WARE:



---

Page 124

CHERYL PERICH
July 3, 2008

1    Q.  Okay.  Were you still having any episodes or any --
2         suffering from any of the effects of the narcolepsy in
3         December 2004?
4    A.  Yes, I'd just been diagnosed at that time and they
5         were just starting to put me on the medication.
6    Q.  What about in January of '05?
7    A.  Yes.  What happened is once I got put on the medicine
8         is that I would gradually be increasing the medicine
9         and then I would gradually be having less and less of
10       the episodes.
11  Q.  So you were still having episodes but less often?
12  A.  Uh-huh.
13  Q.  What about in February of '05?
14  A.  I really don't remember when the last one was, but I
15       do know that when I went to that meeting on
16       February 13th I was not having any at that point and I
17       had not been having any for a while.
18  Q.  Did you have any after that?
19  A.  No.  I have not had any at all ever since then.
20  Q.  So you've been symptom free since at least
21       February 13th of '05?
22  A.  Yeah, actually before that, I mean, actually -- I
23       mean, really I could have gone back to work -- okay.
24       Yeah, I guess that answers that question.  That was
25       before February 13th that I was symptom free.



CHERYL PERICH
July 3, 2008

1 Q. Now, I believe it was on January 27th of '05 that you
2 first indicated you'd be able to return to work
3 between February 14th and February 28th. Do you
4 remember that? I mean, if you want to look at
5 something --
6 A. I don't remember the exact date that I said it, but I
7 do remember saying between those two dates.
8 Q. Now, up until that date, the January 27th, 2005 date,
9 did you have any problems or concerns with how your
10 disability had been handled by the school? Let me
11 rephrase the question.
12 Did you feel like you were being
13 discriminated against up until that date of
14 January 27th, 2005? I mean, if you want to look
15 through some of the e-mails or something to refresh
16 your recollection you can do that because that might
17 give you a better idea of what was going on.
18 A. Okay.
19 MR. ROACH: I'm not even sure. That was in
20 January.
21 BY MR. WARE:
22 Q. And just for your information, your January 27th
23 e-mail is number 60, it's circled as number 60 in
24 here, which I just asked you about, so if that helps
25 you out.



CHERYL PERICH
July 3, 2008

1 A. I'm not even looking at that right now.
2 MR. ROACH: Well, let me also put an
3 objection on the record as to the question requesting
4 a legal opinion.
5 MR. WARE: Because of the word
6 discrimination?
7 MR. ROACH: Yes.
8 BY MR. WARE:
9 Q. I think my first question to you was did you have any
10 problems or concerns with it, because I was trying to
11 stay away from the word discrimination, but for most
12 laypeople, I mean, when you feel somebody's done
13 something wrong to you you feel, quote, discriminated
14 against. So what I'm trying to say is up until the
15 January 27th notification of when you believed you
16 were able to return was there anything else going on
17 that was giving you the idea that you were somehow
18 being treated unfairly or discriminated against?
19 MR. ROACH: Same objection as to the last
20 part of the question.
21 BY MR. WARE:
22 Q. Right, and that's just in your opinion?
23 A. Well, I was sitting here thinking my attorney would be
24 better able to answer the question than I, but I
25 wasn't sure if I was allowed to say that.



CHERYL PERICH
July 3, 2008

1 Q. So you didn't know up until that point whether or not
2 there was anything wrong with the way your disability
3 was being handled?
4 A. I remember seeing one that said -- that's not the same
5 one.
6 MR. WEAVER: While this question is still
7 pending I want to add to the objection that that calls
8 for a legal conclusion. The objection on the basis of
9 vagueness, Ms. Perich hasn't been asked about any
10 particular incident, remark or communication from
11 anyone representing Hosanna to her or from herself to
12 anyone representing Hosanna, and I believe leading up
13 to January 27th there were an abundance of
14 communications between her and Ms. Hoeft, perhaps some
15 representations from Ms. Hoeft about the board
16 thinking about doing certain things with regard to
17 asking for peaceful releases of cause after six
18 months.
19 We just don't know what she's being asked at
20 this point, and that could be anything, and I don't
21 want to make assumptions about what the question is
22 asking, but I do believe it's pretty vague without
23 more specificity.
24 BY MR. WARE:
25 Q. If that doesn't refresh your memory, Ms. Perich,



CHERYL PERICH
July 3, 2008

1 that's all you have to say is they don't refresh your
2 memory.
3 A. Okay. They don't refresh my memory.
4 Q. Okay. So I believe when I left off you said it was
5 January 27th of 2005?
6 A. What was on January 27th, 2005?
7 Q. Is when you first notified Ms. Hoeft and the school
8 that you'd be able to return to work between
9 February 14th and February 28th?
10 A. No, you said it was January 27th. I said I know it
11 was in -- I said I remembered that it was between
12 February 14th and February 28th, but I didn't remember
13 exactly what date that I said that.
14 Q. Can you look at the e-mail dated January 27th, 2005?
15 It's number 60. Do you see that?
16 A. Yes.
17 Q. Now, prior to this e-mail had you given Ms. Hoeft or
18 anyone else at the school a specific date that you
19 would be able to return?
20 A. I had given her -- I guess it wouldn't be a
21 specific -- I gave her a date of -- in December I gave
22 her a time line -- Dr. Spitzer had said it took two
23 months to get a patient fully functional with
24 narcolepsy and then he wasn't sure if he'd have to
25 take me off -- he might need to take me off some of



CHERYL PERICH
July 3, 2008

1      the other medicines, so he wasn't sure on that.  So I
2      said we might need to add another month onto that, so
3      it would be two to three months.  It could be two
4      months or it could be two to three months, and that
5      was in December.
6  Q.  That's your December 16th e-mail that you're referring
7      to?
8  A.  Yes.
9  Q.  Okay.  And you previously testified that December was
10     when you had started the first of your new medication,
11     right?
12 A.  Yes.
13 Q.  But you were still having episodes, right?
14 A.  Yes.
15 Q.  In fact, you passed out the week after Christmas,
16     right?
17 A.  Yes.  It takes a little while for the medicine to
18     work.  You don't stop getting episodes immediately,
19     your episodes start getting fewer and fewer --
20 Q.  Okay.
21 A.  -- as your medicine is gradually increased.
22 Q.  That's fine.  So then if we get back to January 27th,
23     again this is the first time -- and you've probably
24     been on your medication now at least a month -- the
25     first time that you had specific dates, February 14th



CHERYL PERICH
July 3, 2008

1      and February 28th, right?
2  A.  Right.
3  Q.  Okay.  And do you remember you were being informed
4      that they were going to be hiring a substitute,
5      sometime around January 10th in an e-mail, named
6      Elizabeth Gavrun?
7  A.  Yes, they did tell me they were going to be hiring a
8      substitute.
9  Q.  Okay.  And at that time you still hadn't given them a
10     specific date when you would be returning, right?
11 A.  I had told her in December that I would be returning
12     in two to three months.
13 Q.  Right, while you were still having episodes?
14 A.  As I said previously, the episodes would become fewer
15     and fewer as you gradually increase the medicine.
16 Q.  So on January 10th of '05 when you were notified that
17     they were going to be hiring Ms. Gavrun did you
18     indicate to them that I should be able to be back next
19     month in February?
20 A.  We weren't able to make that prediction at that time.
21     As I said earlier, in December I told her it would be
22     two to three months.  On January 27th I was far enough
23     into my regimen of making the medication adjustments
24     that the doctor was able to make a prediction that it
25     would be sometime between February 14th and

CHERYL PERICH
July 3, 2008

1      February 28th.
2  Q.  But as of January 10th you weren't far enough into
3      your medications to make that prediction, right?
4  A.  Not for him to make an accurate prediction.
5  Q.  Okay.  And in fact you sent an e-mail on January 12th
6      regarding Ms. Gavrun being hired, and you stated in
7      that e-mail I'm glad to hear that you found someone to
8      be my long-term sub until I come back?
9  A.  Yes.  Usually a person is considered a long-term sub
10     if they're subbing for one week or more.
11 Q.  Okay.  So is that what you meant by the word long-term
12     sub is one week or more?
13 A.  Yes, it is, yes.
14 Q.  But that didn't -- you weren't referring to an
15     extension on your return time, right?
16 A.  No.
17 Q.  Meaning at this point you had no reason to believe
18     that you still would not be back by February?
19 A.  No.  She had told me -- I told her in December it
20     would be two to three months and I still believed
21     that, and then when I -- and later on in January
22     I was able to give her an exact time line within a
23     two-week span of between this date and this date that
24     I would be returning.  A long-term sub anywhere I've
25     been has always been considered one week or more.

CHERYL PERICH
July 3, 2008

1  Q.  Were you still passing out as of January 12th?
2  A.  As I stated earlier, I don't remember when the last
3      day was that I had -- oh, I don't remember when the last
4      date was that I had an episode.  As I stated, we now
5      at that point in my -- at that point in my medical
6      history we knew that I was not passing out.  You might
7      see in some of the e-mails me saying passing out
8      because Stacey and I had gotten used to saying the
9      word passing out, and she -- I had explained it to her
10     what it really was and she and I both knew that it
11     wasn't passing out, so we just kept using those terms
12     because we didn't really know what else to call it,
13     but we knew that it wasn't passing out.
14 Q.  Okay.  So when you referred to she could also call but
15     if I've passed out I won't hear the phone?
16 A.  Yeah.
17 Q.  You meant if you fell asleep?
18 A.  Yeah, it could be fallen asleep or it could be fallen
19     asleep with narcolepsy combined, and she knew that
20     because I had already explained it to her.  And we
21     just didn't know what else to call it because that's
22     what we've been calling it all along.
23 Q.  Now, isn't it correct that on January -- sometime
24     around January 20th you went to a new dosage of your
25     medication because you were having flu-like symptoms?



CHERYL PERICH
July 3, 2008

1   A.   Okay.  I didn't go to a new dose because I was having
2        flu-like symptoms, I went to the new dose and I came
3        down with flu-like symptoms and I didn't know if the
4        flu-like symptoms were a side effect of having the
5        larger dose or if it was really the flu.
6   Q.   Okay.  So we're within probably three weeks of your
7        return date, right, which would be somewhere between
8        February 14th at the earliest?
9            MR. WEAVER:  I'm going to object to the
10       extent it mischaracterizes the record at this point.
11       Her doctor gave her a return date of February 22nd,
12       that would make it a month from the return date.
13           MR. WARE:  I'm sorry, I'll correct the
14       question.
15  BY MR. WARE:
16  Q.   We're within three weeks of this specific return date
17       you had given him at this time, which was
18       February 14th?
19  A.   I had given him a date of between February 14th and
20       February 28th.
21  Q.   Okay.
22  A.   So I was going to return somewhere between --
23       somewhere by the end of February, so even if --
24       whether it was flu-like symptoms or whether I was
25       having symptoms from the higher dose and had to have



CHERYL PERICH
July 3, 2008

1        it adjusted, I still would have time to have that
2        medication adjusted and still be well enough by the
3        end of February.
4            As it turned out it was not any problem from
5        the medication.  He had me reduce the medication just
6        to see if it was and the flu-like symptoms continued,
7        so it wasn't the medication after all, it was the flu.
8        And so now we knew it wasn't the medication so I could
9        continue -- then up the dosage and continue having
10       less and less episodes because I was continuing to up
11       my dosage.
12  Q.   Can you look at the January 21st, 2005 e-mail from
13       Ms. Hoeft to yourself?
14           MR. ROACH:  From?
15  BY MR. WARE:
16  Q.   That's not it.
17  A.   Number 51?
18  Q.   52.
19  A.   Okay.  Oh, 52.
20  Q.   Now, was this the first communication you had got from
21       Ms. Hoeft regarding a peaceful release or resignation
22       of your call?
23  A.   I haven't read this yet.  Could I have some time to
24       read it?
25  Q.   I'm sorry.

CHERYL PERICH
July 3, 2008

1   A.   This is the first time I heard it, but it doesn't say
2        that they're going to do it.  It just says that
3        they're going to ask Pastor to do this but he had
4        been -- his situation was different.  He had been on
5        disability since September of the previous school
6        year.
7   Q.   Okay.
8   A.   And he was terminally ill, stage IV cancer.
9   Q.   So at some point you e-mailed them back to say that
10       you would be back, right?
11  A.   Yes.
12  Q.   And I think that was the same day?  If you turn to --
13       do you have an e-mail dated January 21st, 5:09 p.m.?
14       All right.  Now, this e-mail again is dated
15       January 21st, 2005 and it doesn't give a specific date
16       yet though, right?  In fact, you indicate at one point
17       in the e-mail looks like I will be back this school
18       year.
19  A.   I haven't read this, so you're asking me questions
20       about something I haven't read yet.  Yes, it does say
21       this school year.  I was talking in generic years
22       between this school year and next school year because
23       she was asking a question about would I be back next
24       school year.  And why ask the question about would I
25       be back next school year when I would be well enough

CHERYL PERICH
July 3, 2008

1        to come back during this school year?  So that's why I
2        was saying generically this school year and not
3        talking a time line of exactly what time.
4   Q.   So you still hadn't given them a specific date?
5   A.   In December I had given them the time of two to three
6        months, and then when was the time -- I think we've
7        covered that already.  What was the date that -- there
8        was another date that I gave them, the other --
9   Q.   The February 14th to 28th day?
10  A.   Yeah.
11  Q.   That was January 27th.  We haven't got to that e-mail
12       yet.
13  A.   Okay.  So no, on January -- we haven't got to it but
14       we got to it a little while ago.  Okay.  So as of
15       January 21 I didn't give exact dates, but in December
16       I had said it would be between two to three months,
17       and then January 21 I was telling her I thought it
18       might be the medicine giving me these symptoms but it
19       looks like it's the real flu so it looks like I'll be
20       able to increase my medicine and I'll be able to start
21       increasing it sooner and that won't be a problem.
22       I'll be able to get back sooner.  So then it was only
23       six days after that that I was able to give her exact
24       dates of between February 14 and February 28.
25  Q.   And the six days after that you're referring to is



CHERYL PERICH
July 3, 2008

1      January 27th?

2   A.   January 27, uh-huh.

3   Q.   Okay.  So the next question I guess I want to -- I

4      guess what the question I'm asking you though is did

5      you have any problems or concerns with anything that

6      was going on before you gave them the specific date of

7      the February 14th or February 28?

8   A.   I think I already stated that I'm not sure exactly

9      when the time was that there were -- that there were

10     concerns.  I think there were some concerns at various

11     different times along the way.  My major concerns came

12     at the time of the meeting on February 13th.

13  Q.   Okay.  We haven't got to that meeting yet.

14  A.   But there were other concerns along -- there were some

15     concerns along the way, but my major concern came

16     in.

17  Q.   Is that when you feel you were first discriminated

18     against?

19  A.   Whether I was first discriminated against, I'm not

20     sure.  I was definitely very discriminated against

21     that day, but whether I was first discriminated

22     against then, I'm not sure.  That would have to be my

23     attorney's decision on that.

24  Q.   It would have to be your attorney's decision?

25  A.   Yeah, that's a bit of a legal decision, I would think.



---

CHERYL PERICH
July 3, 2008

1   Q.   Of when you were first discriminated against is your

2      attorney's decision?

3   A.   Right.

4           MR. ROACH:  I paid all that money for law

5      school.

6   BY MR. WARE:

7   Q.   So you can't identify any specific act of

8      discrimination prior to speaking with your attorney,

9      right?

10          MR. ROACH:  I'm sorry, what?  I missed --

11          THE WITNESS:  He said that I can't identify

12     any acts of discrimination without talking to my

13     attorney.

14  BY MR. WARE:

15  Q.   Well, I mean prior to having spoken with an attorney

16     you couldn't identify any specific acts of

17     discrimination?

18          MR. ROACH:  As far as making a legal

19     conclusion, that would be correct.

20  BY MR. WARE:

21  Q.   I'm not asking for a legal conclusion, I'm just asking

22     in your mind did you feel there were being things that

23     were being done discriminatory to you, whether or not

24     the law recognized it as discrimination or not?  All

25     right.  Let me rephrase the question.

---

CHERYL PERICH
July 3, 2008

1           Did you feel any of the actions of the

2      school and Ms. Hoeft were motivated by discrimination

3      that were being -- well, that were being directed

4      towards you?

5           MR. ROACH:  Could we -- and maybe you can

6      repeat your question if you'd like, but maybe you

7      could rephrase it in such a way of making decisions,

8      unfair decisions based on your disability.

9           MR. WEAVER:  Yeah, because it's more of a

10     factual question versus a legal question.

11          MR. WARE:  Well, I'm trying to separate the

12     discrimination from the retaliation.  I understand

13     when she's going to -- her claim of retaliation is

14     going to come up, but I'm trying to do prior to that,

15     whether or not you felt any of the actions that were

16     being directed toward you were motivated by a desire,

17     an intent to discriminate against you based on your

18     disability, and if so if you can kind of identify when

19     you first got that feeling that all of this is being

20     motivated because of my disability?

21          MR. ROACH:  Well, the problem is that when

22     you're using legal words and legal terms, then it's

23     hard for her to make a judgment.  If you go back to

24     making decisions regarding her employment based on a

25     disability that she disagrees with or is unfair, maybe

---

CHERYL PERICH
July 3, 2008

1      we can go right to the facts rather than her trying to

2      make a determination as to what's unlawful

3      discrimination or not.

4           MR. WARE:  Okay.  I just -- your distinction

5      went over my head.  You said my making decisions based

6      on her employment?

7           MR. ROACH:  Decisions about her employment

8      that are based on her disability or lack thereof, in

9      other words so that she's going to -- I think what

10     you're getting at is her concerns about decisions that

11     were about to be made or that were being made that

12     were based on her disability or lack thereof, I think.

13          MR. WEAVER:  Yeah.

14          MR. ROACH:  I think that's what --

15  BY MR. WARE:

16  Q.   Did you understand what your attorney said,

17     Ms. Perich?

18  A.   Yes.

19  Q.   So then let me rephrase the question like this.  When

20     you received the -- I believe it was the January 21st

21     e-mail from Ms. Hoeft regarding your intentions for

22     the next year was that the first time that you felt an

23     employment decision was being made based on your

24     disability?

25  A.   I didn't really think there was -- I thought she just



CHERYL PERICH
July 3, 2008

1    misunderstood me in this letter.  I'm trying to --

2  Q.  That's fair.  Let me see if I can keep going.  Did you

3    think it was unusual or were you -- what's the word

4    I'm looking for?  Did you understand why around this

5    time of year they were trying to ask for your

6    intentions for the next school year, I mean, would

7    that have been usual if you hadn't been out on

8    disability leave to start asking you in January?

9  A.  They don't usually ask that early.

10  Q.  So you thought that might have been a little early?

11  A.  Uh-huh.

12  Q.  Do you think that was based on your disability?

13  A.  I was starting to wonder because they don't usually

14    ask that early.

15  Q.  Do you know in speaking with Ms. Mills whether any of

16    the other teachers were starting to be asked around

17    that time what they were going to do next year?

18  A.  I didn't even think to ask her.

19  Q.  And by early you -- normally they would start asking

20    in February, I believe you testified, right?

21  A.  I don't remember testifying to that.

22  Q.  When we were speaking about your call and you got your

23    colloquy completed in February, do you remember

24    testifying that that was usually when they'd start

25    asking about the next year and contracts and things?

CHERYL PERICH
July 3, 2008

1  A.  Occasionally they have in February.  More of the time

2    it's usually been around March.

3  Q.  Okay.  And so for this particular year did you ever

4    find out whether or not any other teachers were being

5    asked around this same time about their intentions?

6  A.  No, I didn't.

7  Q.  What about any other employees like Pastor Eggers?

8  A.  Well, she says that they were -- I think there were --

9    I think there was something in here about -- well, I

10    don't know.  I don't know.

11  Q.  That's an answer.

12  A.  Later on there was something about asking him to

13    rescind his call, but it didn't say anything in here

14    about asking if he was going to come back because they

15    don't ask if he's going to come back.  He's always

16    there.

17  Q.  Now, as of January 21st when you got the e-mail from

18    Ms. Hoeft regarding your intentions, isn't it true

19    that you had never mentioned anything about filing a

20    lawsuit?

21  A.  That's true.

22  Q.  All right.  And isn't it true that you had never told

23    anybody that you felt like you were being

24    discriminated against?

25  A.  Like I stated, I thought that she didn't understand



CHERYL PERICH
July 3, 2008

1    what I had been saying, so I was --

2  Q.  Right, that's fair, but at this point hadn't invoked

3    any rights under the disability act, had you?

4  A.  I thought she misunderstood me and I tried to explain

5    myself, that's why -- that's what this was about.

6  Q.  So is that a no?

7  A.  No, I had not invoked any rights under anything at

8    that point.

9  Q.  So you stated in your lawsuit that in January 2005

10    Perich informed Hoeft that she would be able to return

11    to work in the last two weeks of February 2005.

12    Shortly thereafter Hoeft informed a coworker that,

13    quote, I'm not a doctor but as sick as she (Perich)

14    been, I don't think that she'll be back this year and

15    probably not next year.  Who was that coworker that

16    Ms. Hoeft sent that to?

17  A.  Golly, that was so long ago that I don't remember who

18    the coworker was.

19  Q.  So you don't know who the coworker was?

20  A.  Well, I did at the time, but I can't remember now

21    because that was a long time ago.

22  Q.  You were told this statement by the coworker?

23  A.  I don't remember if I was told that by the coworker or

24    by someone who heard her tell it to the coworker.

25  Q.  Was it Ms. Mills?  If you don't remember you can say



CHERYL PERICH
July 3, 2008

1    you don't remember.

2  A.  I don't remember.

3  Q.  Do you remember me asking you earlier if you had

4    spoken with any other coworkers or employees at the

5    school other than Ms. Mills and you indicated you had

6    not?

7  A.  Right.

8  Q.  So are you changing that answer now that you might

9    have spoken with one other coworker?

10  A.  No.

11  Q.  Okay.  So then it would have been Ms. Mills that told

12    you about that statement?

13        MR. ROACH:  Objection, misstates her

14    testimony.

15  BY MR. WARE:

16  Q.  Well, was it -- well, no, you've already answered.

17    I'll go to another question.

18  A.  I did talk to some other people when I was at Pastor

19    Eggers' funeral, at the funeral dinner.

20  Q.  Do you remember when that was?

21  A.  No.

22  Q.  All right.  I guess -- do you know who you spoke to at

23    the funeral dinner?

24  A.  A lot of people.

25  Q.  Church members or school teachers?



Page 145

CHERYL PERICH
July 3, 2008

```
 1   A.   School teachers, school board members, school
 2        families, children that would come to me and talk to
 3        me.
 4   Q.   And so if Pastor Eggers' funeral was not in January of
 5        '05, then you would have -- you would not have known
 6        about this statement then, right, this would have been
 7        some statement that you somehow heard about later?
 8   A.   I don't know if I heard about it at Pastor Eggers'
 9        funeral or if I heard about it in a different way.  I
10        really don't remember when I heard about it.
11   Q.   Do you remember speaking with any other employees or
12        church members prior to January of '05 and prior to
13        Pastor Eggers' funeral?
14   A.   No.
15   Q.   Now, were you at the January 30th congregation
16        meeting?
17   A.   January 30, no.
18   Q.   Okay.  Were you informed that there was going to be a
19        congregation meeting on January 30th, if you remember?
20        I don't know if I looked at that or not.
21   A.   I'm not sure if I knew about it or not.
22   Q.   Okay.  And that meeting, do you remember what the
23        purpose of that meeting would have been or do you know
24        now what the purpose of that meeting would have been?
25   A.   I remember hearing at some of the other depositions
```



Page 146

CHERYL PERICH
July 3, 2008

```
 1        that they decided to change the disability policy and
 2        that they decided to ask Pastor Eggers and myself to
 3        ask for a peaceful release in exchange for us getting
 4        the -- our insurance paid for at the HMO rate and if
 5        we wanted -- my insurance was PPO, so I wanted to keep
 6        the same insurance I had to pay the remainder of my
 7        own cost through the end of that calendar year.
 8   Q.   Now, the January 30th meeting, congregational meeting,
 9        would actually have been only three days after they
10        had got a definitive return date for you, right, when
11        it was held, is that correct, from the 27th to the
12        30th?
13   A.   That's correct.
14   Q.   Do you remember testimony in prior depositions that
15        congregational meetings are announced two weeks
16        consecutively prior to the meeting before they're
17        held?
18   A.   They are supposed to be announced two weeks prior, but
19        they're not always announced two weeks prior.
20   Q.   But do you have any reason to believe in this instance
21        this meeting wasn't announced for two weeks
22        consecutive to the meeting?
23            MR. ROACH:  Objection, foundation.  She
24        wouldn't know one way or the other unless she went to
25        church.
```



Page 147

CHERYL PERICH
July 3, 2008

```
 1            MR. WARE:  I'm asking her does she have any
 2        reason to know?
 3   A.   I really don't know since I wasn't there.
 4   BY MR. WARE:
 5   Q.   What about through Ms. Mills?
 6   A.   She didn't tell me if it was or wasn't.
 7   Q.   Did you speak to Ms. Mills about the meeting?
 8   A.   I don't remember if we talked about it or not.
 9   Q.   Did you ask Ms. Mills to tell the congregation you
10        felt betrayed?
11   A.   No, I didn't.
12   Q.   Okay.  So if Ms. Mills went to the meeting and made a
13        statement saying that you felt betrayed, you don't
14        know where she would have gotten that from?
15   A.   I would -- I would probably guess that she probably
16        decided that if something like that were happening to
17        her that she would feel betrayed so she decided that I
18        would feel betrayed.  That's probably where it came
19        from.
20   Q.   But at this point you testified just recently that as
21        of the -- I believe you said it was the January 21st
22        e-mail you simply felt that Ms. Hoeft didn't
23        understand what you were saying about being able to
24        return to work, right?  You didn't express any
25        feelings of being betrayed by her asking for your
```

Page 148

CHERYL PERICH
July 3, 2008

```
 1        intentions?
 2   A.   As of what?
 3   Q.   As of January 21st, so you're saying you don't
 4        understand why Ms. Mills would have went and told them
 5        you felt betrayed, but I had asked you previously when
 6        you received the January 21st e-mail from Ms. Hoeft
 7        regarding your intentions whether or not you felt you
 8        were being discriminated against, and your response
 9        was I felt she didn't understand what I was saying
10        about being able to return?
11   A.   Well, based on the things she said in the letter it
12        sounded like she didn't understand, but I don't know
13        what Ellen was hearing at the meeting and based -- and
14        what comments people were making, and also the fact
15        that I later on found out that that was when they were
16        saying that they could be -- you know, they wanted me
17        to rescind my call in exchange for -- in order to keep
18        the same insurance I had, I had to pay a huge amount
19        of money.  And then they acted like they were doing me
20        a favor by paying the HMO rate but I still would end
21        up paying a lot of money to keep that insurance, and
22        they'd only be paying it until the end of the year and
23        I'd be out of a job when they had promised me I could
24        go back to work and I had already told them in
25        December it would be two to three months and prior to
```

CHERYL PERICH
July 3, 2008

1    that meeting I had given them -- well, yeah, prior --

2    prior to the -- I think it was prior to that meeting I

3    gave them -- prior to that meeting I gave them a more

4    exact date.  Prior to that meeting they knew that it

5    would be between the 14th -- February 14th and

6    February 18th, and when she said she was going to get

7    a sub for me she said the sub -- she'd be subbing for

8    me until I could return.

9        MR. WEAVER:  Just to clarify, I believe you

10   said a minute ago February 18th, but --

11 A.  February 14th to February 28th.  She'd been writing

12   get-well cards to me and the older kids that could

13   write would be writing get-well letters to me and

14   they'd be asking me are you coming back when you get

15   well and I'd be writing letters back to them -- I

16   didn't want -- it was too hard to write a letter to

17   each and every kid in every class, so I'd write a

18   letter to their classroom and I'd try to answer the

19   questions that they'd ask in their letters and say I'm

20   starting to get better now and say, yes, I am coming

21   back when I get well, I'm looking forward to seeing

22   you, because that was my understanding that I was

23   coming back.  She had told me that my classroom would

24   be there -- my position would be there for me when I

25   got well, told me there was going to be a sub in my

CHERYL PERICH
July 3, 2008

1    classroom and until you can return, so --

2  BY MR. WARE:

3  Q.  That's fine.

4  A.  -- I guess I can see where Ellen would feel that I

5    would feel I was being betrayed.

6        I never said that, but I can see where she

7    would feel that I would feel that way.

8  Q.  Okay, that's fine, you never said that.  I want to go

9    to your January 31st, 2005 e-mail and in particular --

10       MR. ROACH:  62?

11       MR. WARE:  Yes.

12 BY MR. WARE:

13 Q.  In particular I want to go to the last paragraph where

14   you go through some different suggestions I guess as

15   to regarding if you aren't able to teach.  Do you see

16   those?

17 A.  Yes, I do.

18 Q.  Okay.  Did you prepare this because you felt you

19   wouldn't be able to teach because of your condition,

20   because at this point you've already given them a

21   return date so you've already said, look, I should be

22   back between the 14th and the 28th.  And so now you're

23   kind of discussing if I'm not able to teach here's

24   some other ideas.  And so what I want to ask you is

25   were you given these ideas because you felt you might

CHERYL PERICH
July 3, 2008

1    still not be medically able to teach --

2  A.  No.

3  Q.  -- or was this because you had been informed there was

4    no position available as a teacher?

5  A.  No, I was not doing this because I was not going to be

6    medically able to teach.  I knew I'd be medically able

7    to teach.  Give me a minute and I'll show you why.

8    Okay.  Please look at number 60.  It's the e-mail from

9    Stacey -- from me to Stacey Hoeft from Thursday,

10   January 27, 2005 2:46 p.m. with 60 circled.

11       It reads, Stacey, I called Dr. Spitzer's

12   office today.  He says that I will probably be able to

13   go back to work on Monday, February 14th if everything

14   goes okay with the medication adjustments between now

15   and then.  There is a possibility that I might have to

16   return one or two weeks after that if there's a

17   problem with how I adjust to the next medicine, so

18   I'll see you sometime between February 14th and

19   February 28th.  Thanks for your prayers, Cheryl.

20       I was so excited to be able to give her that

21   news.  I thought she'd be excited for me also.  She

22   answers on the next one, item number 61, from Stacey

23   Hoeft sent Thursday, January 27, 2005, 7:18 p.m. to

24   Cheryl Perich.  Subject, Re:  More good news.  Cheryl,

25   why -- I mean, wow.  I am surprised to hear that you

CHERYL PERICH
July 3, 2008

1    will be able to return so soon.  It was just a few

2    days ago that you said that you were unable to

3    complete your disability forms because of the illness.

4    The medicine must be doing wonders.  How often are

5    you, quote, passing out?  I know that it's not really

6    passing out.  How do you term it now?  Is he going to

7    permit you to come back full time?

8        I, in parentheses, and the board especially,

9    closed parenthesis, am going to have so many questions

10   for you.  I guess I wonder how you're not permitted to

11   drive, yet you can be responsible for the safety of a

12   classroom of children.  You can see why I'd be

13   concerned.  Also I want to make it clear that when you

14   are able to return it will not be to teach third and

15   fourth grades.  First, I contracted Liz to teach until

16   June 15th and cannot take her job away.  Second,

17   because those children have already had two teachers

18   this year and having a third does not provide a good

19   learning environment for them, not to mention a bad

20   reputation for our school, we need to start thinking

21   about how we can include you back into our staff.  Let

22   me know if you have any suggestions.

23       Also I know that you will not be able to

24   just walk into a classroom and start teaching, no one

25   could.  You haven't even stepped foot into our





CHERYL PERICH
July 3, 2008

```
 1   building since last June.  There will have to be some
 2   major preparations to be made to provide a smooth
 3   return.  I'm sorry if I don't sound excited for you.
 4   I guess the administrator in me is nervous about how
 5   to make the best of the situation for everyone.  Of
 6   course I'm concerned for you, but please remember that
 7   my main concern as the principal is doing what's best
 8   for the ministry as a whole, especially my students.
 9        Please keep me informed as usual.  I will
10   pass this information along to the board of ed and the
11   board of directors.  I will keep you posted too.  Dan
12   and I are taking the kids to Niagara Falls for the
13   weekend.  I'll be back in time for the voters' meeting
14   on Sunday.  I just want you to know that so if you
15   e-mail me and I don't respond this weekend you'll
16   know why.  Have a great weekend.
17   Q.  Okay.
18        MR. ROACH:  Well, I think that she has to
19   now finish the -- answer the question.
20   A.  Now, this is -- I was under the understanding -- I was
21   so excited to give her this e-mail from January 27th
22   that, you know, I'm going to return sometime between
23   February 14th and February 28th, thought she'd be
24   really excited for me.  All along she's praying for me
25   and she's hoping I'm going to return, my job's waiting
```



CHERYL PERICH
July 3, 2008

```
 1   there for me, they have a sub in place until you can
 2   return.  Okay.
 3        Then I tell her that and all of a sudden I
 4   want to make it clear that when you return it will not
 5   be to teach third and fourth grades.  She's contracted
 6   Liz to teach until June 15th, which didn't make any
 7   sense to me.
 8   BY MR. WARE:
 9   Q.  So was that the first notification you got that there
10   was no position available for a third and fourth-grade
11   teacher.
12   A.  Yes, and then --
13   Q.  Had you threatened to file any lawsuit at that time?
14   A.  Excuse me, I haven't finished --
15   Q.  Well, Ms. Perich, Ms. Perich --
16   A.  I haven't finished answering your question.  Your
17   question was why did I --
18   Q.  I was going to withdraw it, but go ahead.
19   A.  Your question was why did I give all of these things
20   that I could do.  In this she said that I couldn't
21   come back to the third and fourth-grade position.  We
22   need to start thinking about how we can include you
23   back into our staff.  So I'm thinking, well, she
24   should be letting me go back into the third and
25   fourth-grade classroom because she promised me that.
```



CHERYL PERICH
July 3, 2008

```
 1   She just said that sub's there until I can return, but
 2   she's still going to include me back in the staff, she
 3   wants to know she can do it.  She says let me know
 4   if you have any suggestions, so --
 5        MR. WEAVER:  Just what date was that e-mail
 6   you just read from?
 7        THE WITNESS:  Thursday, January 27th, and
 8   it's number 61.  So she was going to be out of town
 9   for the weekend so I took the weekend to think about
10   the suggestions.  At 7:45 in the morning on Monday,
11   January 31 I answered her and I -- it's from Cheryl
12   Perich to Stacey Hoeft.  I said, you mentioned that
13   you were surprised that I would be able to come back
14   this soon because it wasn't very long ago that I
15   worked on my disability forms a little at a time.
16        Please remember that I had the flu,
17   underlined, along with still having a few of my
18   episodes.  I only mentioned that it had taken me a while to
19   fill out those forms because I wanted to let you know
20   that if I had been able to fill them out more quickly
21   it would have had the wrong information because I
22   didn't know about the 30 percent check stopping.  So I
23   was glad that I had only been able to work on them a
24   little at a time because that I hadn't mailed them in
25   yet and I could white out the response to the question
```



CHERYL PERICH
July 3, 2008

```
 1   about any other income since I had just found out that
 2   I wouldn't have any more income.
 3        She had said in hers that I couldn't fill
 4   out the form.  I just could but I was doing it a
 5   little bit at a time because I had the flu.  I have
 6   been continuing to call my episodes passing out
 7   because that is what it looks like and I knew that you
 8   were aware that it really wasn't passing out.
 9   BY MR. WARE:
10   Q.  Okay.  Ms. Perich, I want to stop you there because
11   your answer is no longer responsive to the question.
12   A.  Okay.  Now that later on I -- it says -- I went down
13   to the next paragraph.  It says you wanted me to give
14   you ideas of what I could do if I'm not teaching third
15   and fourth grade.  I do believe that I should still be
16   teaching third and fourth grade because you told me
17   that you were going to hire (inaudible) underlined
18   until I could come back.  Even though I believe that I
19   should be teaching that classroom, I will give you
20   ideas of what I could do if I'm not teaching those
21   grades, parenthesis, since that's what you asked, end
22   parenthesis, period.  And I listed seven different
23   ideas.
24   Q.  So let me ask you this, why didn't you simply file a
25   lawsuit for breach of contract?
```



CHERYL PERICH
July 3, 2008

```
 1   A.   I continued to try to work this out with the school.
 2        I did not want to file a lawsuit.
 3   Q.   Okay.  But --
 4   A.   I continued to try to work it out.
 5   Q.   Okay.  That's fine, maybe that's a legal decision.
 6   A.   At that point that we're at there in the e-mails I was
 7        still trying to work it out.
 8   Q.   Right, so I guess the gist of my question is these
 9        aren't accommodations that you need and are requesting
10        because of your condition, these are simply other
11        duties you can be given as an employee, right?
12   A.   Yes.
13   Q.   Was that the purpose of this?
14   A.   Right, she wasn't -- I was supposed to be -- come back
15        to my class and she wouldn't allow me to do that, but
16        I was still going to be an employee, so I could -- she
17        said you can come back, we're going to work you back
18        in, but help me think of some other things you could
19        do, so I did.
20   Q.   Now, and this was January 31st, right, when you gave
21        the list of other things you could do as an employee?
22   A.   I closed it up.
23   Q.   It's number 62?
24            MR. ROACH:  You said the word suggestions?
25        Did I --
```



CHERYL PERICH
July 3, 2008

```
 1            MR. WARE:  I said the list of other things
 2        you could do as an employee.
 3   BY MR. WARE:
 4   Q.   62?
 5            MR. ROACH:  January 31st, the long one.
 6   A.   Okay.
 7   BY MR. WARE:
 8   Q.   All right.  And so we saw previously that there was a
 9        congregation meeting on January 30th, and I guess you
10        learned later on that the results of that meeting were
11        to request a peaceful release, right?
12   A.   However -- I did learn that later on, however Stacey
13        knew three days prior to that that I had given her a
14        return date -- return-to-work date of between
15        February 14 to between February 28, and she didn't
16        want to return me back to my classroom even though she
17        had promised that and she told me that the sub was
18        only going to be subbing until I could return to work.
19        But even though she said she -- she wasn't going to
20        let me return to my classroom, she offered to have me
21        do other things -- other things in the building as --
22        still as a Hosanna-Tabor employee as long as I gave
23        her ideas, came up with some ideas of other things I
24        could do.
25   Q.   Is it correct to say you felt Stacey had broke her
```



CHERYL PERICH
July 3, 2008

```
 1        word --
 2   A.   Definitely.
 3   Q.   -- when she told you you would have a position there
 4        waiting for you?
 5   A.   Yes.  She should have informed the voters of that,
 6        should have informed the voters at that meeting of
 7        what I told -- what I had -- whether the information
 8        that I gave her three days prior that those -- that
 9        the return-to-work date between February 14 to
10        February 28th, instead of this stuff that we saw in
11        there when we did the other deposition, we saw it said
12        that I wouldn't be able to return to work that year or
13        the following year.  She had knowledge that the doctor
14        had said it would be between February 14 and
15        February 28.
16   Q.   Now, in the January 31 --
17   A.   She should have told them that she'd offered to let
18        me -- if I couldn't teach in that classroom she should
19        have told them that I'd offered -- that she had asked
20        me to come up with ideas of other things I could do,
21        and I've done that.  I don't think that's --
22   Q.   You felt she broke her word?
23   A.   Yes.
24   Q.   Okay.  In the e-mail number 64 Ms. Hoeft basically
25        tells you she wants you to start having -- and I don't
```



CHERYL PERICH
July 3, 2008

```
 1        know if she puts it in this one, having communication
 2        with Jim Pranschke or she -- I think she mentioned
 3        Scott in here.  But in essence the e-mail is saying,
 4        well, don't contact me no more, right?
 5   A.   Uh-huh.
 6   Q.   Did you try to contact her after that e-mail?
 7   A.   I don't think so.
 8   Q.   Okay.  Did you at some point start --
 9   A.   I did contact her the one time by e-mail, and that was
10        the evening before I went into work that I contacted
11        her on February 24th.
12   Q.   Other than that was there any other time that you
13        tried to get in touch with her?
14   A.   I don't think so, not that I remember, because I was
15        told not to.
16   Q.   Now, at this point had you given them a decision on
17        your peaceful release?
18   A.   No.
19   Q.   All right.  Had you been informed at this point that
20        the congregation had voted to ask for your peaceful
21        release?
22   A.   No.
23   Q.   When did you first get informed that the congregation
24        had voted to ask for your peaceful release?  And, I
25        mean, if it will help you you have an e-mail, and I
```



CHERYL PERICH
July 3, 2008

```
 1     think it's dated February 21st, where you say, I've
 2     decided to not ask for a peaceful release.  So do you
 3     remember when you were first informed -- I'm assuming
 4     it would have been by Jim -- that, okay, there's been
 5     a vote -- or Scott, that they want you to ask for a
 6     peaceful release?
 7  A.  Scott contacted -- Scott called my house and he told
 8     me that he wanted to -- he wanted to -- he and Tom
 9     Pichan wanted to talk to me about my -- no, that
10     doesn't even answer your question.  I thought you
11     meant something else.  Excuse me.  The first time I --
12     the first time I can remember hearing about it was at
13     the February 13 meeting.
14  Q.  Do you remember being contacted by Scott sometime
15     between -- between either February 7th and
16     February 9th regarding setting up a meeting with you,
17     him and Tom?
18  A.  Yes, Scott wanted to meet -- Scott wanted to meet with
19     me and bring Tom along, and I said I didn't have any
20     problem with him bringing Tom, but I really preferred
21     to meet with the whole school board and Jim Pranschke,
22     so I said, how about this, how about I just come to
23     the school board meeting because I know there's a
24     school board meeting scheduled for this coming Monday.
25     I said school board meetings are always on the second
```



CHERYL PERICH
July 3, 2008

```
 1     Monday of the month, so there was supposed to be a
 2     school board meeting on the 14th.
 3  Q.  Do you know if that's why Jim Pranschke was at that
 4     school board meeting on the 14th was because you asked
 5     that he be there?
 6  A.  I thought -- at the time I thought that he was -- that
 7     was why he was there, but I'm not sure because hearing
 8     his testimony in his deposition he said that --
 9  Q.  All right.  Well, let's not go by his testimony.
10  A.  He said that sometimes he goes to school board
11     meetings.  Other times I didn't -- when I have -- as a
12     teacher you're supposed to go to a certain amount of
13     school board meetings in a year.  When I've been to
14     school board meetings other times he wasn't there, but
15     that doesn't mean he wasn't there on other occasions
16     when I wasn't there.  So I thought he was there
17     because I requested him.  He could have been there
18     otherwise even if I didn't.  I don't know.
19  Q.  Did you also request that Ms. Mills attend the school
20     board meeting?
21  A.  I did request that.
22  Q.  And that request was denied?
23  A.  It was denied.
24  Q.  Did they tell you why, I mean, did they say because it
25     was a closed meeting?
```

CHERYL PERICH
July 3, 2008

```
 1  A.  I asked Scott.  Scott didn't know what to say, so he
 2     said I'll have to ask Jim.  And he called me back the
 3     following evening and he said Jim Pranschke said it
 4     would be inappropriate.
 5  Q.  Okay.  Prior to the February --
 6  A.  I really don't understand what would be inappropriate
 7     about a fellow teacher being at that meeting.
 8  Q.  Okay.  Prior to the February 13th meeting did you meet
 9     with Jim and Stacey alone?
10  A.  No, I did not.
11  Q.  Okay.  So when you met with them what would that have been
12     at the board meeting?
13  A.  Yes.
14  Q.  What happened at the February 13th board meeting?
15  A.  Well, the first thing, Scott presented a letter to me
16     and read it stating that they wanted me to request a
17     peaceful release and in exchange for that they would
18     pay my medical benefits at the HMO rate and if I
19     wanted to continue getting the PPO I'd have to pay the
20     difference, and that would be until -- through
21     December of that year.
22         And then I asked to speak and they -- I
23     presented my back-to-work slip.  I had the original
24     and I had lots of copies, and I asked -- I passed out
25     the -- a pile of copies.  I passed them around the
```

CHERYL PERICH
July 3, 2008

```
 1     table and I asked them who wants the original.  No one
 2     replied.
 3  Q.  The original, meaning the small return-to-work thing?
 4  A.  The original return-to-work from my doctor.  I asked
 5     them who would like to have the original.  I didn't
 6     know if it should go over to the school board
 7     chairperson or the president of the congregation or
 8     the principal.  So I said, who would like the
 9     original?  No one replied, so I put it in the middle
10     of the table in case someone decided to take it later.
11     At the end of the meeting no one had picked it up so
12     I took it with me.  But everyone got a copy, everyone
13     who was there got a copy of the return-to-work slip.
14     I made sure that everyone had one in front of them and
15     then they passed me back the extras.
16         They wanted to -- I told -- they saw that
17     narcolepsy was on there.  They wanted to know what
18     narcolepsy was and what the symptoms of narcolepsy is
19     and -- much as you were asking earlier.  And so I gave
20     them a full description, even more full than what I
21     gave today, gave them -- you know, answered all their
22     questions about it, and then I let them know that I've
23     been on medication and I'm completely free of
24     symptoms, the medication completely controls my
25     symptoms.  And they said they didn't see how I could
```



CHERYL PERICH
July 3, 2008

1    be -- see -- didn't see how I could take care of the
2    children and be sure that the children could be safe
3    if I couldn't even drive a car.
4  Q.  When you said they, did anybody in particular say that
5      at the meeting, if you remember?
6  A.  I think it was Stacey, but I'm not sure.  I'm like
7      99 percent sure it was Stacey.  And I said, well, I'm
8      not -- the doctor doesn't want me to drive a car yet
9      even though I'm -- even though I'm episode free and he
10     knows I'm not going to have any more episodes, but
11     that's only because I'm a little on the weak side
12     because I haven't been doing a lot of things.  He
13     wants me to get my strength back before I start
14     driving, and he had said a few days before I go back
15     to work I could start driving around the neighborhood
16     and then the day I go back to work I'll be fine to
17     drive to work.
18 Q.  Did they --
19 A.  And then Mr. Ostrander said, Cheryl, I wouldn't drive
20     even if the doctor says you could drive.  You've got
21     to think about your -- your own safety and the safety
22     of others around you.  And I said if -- I said,
23     Dr. Spitzer is not only a neurologist, he's a
24     neurologist that other neurologists send their
25     patients to when they can't figure out things.  He's



CHERYL PERICH
July 3, 2008

1    very good.  There's no way that he's going to
2    jeopardize my life and the lives of other people
3    around me by telling me I can drive if there's any
4    possibility that I'm going to have any of these
5    episodes while I'm driving.  So if Dr. Spitzer tells
6    me I can drive, I know that I'm not jeopardizing my
7    life or anybody else's life.
8        And Mr. Ostrander continued to say, I still
9    think that no matter if a doctor tells you to or not,
10   I wouldn't drive until you're back on that medicine a
11   lot longer and you know for sure that you're not going
12   to have any more episodes, even if the doctor says you
13   can drive.  I said, the doctor has assured me that the
14   medicine is working and will continue to work, and I'm
15   not jeopardizing anyone's life.
16       And then Stacey said there are parents in
17   this building that are -- that would be -- that would
18   be afraid to see you in this building.  I said, well,
19   the good thing to do is to let me be in this building
20   and let them see how healthy I am and that nothing
21   happens and then they wouldn't be afraid to see me in
22   the building.
23       Then Sheila Simpson said, well, you
24   haven't -- you haven't been symptom free for long
25   enough to even know that medicine's going to -- she



CHERYL PERICH
July 3, 2008

1    says, I've -- Sheila Simpson says, I have a medical
2    background and I know that you haven't been symptom
3    free for long enough to know that you are not going to
4    start having episodes again, and what if you need to
5    change -- and what if you need to have a different
6    dose?  What if it starts -- this amount of the
7    medicine doesn't work anymore and you need to change
8    your dose and then you start having symptoms because
9    you need a different amount of dose, what then?  She
10   said, I think you need to be symptom free for at least
11   three months before I'd want you to come back.  And a
12   lot -- most of the board agreed with her on that.
13       And then she says, but if I had a child in
14   that classroom I'd want you to be symptom free for at
15   least six months but probably a year before you came
16   back.  And then the board started arguing with me over
17   when I started the medicine.  They said you haven't
18   even been on the medicine long enough to be well
19   enough to come back.  You didn't start the medicine
20   until January.  I said, no, I started the medicine in
21   December.  They said, well, we've been looking through
22   your e-mails so we know you started in January.  I
23   said, well, you know, I might not have mentioned
24   starting it in December, but I know when I started the
25   medicine, I started my medicine in December.



CHERYL PERICH
July 3, 2008

1        And they kept arguing back and forth with me
2    on when I started my medicine and how long I had I'd
3    been on medicine and the fact that I just could not
4    have been well enough this soon to be able to come
5    back.  So they were totally convinced that even though
6    my doctor gave me a note with no restrictions at all
7    saying that on February 22nd I could come back, they
8    are all convinced that I was still in a disabled
9    state, I still had problems, there's no way I could
10   come back.
11 Q.  Now, did they also tell you at the meeting that there
12     was no job for you to return to?
13 A.  Scott Salo did say that, and that was only after
14     everybody went for a long time on this other thing
15     about all my health problems and gave all the reasons
16     why I couldn't come back.  So that was the board --
17     the consensus of the board was I couldn't come back
18     because of all my medical problems which they
19     perceived me to still have which I no longer had.  Not
20     only was my narcolepsy under control, I no longer had
21     irregular heartbeat and I no longer had asthma.
22 Q.  Did they also tell you they couldn't promise you a
23     position in the next school year at that time, not
24     that you wouldn't have one but they couldn't promise
25     you one?



CHERYL PERICH
July 3, 2008

1   A.   Yes, I said -- they -- Scott said, we don't have a

2     position for you.  Then Stacey said, we contracted Liz

3     until June 15th, and I said, yes, and you promised me

4     she was just going to be a sub.  Jim says a long-term

5     sub, and I said, but, Jim, you might not understand

6     this because you're not in education, but a long-term

7     sub means one week or longer, and she would have been

8     here longer than one week.  And subs usually like

9     long-term sub positions, even if it's only one week

10     because they're in the same classroom every day for

11     even a week, and that's wonderful instead of going

12     from room to room or building to building.

13     So that's -- so I said this is not what you

14     promised.  I said, okay, so let's -- I said, let's

15     talk about next year, if you've already done this,

16     which you told me you weren't going to do.  Would I be

17     able to be coming back next year?  And Scott says,

18     well, you know we never know how many teachers we're

19     going to need the next year.  And I said, that's true,

20     it depends on how many students we have.  But I want

21     to know if we had the same approximate amount of

22     students, give or take a few, and we needed the same

23     amount of teachers would you ask Liz Gavern to come

24     back first or would you ask me to come back first?

25     And Stacey shoved her chair back and said, well, I



---

CHERYL PERICH
July 3, 2008

1     don't know how good Liz Gavern is compared to you yet

2     because she hasn't been here very long, so I can't

3     make the decision yet.

4     I'm a called teacher.  I'm supposed to be

5     called to that position until some other school calls

6     me.  She was only supposed to be a sub until I

7     returned from disability leave.  She's only contracted

8     until June 15th, but now she's telling me it all

9     depends how good she is compared to me and whether or

10     not she's going to be there the following year.

11     So I said, well, let's go -- let's talk

12     about this in a different way.  It seems like most of

13     you are concerned over my ability to work even though

14     my doctor says that there's no problem with me

15     working.  And it seems the consensus of the board that

16     you want me to be symptom free for three months.

17     Well, three months and the school year is going to be

18     out.  So if I were symptom free for three months then

19     would you agree to give me a position, granted there

20     is one, but over Liz who was only just contracted to

21     be here for next year?

22     Stacey says, well, how can we do that?

23     Well, what if you were -- what if you were symptom

24     free for three months and then so we'd say, okay, you

25     have a teaching position now, and then what if one day



---

CHERYL PERICH
July 3, 2008

1     after three months you've have an episode and then

2     you'd say, well, you told me you'd have a teaching

3     position?  I said, Stacey, my doctor has assured me

4     I'm not going to have any more episodes and that's not

5     going to happen.  And I said, we can even put in there

6     episode free until the beginning of the school year if

7     you want to because there's not going to be any more

8     episodes.  She says, well, we're not going to do that.

9   Q.   So was it your impression that prior to the meeting

10     they had already made up their mind not to bring you

11     back the next year?

12   A.   I really don't know, but at that meeting it certainly

13     seemed that they all felt that I was too sick to come

14     back to work even though --

15   Q.   Isn't is true you stated --

16   A.   Even though I was -- even though I was -- even though

17     my doctor said that I was fine to go back to work with

18     no restrictions.

19   Q.   But isn't it true you state in your lawsuit at

20     paragraph -- I believe it's paragraph 12, at the

21     beginning of the meeting Salo gave Perich a written

22     proposal wherein Perich would resign if the church

23     paid part of her medical insurance for a limited time.

24     It says in response Perich provided the board with a

25     copy of her return-to-work, so before you ever



---

CHERYL PERICH
July 3, 2008

1     provided them with your return-to-work they already

2     had a written proposal asking for your peaceful

3     release?

4   A.   Yes, they did.

5   Q.   When did you first get a doctor's excuse authorizing

6     you to go back to work?

7           MR. WEAVER:  A doctor's excuse?

8   BY MR. WARE:

9   Q.   Or a doctor's note saying you could return to work?

10   A.   It's called a return-to-work slip from the doctor.

11   Q.   When did you first get your return-to-work slip from

12     the doctor?

13   A.   I don't recall exactly what day it was on.  I really

14     don't remember.

15   Q.   You had it on February 13th which you just testified

16     to so do you remember whether or not you got it a day

17     before that or a week before that or --

18   A.   I just stated I don't remember.

19   Q.   Do you remember how many days before it?  I'm not

20     trying to get the exact date.

21   A.   I don't remember.

22   Q.   Do you remember whether or not you got one or two

23     doctor's return-to-work slips?

24   A.   I've got this -- I don't understand why you'd be

25     asking me if I got a different return-to-work slip.  I



Page 173

CHERYL PERICH
July 3, 2008

```
 1        gave you this return-to-work slip that the doctor gave
 2        me and said that I could go back to work on the 22nd.
 3   Q.   Did you get one or two return-to-work slips from your
 4        doctor, if you remember?
 5   A.   I don't remember getting any other return-to-work slip
 6        besides this return-to-work slip.
 7   Q.   Besides the February 13th return-to-work slip?
 8   A.   No, the February 22nd return-to-work slip.
 9   Q.   All right.  But one you passed out February 13th?
10   A.   Yes.
11   Q.   That said you could return to work February 22nd?
12   A.   Right.
13   Q.   Did you get any other letters from your doctor saying
14        you could return to work February 2nd?
15   A.   When I was -- yes.
16   Q.   Okay.  And when was that?
17   A.   On February 21.
18   Q.   Okay.  And is that this letter here that I'm showing
19        you?
20   A.   Yes.
21   Q.   Do you remember what time in the day you got that on
22        February 21?
23   A.   No.
24   Q.   Did you ever give this to anyone at Hosanna-Tabor?
25   A.   No.
```



---

Page 174

CHERYL PERICH
July 3, 2008

```
 1   Q.   Why not?
 2   A.   They had -- at the school board meeting they had -- I
 3        had told them that if -- they wouldn't let me come
 4        back to work, I was going to be out without any money
 5        coming in because my doctor had told me I could return
 6        to work and my -- so I wasn't going to be getting
 7        disability.
 8             And Sheila said, I know how doctors do,
 9        doctors work with patients.  If you -- you can just go
10        to your doctor and say that your employer says that
11        you need to be symptom free for three months and then
12        they'll extend your disability, so I -- she says -- so
13        they all agreed I needed to go talk to my doctor --
14        go -- I need to call my doctor.  Well, I tried calling
15        my doctor and he wasn't there that week and the
16        next -- but his office manager said he can't take care
17        of things like that over the phone, so she gave me an
18        appointment for Monday morning.
19             And when I talked to him on Monday he said,
20        I can't extend your disability when you're well and
21        able to work.  And then I said to him, I haven't made
22        my full decision yet but I -- I don't -- I'm thinking
23        I might not ask for the peaceful release, and if I
24        don't -- no, wait a minute, that's not how it -- oh,
25        that's what -- that was later on I was thinking of
```



---

Page 175

CHERYL PERICH
July 3, 2008

```
 1        that -- about -- no.  I just told him, I said, they
 2        wanted me to come in on the 21st.  They might want a
 3        letter -- they might want a letter from you so that
 4        they know I've actually come and talked to you about
 5        this.  He said, why would they want a letter?  I've
 6        already given you a return-to-work slip.  I said,
 7        well, just to verify that I actually came to your
 8        office.
 9   Q.   Let me stop you.  Who wanted you to come in on -- you
10        said the 21st --
11   A.   Well, they wanted me to --
12   Q.   -- I'm assuming you meant the 22nd?
13             MR. ROACH:  They, who?  Spitzer's office?
14   A.   Yeah, Spitzer's office.
15   BY MR. WARE:
16   Q.   Well, you said they might want a letter, so I'm saying
17        who?
18   A.   Sheila Simpson told me to go to my doctor's office --
19        to call my doctor's office and try to get him -- and
20        tell him that I needed my disability extended because
21        she says, I have a medical background and I know how
22        doctors do these things.  You just tell him your
23        employer needs you to be symptom free for three months
24        before you can return to work and they'll extend your
25        disability.
```



---

Page 176

CHERYL PERICH
July 3, 2008

```
 1             So I talked to Jim Pranschke the following
 2        evening and I said that doesn't sound -- that kind of
 3        sounds illegal to me to ask someone -- ask a doctor to
 4        change his records and ask him to put you back on
 5        disability when you're really able to work, and I
 6        said, that's probably why it took me so long to get
 7        approved for disability is because people probably do
 8        stuff like this and try to be on disability when
 9        they're not really disabled.  I said, do you really
10        think I should do that because Sheila says to do it
11        and the rest of the board is agreeing with her.
12             So I asked Jim because he's the president of
13        the congregation.  I said do you really think I should
14        do this, it sounds like it might be illegal?  And he
15        says, well, go ahead and call the doctor and see what
16        he says.  So he still wanted me to do it.
17             So I called, he wasn't there that week.  The
18        office manager said with something like that he can't
19        handle it over the phone, you're going to need to meet
20        with him.  And he wasn't there that whole week, that's
21        the first time I could meet with him was
22        February 21st.  So I just asked him for some kind of a
23        letter showing I had met with him.  So that's the
24        letter he gave me.
25             Well, I came in the next -- when I came in
```



Page 177

CHERYL PERICH
July 3, 2008

```
 1    the next -- came in later on in the day I still was
 2    undecided most of the day and it was -- that's why the
 3    e-mail was later because I still was undecided for
 4    quite a while.  So when I decided not to take the
 5    peaceful release and I knew everybody had the
 6    return-to-work slip so that was -- that would be the
 7    end of my leave, so I came in to work -- I came in the
 8    next day.
 9            I didn't even think about giving it to --
10    you know, I got that in case anybody asked for a
11    letter or something showing I had been to him.  She
12    didn't ask -- Stacey didn't ask for it and I didn't
13    even think about giving it to her because she was --
14 Q. Did you have this on you on February 22nd, did you
15    have this letter with you?
16 A. She was yelling at me and just, you know --
17            MR. ROACH:  Well, he's got a question.
18 BY MR. WARE:
19 Q. Did you have that letter with you on February 22nd
20    when you came in?
21 A. I think so.  I don't remember if I -- I know he had
22    to -- he said he would be -- he would be transcribing
23    it at the end of his day, not right after the time I
24    saw him, and then his secretary would be typing it.
25    So I don't really remember if I went and got it at the
```



Page 178

CHERYL PERICH
July 3, 2008

```
 1    end of the day or I got it the next day, but even if I
 2    had it that day I'm sure I wouldn't have remembered to
 3    give it to her because she was yelling at me so much,
 4    so --
 5            MR. ROACH:  Okay.  Wait for a question.
 6 BY MR. WARE:
 7 Q. Okay.  And then so you sent an e-mail that evening.
 8    Is that when you had first made up your mind not to
 9    take the peaceful release?  I believe we looked at
10    that.  That was at --
11 A. That's when I had gotten --
12 Q. -- February 21st around 9:03 p.m.?
13 A. That's when I had finally made my decision.  I had
14    been trying to make my decision all this time.
15 Q. So at this point when you send this at 9:03 p.m. do
16    you go back and refer to the employee manual with
17    regards to once your leave expires you can be
18    considered a voluntary termination?  Well, let me ask
19    you this.  Is this when you made up your mind that you
20    had to report the next day because of what was in the
21    manual or simply because that was what your return to
22    work was and you were just going to return to work?
23 A. I think it was both.
24 Q. Do you remember whether you referred to the manual
25    that evening before you came in?
```



Page 179

CHERYL PERICH
July 3, 2008

```
 1 A. I don't remember.
 2            MR. ROACH:  All right.  We're at a pause.
 3    It's about five minutes to 4:00.  What are your
 4    thoughts as far as completing the deposition, how much
 5    time?  I've lost my secretarial staff at 3:30.  Let's
 6    take a break.
 7            (Recess taken at 3:54 p.m.)
 8            (Back on the record at 4:04 p.m.)
 9 BY MR. WARE:
10 Q. I think my last question I just want to know is your
11    version of the events of February 22nd, exactly what
12    happened?
13 A. I came in at 7:15 and quietly looked at the children's
14    artwork in the hallway.  One of the teachers unlocked
15    the door to the teachers' workroom where we were going
16    to have devotions.  I walked in there and Ms. Gavern
17    introduced herself to me and I introduced myself to
18    her and we sat next to each other, and -- oh, before I
19    went in Becka (phonetic) came up to me and gave me a
20    hug and said she was so glad to see me.
21            Then we went in there and we had devotions.
22    At some point during the time, I don't remember if it
23    was before or after, Jim Hoeft took out his cell phone
24    and went into the hallway to make a phone call.  I
25    think it was before but I'm not sure.  After devotions
```



Page 180

CHERYL PERICH
July 3, 2008

```
 1    were over Stacey arrived and she handed out some
 2    yearbook pages and told the teachers to look at them
 3    and check them for mistakes and she asked me to come
 4    into her office.  And she said, would you come into my
 5    office.  I said, sure, and we -- we quietly walked
 6    across the hall to her office.
 7 Q. The devotion room, is that the room off from the gym?
 8 A. That's the room we used to use for devotions and I
 9    don't know if they might be currently using it --
10 Q. Probably, yeah.
11 A. -- but at that time they were using the room that they
12    were at that time calling the teacher workroom.
13            It was a room, a small room, that was next
14    to -- a very small room that was next to the
15    kindergarten room.  It used to be used as a resource
16    room at one point.
17 Q. Okay.  Is that --
18 A. They were using it as a teacher workroom that year.
19 Q. Is that the entrance where the office is at, the
20    entrance next to the school office, it's the room by
21    that entrance?
22 A. Right, yes.
23 Q. Okay.  So there's a room over there by the school
24    office that they were using back there?
25 A. It's across the hall from the school office, next to
```



CHERYL PERICH
July 3, 2008

```
 1        the kindergarten room.
 2   Q.   Right.  Now, was latchkey in session at the time?
 3   A.   Yes, it was, but I didn't walk anywhere near the
 4        latchkey.  I walked down the hall and looked at the
 5        artwork past where they were.
 6   Q.   Was latchkey still located next to the office back
 7        then?
 8   A.   Right in the preschool room.
 9   Q.   Right.  Okay.
10   A.   I just, you know, walked past them and --
11   Q.   So what happened after Stacey asked you to come into
12        the office?
13   A.   She shut the door and started yelling at me.
14   Q.   All right.  What was she yelling at you about?
15   A.   She said, I don't know why you're here, you know we
16        don't have a position for you.  There's no reason for
17        you to be here.  What do you think you're doing coming
18        in this school and disrupting things.
19             I said, I didn't disrupt anything.  I came
20        in quietly and enjoyed devotions with the teachers and
21        came in here when you asked me to come in here.
22   Q.   So at some point where did she get the idea you
23        wouldn't leave without a note, I mean, at some point
24        did she ask you to leave?
25   A.   Yes, at some point she did.
```



CHERYL PERICH
July 3, 2008

```
 1   Q.   All right.  And what did you reply?
 2   A.   I replied that I wanted something in writing showing
 3        that I had been there.
 4   Q.   So you just wanted something in writing showing you
 5        had been there?
 6   A.   Uh-huh.
 7             MR. WEAVER:  You have to say yes or no.
 8   A.   Yes.
 9   BY MR. WARE:
10   Q.   This is -- is that what you were given -- and this has
11        previously been marked, I'm not sure.  It's a letter
12        dated February 22nd on plain paper with no letterhead
13        addressed to you?
14   A.   Yes, she gave me this.
15   Q.   And was that -- did that satisfy you as to something
16        in writing showing you had been there?
17   A.   Yes.
18   Q.   Now, the rest of the language in there, do you know
19        why they put that in there?  Let me rephrase the
20        question.
21             Do you know why they wouldn't have simply
22        wrote a letter saying this is to verify that
23        Ms. Perich came into work today and we asked her to
24        leave if all you asked for was something showing you
25        had been there?
```



CHERYL PERICH
July 3, 2008

```
 1   A.   Well, I didn't really think it was improper
 2        notification because she had asked me to -- she had
 3        asked me to communicate with her via e-mail, and when
 4        I was in her office she told me that I -- that I had
 5        used her work e-mail.  Well, that's the e-mail we had
 6        been communicating all along was her work mail and she
 7        had been answering the working e-mail both from work
 8        and from home --
 9   Q.   That's fine.
10   A.   -- and she'd answered it both --
11   Q.   That's fine, Ms. --
12   A.   She'd answer it in the evening --
13   Q.   Let me stop you.
14   A.   -- at this time of the evening often --
15   Q.   Let me stop you.
16   A.   -- and later than this.
17   Q.   I'm not trying to make any --
18   A.   Lots of times after she put her kids to bed she'd
19        answer this.
20             MR. WEAVER:  Cheryl, you have to let him ask
21        a question.
22   BY MR. WARE:
23   Q.   I'm not trying to make any kind of characterization as
24        to any of the language used in there about improper
25        notification and all that.  I don't care about that.
```



CHERYL PERICH
July 3, 2008

```
 1        The only thing I'm trying to ask you about was you
 2        didn't ask for the rest of this information, did you,
 3        you said you just wanted a letter saying you had been
 4        there?
 5   A.   Right.
 6   Q.   Okay.  So about how long were you there before they
 7        gave you the letter, and by they I mean Stacey and
 8        then at some point Scott showed up?
 9   A.   Yes.
10   Q.   About how long were you there before Scott showed up?
11   A.   I don't remember how long I was there before she
12        called him, but when she called him he was there
13        within minutes.
14   Q.   Were you sitting there when she called him?
15   A.   Yes.
16   Q.   Okay.
17   A.   She did not call enough numbers to have -- to have
18        been able to call him at home.
19   Q.   Okay.  I don't know what that means.
20   A.   Well, you know, there's a certain amount of numbers
21        you call if you're going to call an inside line and
22        you have to dial or push on a push-button phone more
23        numbers if you're calling someone at home.
24   Q.   So you're saying from the number of numbers dialed you
25        have to assume he was in the building somewhere?
```



CHERYL PERICH
July 3, 2008

```
1   A.   Oh, yes, from the amount of numbers dialed he was in
2        the building, and also from the amount of time he took
3        to arrive he was in the building.
4   Q.   Okay.  So from when you arrived to when you got this
5        letter how long do you think you were there?
6   A.   Well, I arrived at the school at 7:15 and I'm --
7        golly, when did I leave?  I'm thinking it might have
8        been somewhere between 8:45 and 9:00 when I left.  She
9        gave me -- after they finished doing the letter and
10       proofreading the letter and signing the letter and she
11       gave me the letter, asked me if I wanted to say
12       anything else, and I said, yes, I'd like to give the
13       insurance payment to you and I'd like a receipt, so
14       that took a little bit of time.  So we got that taken
15       care of, and so I'm thinking it was somewhere between
16       8:45 and 9:00 when I left.  And then she told me I was
17       no longer welcome in the school, you are not to
18       return -- not to come into this school ever again.
19  Q.   Did she ask for your keys?
20  A.   No.
21  Q.   Has anyone ever asked you to turn in your keys?
22  A.   Yes.
23  Q.   Okay.  Have you turned them in?
24  A.   No.  Until recently I thought that they were lost
25       somewhere in the school.  I had no knowledge that I
```



CHERYL PERICH
July 3, 2008

```
1        had them.  I had looked -- searched and searched for
2        them on the day that -- on the last day that I had
3        worked there and I still thought they were lost
4        somewhere in the school.
5             MR. ROACH:  I have the key.
6   BY MR. WARE:
7   Q.   I was going to say did your attorney ever tell you we
8        wanted the keys?
9   A.   Well, I just recently found them and Jim's got them.
10  Q.   Okay.  Now, after that did you at some point call
11       Bruce Braun?
12  A.   Yes, I did.
13  Q.   And that was after the 22nd?
14  A.   No, it was before.
15  Q.   It was before the 22nd?
16  A.   Stacey, when I was in her -- I don't remember if it
17       was in an e-mail or when I was in her office, but I
18       know that Stacey told me that she has consulted Bruce
19       Braun during this process and Bruce Braun would be
20       glad for you to call him and consult with him as
21       well --
22  Q.   Okay.  So --
23  A.   -- so I still hadn't made the decision up even part
24       way through the day on the 21st, and I had -- I was
25       supposed to let Jim Pranschke know, you know, on the
```

CHERYL PERICH
July 3, 2008

```
1        21st --
2   Q.   Okay.  I'm just asking you this.
3   A.   -- so I called --
4   Q.   Cheryl, I'm trying to move along.
5   A.   -- Bruce Braun on the 21st.
6   Q.   On the 21st?
7   A.   Uh-huh.
8   Q.   Of February or January, if you remember?
9   A.   February.
10  Q.   Okay.
11  A.   That was when I had to make the decision.
12  Q.   Did you call him again after what happened at the
13       school?
14  A.   No.
15  Q.   Okay.  Did you get through to him on the 21st of
16       February?
17  A.   No, I left a voicemail.  I called his office, he
18       wasn't in, they gave me his cell phone number, I
19       called his cell phone, I left a voicemail.  He chose
20       to never return my call from then until now.
21  Q.   What did you say in the voicemail?
22  A.   I said, Bruce, this is Cheryl Perich from
23       Hosanna-Tabor.  I need to talk to you.  Please return
24       my call.
25  Q.   Okay.
```

CHERYL PERICH
July 3, 2008

```
1   A.   Oh, please return my call as soon as possible.
2   Q.   Did you tell him that you were having a problem or you
3        were trying to return to work?
4   A.   I wanted to talk to him about that when I actually
5        talked to him.
6   Q.   Did you at any point contact Bruce about instituting a
7        grievance procedure against the school?
8   A.   That's the only time I called him.  I was waiting for
9        him to call me back.  He has never called me back.
10  Q.   When you got the letter from Stacey on the 22nd did
11       you at any time mention to her that you wanted to
12       start a grievance procedure against the school?
13  A.   I did not know there was a grievance procedure.
14  Q.   So that's a no, you didn't ask about that?
15  A.   No.  I couldn't because I didn't know there was one.
16  Q.   When did you first find out that there was a grievance
17       procedure?
18  A.   2008.
19  Q.   So nobody ever informed you prior to that time that
20       you had the right to request a grievance procedure
21       through the school and the synod?
22  A.   No.
23  Q.   And that includes your attorney?
24            MR. ROACH:  I'm sorry, what?
25  BY MR. WARE:
```



CHERYL PERICH
July 3, 2008

1  Q.  I just asked her did that include her attorney that

2      nobody told her she had a right to a grievance

3      procedure?

4  A.  He wouldn't know about the procedures that the

5      Lutheran Church, Missouri Synod has.

6          MR. ROACH:  If I had said anything it would

7      be attorney/client privilege anyway.

8          MR. WARE:  You can't blame me.

9  BY MR. WARE:

10  Q.  Have you been back to the school any time since

11      February 22nd?

12  A.  I went back when I was told that I could come back to

13      get my personal belongings from my classroom.

14  Q.  Have you attended the church any time since

15      February 22nd?

16  A.  Yes.  Stacey did tell me that I could attend church

17      there.  I told her that she wasn't being fair to the

18      children to not allow me to come back into the school

19      because they had been praying for me to get well, and

20      now that I'm well they're not -- not only is she not

21      allowing me to have my job back, she's not even

22      allowing those kids to see me well after they had been

23      praying for me while I was sick.  So she said, well,

24      I'm still not going to allow you to come into the

25      school, but if you want those kids to see you well you



CHERYL PERICH
July 3, 2008

1      can come to the church.

2          So I went to -- well, and she also told me

3      they were going to have a meeting on that following

4      Sunday, so I went to church there the following Sunday

5      because I thought there was going to be a meeting.

6      Come to find out, there was no meeting scheduled, so I

7      went that following Sunday and I also went on Lutheran

8      schools week Sunday because she said it would be a

9      good idea to go when the kids were going to be there

10      so the kids could see me well.

11  Q.  You mean the Sunday following the 22nd?

12  A.  Uh-huh, because she told me there would be a meeting

13      about me.

14  Q.  And then you went again --

15  A.  And then there wasn't.

16  Q.  -- on Lutheran schools week?

17  A.  Uh-huh.  She suggested I go when the kids were there

18      because I told her I wanted kids to see me well since

19      they had been praying for me so long.  And she said

20      you can come there.  Not all of the kids in the school

21      go to our church, so I figured that was the time that

22      I should go so they could see the person well that

23      they had been praying for to get well, and that's the

24      time they'd all be there.

25  Q.  Okay.  My final question is on the 22nd, and I believe



CHERYL PERICH
July 3, 2008

1      this would have been in a phone call that evening, you

2      spoke with Stacey that evening on the telephone?

3  A.  She called me that afternoon.

4  Q.  That afternoon?  Was that the first time you informed

5      Stacey that if you didn't get your job back you were

6      going to file a lawsuit?

7  A.  Yes.

8  Q.  Did you inform anybody else of that besides Stacey?

9  A.  No.

10  Q.  Did you specifically ask her to let the board and the

11      school know as well?

12  A.  I didn't ask for her to do that.  She said she was

13      going to do that.

14          MR. WARE:  Okay.  I don't have any further

15      questions.

16          MR. ROACH:  I have no further questions.

17          MR. WEAVER:  I don't have any.

18          (The deposition was concluded at 4:21 p.m.

19      Signature of the witness was not requested by

20      counsel for the respective parties hereto.)

21

22

23

24

25

CERTIFICATE OF NOTARY

STATE OF MICHIGAN  )
                   ) SS
COUNTY OF OAKLAND  )

        I, CHERI L. GLEYRE, a Notary Public in

and for the above county and state, do hereby

certify that the above deposition was taken before

me at the time and place hereinbefore set forth;

that the witness was by me first duly sworn to

testify to the truth, and nothing but the truth;

that the foregoing questions asked and answers made

by the witness were duly recorded by me

stenographically and reduced to computer

transcription; that this is a true, full and correct

transcript of my stenographic notes so taken; and

that I am not related to, nor of counsel to either

party nor interested in the event of this cause.


                    _Cheri L. Gleyre_
                    CHERI L. GLEYRE, CSR-6548
                    Notary Public,
                    Oakland County, Michigan


My Commission expires: May 9, 2013



CHERYL PERICH
July 3, 2008

```
 1                    INDEX TO EXAMINATIONS

 2

 3   Witness                                    Page

 4   CHERYL PERICH

 5

 6   EXAMINATION

 7   BY MR. WARE:......................................   5

 8

 9                    INDEX TO EXHIBITS

10

11   Exhibit                                    Page

12   (Exhibits attached to transcript.)

13

14   DEPOSITION EXHIBIT A.............................. 114

15   DEPOSITION EXHIBIT B.............................. 116

16

17

18

19

20

21

22

23

24

25
```



BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888